# EXHIBIT 5

REDACTED VERSION

OF DOCUMENT SOUGHT TO BE SEALED



801-297-1850
111 South Main Street, Suite 600
Salt Lake City, Utah 84111
www.maschoffbrennan.com

L. Rex Sears
rsears@mabr.com

October 26, 2020

**Via E-Mail**

Elizabeth Day
*eday@feinday.com*
FEINBERG DAY KRAMER
ALBERTI LIM TONKOVICH & BELLOLI
577 Airport Boulevard, Suite 250
Burlingame, CA 94010

**Re:**   *Wapp Tech Ltd. Partnership, et al. v. Seattle SpinCo, Inc., et al.*, **4:18-cv-00469-ALM (E.D. Tex)**

Elizabeth,

Late in the afternoon of Thursday, October 22, you emailed a proposed agenda for discussion during the meet-and-confer call we had already arranged for Friday morning. I write to memorialize our Friday morning call, as it relates to your Thursday afternoon agenda.

**"Document Production"**

Your agenda begins with 16 bullet points under the heading "Document Production." Below I list each of those items, together with a summary of the result of our discussion and, sometimes, additional context.

*"… customer-specific RFI/RFQ/PRD/SOW documents …"*

Your predecessor, Bob Harkins, first raised this issue in an email dated September 8, to which I replied the next day asking Bob to identify particular customers. Over the next couple days, Bob and I exchanged further emails, resulting in a list from Bob of 180 "exemplary customers." In an email dated September 11, I told Bob that was not feasible and suggested. "we should have a call, as our emails may be 'talking past' each other." Bob said, "[l]et's set a time Tuesday" (i.e., September 15) and asked for my availability. I told Bob I was tied up over lunch "but otherwise flexible." Bob never got back and the call never happened.

More than two weeks went by before Bob raised the issue again, in a letter dated September 27 (a Sunday). I replied the next day, renewing my suggestion that we talk and offering to talk at 9 a.m. the next morning. Bob waited until Thursday, October 1 to ask for my availability "tomorrow [Friday] afternoon" or the following Monday. A call was arranged for Monday afternoon. Just as that call was to start, Bob emailed that "something came up." I replied by offering some times to talk the next

day. Finally, Tuesday afternoon, Bob got back and we arranged a call for Wednesday, October 7—nearly four weeks after I had first invited the discussion.

During my October 7 call with Bob, I explained that Micro Focus had already produced the materials from which so-called "pitches" are generally composed, and the burdens associated with customer-specific content. Bob asked and I agreed that Micro Focus search for customer-specific content for Bank of America, Wells Fargo, and ▇▇▇▇▇.

Two weeks later, on Wednesday, October 21, you sent a list of 20 customers—Bank of America, Wells Fargo, and ▇▇▇▇▇ plus 17 others—for which customer-specific content was desired. When you and I spoke on Friday, I conveyed the same general background information I had conveyed to Bob and I also reported that: in-house counsel had contacted more than 20 people and spent well many hours trying to track down customer-specific documents for Bank of America, Wells Fargo, and ▇▇▇▇▇ all that effort yielded meager results, consisting of a small handful of documents; and those documents had been produced. You and I agreed that you would review those documents to see if they contained anything beyond the source material previously produced that would justify extending the search to any of the other customers on your list of 20.

"*Issues raised on Items 4-5 on page 3 of September 27 letter*"

The September 27 letter in which Bob resurrected the issue of customer-specific pitch material also asked for production, in native format, of certain Excel documents and about "internal links and other data sources" in another Excel document. I explained during our call this past Friday that the requested natives had already been produced, before Bob sent his September 27 letter, and had been produced again, in response to his September 27 letter. I also reported that Micro Focus had no additional information or documents for the "internal links and other data sources."

"*Product specific cost/profit margin data for the Accused Products …*"

As I previously explained to Bob and reiterated during our call on Friday, Micro Focus has produced data relating to cost and profit margin for the accused products at the level of granularity at which those are tracked.

"*Updated version of MFDEFS00160452 for 2012-present …*"

So far as I can tell, this was not raised before you sent your agenda last Thursday afternoon. This document already runs through 2019, and 2020 reporting will not be available until sometime after FY 2020 closes on October 31.

"*Underlying data sources … and internal links/references to other data … referenced in MFDEFS00160452*"

As above in connection with the "September 27 letter," Micro Focus had no additional information or documents for the "internal links and other data sources."

additional burden considerations relating to the bank defendants. Then you moved on to other topics, without reaching any resolution or even determining whether an impasse has been reached. Thus this issue stands where it has these past several months: we await your clients' articulation of good cause, upon receipt of which we are ready and willing to engage further.

            Sincerely,

            MASCHOFF BRENNAN

            *L. Rex Sears*

c: Timothy Devlin, *tdevlin@devlinlawfirm.com*
  Deron Dacus, *ddacus@dacusfirm.com*
  Clyde Siebman, *clydesiebman@siebman.com*
  *FDALB-Wapp@feinday.com*