```
 1                  UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF TEXAS
 2                        SHERMAN DIVISION

 3     WAPP TECH LIMITED PARTNERSHIP   | DOCKET 4:18CV469
       AND WAPP TECH CORP.             |
 4                                     | MARCH 5, 2021
       VS.                             |
 5                                     | 8:32 A.M.
                                       |
 6     SEATTLE SPINCO, INC., ET AL     | SHERMAN, TEXAS

 7     ------------------------------------------------------------

 8             VOLUME 5 OF 5, PAGES 1198 THROUGH 1380

 9             REPORTER'S TRANSCRIPT OF JURY TRIAL

10

11          BEFORE THE HONORABLE AMOS L. MAZZANT, III
            UNITED STATES DISTRICT JUDGE, AND A JURY

12     ------------------------------------------------------------

13

14     APPEARANCES:

15     FOR THE PLAINTIFFS:

16                      DERON R. DACUS
                        THE DACUS FIRM
17                      821 ESE LOOP 323, SUITE 430
                        TYLER, TEXAS  75701
18
                        ROBERT F. KRAMER
19                      MARGARET ELIZABETH DAY
                        DAVID L. ALBERTI
20                      SAL LIM
                        RUSSELL STEVEN TONKOVICH
21                      MARC C. BELLOLI
                        SVEN RAZ
22                      ANDREW GRANT HAMILL
                        ROBERT Y. XIE
23                      FEINBERG DAY KRAMER ALBERTI LIM
                        TONKOVICH & BELLOLI
24                      577 AIRPORT BOULEVARD, SUITE 250
                        BIRLINGAME, CALIFORNIA  94010
25
```

```
 1   FOR THE DEFENDANTS:

 2                        HARRY LEE GILLAM, JR.
                          ANDREW THOMPSON "TOM" GORHAM
 3                        GILLAM & SMITH
                          303 SOUTH WASHINGTON AVENUE
 4                        MARSHALL, TEXAS  75670

 5                        L. REX SEARS
                          ALEXIS K. JUERGENS
 6                        MASCHOFF BRENNAN - SALT LAKE CITY
                          111 SOUTH MAIN STREET, SUITE 600
 7                        SALT LAKE CITY, UTAH  84111

 8                        BARRY KENNETH SHELTON
                          BRADLEY DALTON COBURN
 9                        SHELTON COBURN LLP
                          311 RR 620 SOUTH, SUITE 205
10                        AUSTIN, TEXAS  78734-4775

11

12   COURT REPORTER:   CHRISTINA L. BICKHAM, CRR, RDR
                        FEDERAL OFFICIAL REPORTER
13                      101 EAST PECAN
                        SHERMAN, TEXAS  75090
14

15

16
         PROCEEDINGS RECORDED USING MECHANICAL STENOGRAPHY;
17      TRANSCRIPT PRODUCED VIA COMPUTER-AIDED TRANSCRIPTION.

18

19

20

21

22

23

24

25
```

1          (Open court, all parties present, jury not

2    present.)

3          THE COURT:  Are we ready to begin?

4          Let's go ahead and bring the jury in, then.

5          (The jury enters the courtroom, 8:35 a.m.)

6          THE COURT:  Please be seated.

7          Welcome back, ladies and gentlemen.

8          Mr. Dacus, if you want to continue.

9          MR. DACUS:  Thank you, your Honor.

10         THE COURT:  Oh, yes, sorry.  Let's make sure the

11   witness is in the box.  I forgot that one minor detail.

12         You understand you're still under oath?

13         THE WITNESS:  Yes, sir.

14         THE COURT:  Okay.  Just pull the mic down.

15         Go ahead, Mr. Dacus.

16         MR. DACUS:  Thank you, your Honor.

17         CONTINUED RECROSS-EXAMINATION OF CLARKE NELSON

18   BY MR. DACUS:

19   Q.  Good morning, Mr. Nelson.

20   A.  Good morning, Mr. Dacus.

21   Q.  Just a few topics to finish up here and a few

22   questions, if that's okay.

23   A.  Sure.

24   Q.  In the course of your work, sir, that you've done, are

25   you or are you not aware that Micro Focus increased the

1  price of LoadRunner in 2018?

2  A.  I've heard some assertions to that.  I don't recall

3  looking at the pricing guides to ascertain one way or the

4  other.

5       What I did observe is the total revenue for

6  LoadRunner from year over year between those two time

7  periods.  There's a slight bump.  I don't recall it being

8  significant.

9  Q.  So if, indeed, Micro Focus increased the price of

10  LoadRunner in 2018, that's not something that you've looked

11  at in detail; is that fair?

12  A.  Like I said, I'm aware of some of that discussion.

13  Probably not aware of it in great detail, other than I've

14  looked at the aggregate revenues and did not observe a

15  significant bump.

16  Q.  Understood.

17       Because you understand, sir, that part of the

18  dispute here is that Micro Focus says we started giving

19  away Network Virtualization for free in November of 2018.

20  That's their position, correct?

21  A.  I understand it was included in a bundle, in effect,

22  yes.

23  Q.  Right.  And you understand we say no, although you say

24  you included it in a bundle and you gave it away for free,

25  that's really a little deceptive -- or a lot deceptive,

 1  from our perspective.

 2          You understand that's our position, correct?

 3  A.  I understand you just stated that.

 4  Q.  Okay.

 5          MR. DACUS:  Can we pull up D-82, please.

 6  BY MR. DACUS:

 7  Q.  D-82 is this document that we were starting to look at

 8  late yesterday.  Do you remember that, Mr. Nelson?

 9  A.  I recall looking at a document that had the same, once

10  again, blue background with Micro Focus logo.  If this is

11  the same one, I accept your representation.

12          MR. DACUS:  Can you show the entirety of the front

13  page, please, Tom.

14  BY MR. DACUS:

15  Q.  You remember, sir, that this is a document that comes

16  from Micro Focus' internal files.  You remember that?

17  A.  I don't know if it's from their internal files or where

18  it was obtained.  It does have a Micro Focus Bates number

19  on there.

20  Q.  And when you say "a Micro Focus Bates number," that's a

21  document that Micro Focus produced, according to this

22  Court's orders, in this case, correct?  You know enough to

23  know that.

24  A.  That would be my understanding of the procedural

25  logistics of the document coming to light.

1    Q.  And you know this is a document -- or maybe you don't

2    know.  You can confirm it or not -- that this is an

3    internal document that Micro Focus circulated among it and

4    its management team within Micro Focus.

5         Do you know that?

6    A.  I'd have to look more into the following pages to see

7    if that's confirmed, that it was something that was

8    circulated within internal management and who it was

9    circulated among.

10   Q.  Okay.

11        MR. DACUS:  Can you go to the Bates number ending

12   in 29994, please, Tom.

13        And can you blow up that box so we can read it

14   better, please, sir.

15   BY MR. DACUS:

16   Q.  You see this pricing proposal within this Micro Focus

17   memo, and I want to focus you on the fourth bullet point

18   there.  It says, "In order to justify the price increase to

19   existing customers, Network Virtualization will be provided

20   by default."

21        Do you see that?

22   A.  I do see those words.

23   Q.  So the way I read that is, although Micro Focus has

24   been here telling this jury that Network Virtualization has

25   no value, what they were saying internally to themselves

1    is, hey, we can increase the price of our LoadRunner

2    product and the justification is Network Virtualization.

3         Is that how you read that?

4    A.  I'm not sure.  You know, I can't necessarily interpret

5    what that group of individuals that you suggest may have

6    been involved in writing these words.

7         The top of the page does say "pricing proposal."

8    I'm not aware that it was implemented.

9         And, like I said, in the actual accounting data, I

10   don't see a measurable increase in the revenue from

11   LoadRunner.

12   Q.  We can at least agree that what somebody at Micro Focus

13   said is we're going to justify increasing the price of

14   LoadRunner, and we're going to use Network Virtualization

15   as the justification.

16   A.  I think we can agree that the words say what they say.

17   If we interpret that as a hope or as a proposal or

18   something they considered, those are all, I think,

19   questions that remain.

20   Q.  And I guess it begs the question -- since Micro Focus

21   has told this jury repeatedly that Network Virtualization

22   has no value -- it begs the question of how much of a price

23   increase would it warrant, doesn't it?

24   A.  I don't know.  Like I said, I can't observe an actual

25   increase in revenue, and that would be a direct

Jury Trial, Volume 5                    1205

1   relationship if -- if there were a price increase, I would

2   expect to see some kind of measurable increase in the

3   revenues to coincide with that.

4            MR. DACUS:  Can you turn to the next page, Tom.

5            And can you blow up the top half of that box,

6   please.

7   BY MR. DACUS:

8   Q.  So this is the very next page of that document, where

9   they talk about the price increase for the LoadRunner

10  product.

11           On the left column there, sir, is the original

12  price.  Let's just take the top line.  $2.46, do you see

13  that?

14  A.  I do.

15  Q.  And the new proposed price is $4.92.

16           Do you see that?

17  A.  That isn't -- there isn't a header that says that, but

18  I guess we can deduce that.  I'm not sure.

19  Q.  The next line says the old price was 5, and they're

20  going to raise it to 10.

21           Do you see that?

22  A.  I see those numbers.

23  Q.  I'm not the smartest guy in this courtroom, as I've

24  already proven, but that looks like they're doubling the

25  price to me.

Jury Trial, Volume 5                    1206

1             Is that what it looks like to you?

2   A.  Well, again, it says "proposed."  It doesn't say that

3   they did.

4             And, again, what I observe in the historical

5   accounting records is consistent revenue year over year.

6   Q.  So, in this courtroom, Micro Focus has said to this

7   jury Network Virtualization is worthless; but to

8   themselves, in private documents that they never thought

9   would see the light of day in this courtroom, what they

10  were saying to themselves is if we include Network

11  Virtualization that justifies doubling the price of

12  LoadRunner.

13            Isn't that where we wind up, sir?

14  A.  Those words you just spoke don't appear on this page.

15  I see "current and proposed price."  That's what I see.

16  Q.  Beyond that, you just don't know one way or the other;

17  is that fair?

18  A.  No.  I don't think it's entirely fair.  As I said, I've

19  looked at the actual total revenues, and I don't see an

20  increase from year over year.

21            MR. DACUS:  That's all I have, your Honor.  I pass

22  the witness.

23            THE COURT:  Okay.  Thank you.

24            Additional questions?

25            MR. SEARS:  No, your Honor.  Thank you.

```
 1              THE COURT:  Okay.

 2              Okay.  Ladies and gentlemen, if you have a

 3    question, or not, please fold a piece of paper and pass it

 4    over to the court security officer.

 5              Can I have counsel approach?

 6              (Bench conference, off the record.)

 7              THE COURT:  Okay.  The jurors' questions have

 8    already been asked, so I don't need to ask it again.

 9              So -- the juror noticed that.

10              So you can step down.

11              THE WITNESS:  Thank you.

12              THE COURT:  Okay.  What's next for the defense?

13              MR. SEARS:  Defense rests, your Honor.

14              THE COURT:  Very good.

15              What's next for the plaintiffs?

16              MR. ALBERTI:  Your Honor, plaintiffs call Dr. Sam

17    Malek for rebuttal testimony.

18              THE COURT:  Sir, you understand you're still under

19    oath that you took the other day?

20              THE WITNESS:  Sorry?

21              THE COURT:  You understand you're still under oath

22    from the other day?

23              THE WITNESS: Yes, your Honor.

24              THE COURT:  Okay.  Go ahead.

25                              *
```

1           DIRECT EXAMINATION OF SAM MALEK

2          CALLED ON BEHALF OF THE PLAINTIFF

3    BY MR. ALBERTI:

4    Q.  Good morning, Dr. Malek.  I know it's been a long week,

5    and we'll try to keep this as brief as possible.

6          But do you understand we're allowed to present

7    some response to some of the arguments we've been hearing

8    from Micro Focus over the course of this trial at this

9    time?

10   A.  Yes, sir.

11   Q.  Are you prepared to do that today?

12   A.  I am.

13   Q.  I'd like to just start out by, at the very beginning,

14   how you performed your analysis.

15          I found it very interesting, yesterday, when I was

16   questioning Micro Focus' expert, and I asked why didn't he

17   look at source code, why didn't he do independent testing.

18   And his answer was that he was hired to, quote, look for

19   errors in your report.

20          What were you hired to do in this case?

21   A.  I was hired as an independent expert to determine

22   whether the three patents that we've been talking have been

23   infringed by Micro Focus and its products, and also opine

24   on the validity of the patents.

25   Q.  Were you asked to come up with a predetermined result

Jury Trial, Volume 5                    1209

1    when you were hired?

2    A.  No, sir.

3    Q.  We've heard a lot, again, about how Micro Focus'

4    products operate, whether they can test applications,

5    whether they can emulate.  Were you able to investigate all

6    of those issues in this case?

7    A.  Yes, sir.

8    Q.  And what sort of evidence did you consider when you did

9    this investigation?

10   A.  So, first and foremost, I reviewed the source code of

11   the products that were made available to me.  So this was

12   basically the source code of the accused products, all

13   versions of the products, during the infringement period.

14   They were provided on a computer by Micro Focus to me.

15          They were also provided to the opposing expert,

16   Dr. Shoemake.  I understand he didn't review those.  I

17   reviewed all the source code.

18          I reviewed the documents, all the documents

19   produced in the case.  I reviewed the datasheets, the user

20   guide.

21          I confirmed the information in those documents are

22   accurate based on my analysis of the source code.  So I

23   corroborated the data, different inputs to my analysis.

24          I reviewed various deposition testimonies.

25          I used the product myself.  As you know, I created

1   videos, and I showed the jury that I used and tested the

2   products myself.

3           You know, and I also did my own research on

4   websites.  Tried to find publicly available information

5   about the products.

6           So the data points that went into my analysis were

7   multifaceted.  I looked at various data points, tried to

8   correlate source code with the document information.

9           And, yes, so that's an overview of the work that

10  I've done.

11  Q.  And now that we've gotten, I guess, a little more

12  information about these products and how they work, I'd

13  like to kind of, I guess, go back to the beginning and

14  maybe you can just step the jury again through some

15  screenshots of one of your tests to just kind of hit some

16  key points that you noticed when you were testing these

17  products.  Is that fair?

18  A.  Yes.

19  Q.  Can you explain to the jury again what this test was

20  and how you began.

21  A.  Sure.  So these are basically slides that I showed

22  earlier.  The first -- I guess it was on Tuesday was when I

23  first testified.  This is actually screenshots of the tests

24  that I've done.  So these are my tests using the products.

25  These are not coming from documents.

1           And in the first step of the test when I used the

2   product, what I did here is I chose a device for testing.

3   So, in this case, I chose a Nexus 6 device.  And you can

4   tell that that is the device that I've chosen because there

5   is a green highlighted lock at the bottom, so that's the

6   device that I've locked for my testing.

7   Q.  And we heard a lot about the need to show resources of

8   the device.  During your test, were you able to select

9   resources; and, if so, what did you select?

10  A.  Yes, sir.  So this is the second step that I performed

11  with the accused product.  You can see on the right-hand

12  side there is a panel, collect data on.

13          So, here, you can go choose the resources of the

14  mobile device.  In this case, CPU, memory, free memory or

15  consumed memory.  These are the resources that you choose

16  to collect data so you can emulate them and display them

17  during the execution of the test.

18  Q.  What did you do after you selected the device to test?

19  A.  Sure.  So the third step is I basically go to that

20  Network Virtualization panel that you see on the right-hand

21  side.  I enable it by clicking the check box, and I choose

22  the specific network profile -- network characteristic that

23  I would like to simulate.

24          And as you can see there are various options

25  available.  In this case I chose a 4G typical connection

Jury Trial, Volume 5                    1212

1    for simulation.

2    Q.  And, finally, when you run the test, what do you

3    ultimately see?

4    A.  So this is ultimately -- after you have set this up,

5    this is where I am executing the test as the application is

6    running.  So the application is running, as you can see on

7    the right-hand side.  You see the phone with the number 2

8    in it, that's one of the screens of the application.

9          You can see, as the application is running, I'm

10   able to -- the product displays these resources of the

11   mobile device that are being simulated; in other words,

12   being emulated.  You can see the word "simulation" in the

13   panel itself, in the control panel next to the phone.

14         You can see the device metrics, CPU, central

15   processing unit, memory.  These are resources of the mobile

16   device that are being emulated and being displayed as

17   required by the invention.

18         On the left-hand side, we are looking at another

19   type of resource.  This is the throughput of the device.

20   We know it is the throughput of the mobile device because

21   it says client, client.  And client is basically, in the

22   client server model that we've been talking about, client

23   is always the mobile device.  So whenever you see the word

24   "client," that's mobile device, and server is the back end.

25         So, in this case, you can see that, as I'm

Jury Trial, Volume 5                                    1213

 1  executing the test, we are able to see various resources of

 2  the mobile device being simulated and being displayed.

 3  Q.  Now I'd like to talk about some of the specific errors

 4  that Dr. Shoemake says that he found in your analysis.  If

 5  we could go over each one so you could respond to the jury

 6  and let them know your position on those.

 7  A.  Yes.

 8  Q.  We'll start with the first one.  Dr. Shoemake said that

 9  the accused products don't, quote, emulate -- or, I'm

10  sorry -- don't have a application for a mobile device.

11          Starting with the actual language of the claim,

12  why is Dr. Shoemake wrong?

13  A.  Well, he's not reading the preamble of the claim

14  correctly.  The preamble of the claim is the first bullet

15  here.  It says:  "A system for developing an application

16  for a mobile device."  The preamble -- that's the preamble

17  of '192.

18          The other ones -- the other two says:  "A system

19  for testing an application for a mobile device."

20          So what is claimed is a system for developing an

21  application, not an application for a mobile device.  He's

22  taking a portion of the preamble for his analysis; he's not

23  taking the entirety of the preamble for his analysis.

24  Q.  We also heard from Mr. Bachar.

25          Do you recall that?

Jury Trial, Volume 5                    1214

1    A.  Yes, sir.

2    Q.  And he was discussing the types of applications that

3    their products test, and he was asked, "How many different

4    types of mobile applications are there?"

5         And he responded, "There are mainly three."  And

6    then he discusses those three.

7         Can you explain to the jury what the differences

8    are between these three and how they work with the accused

9    products.

10   A.  Sure.  So we heard testimony from Mr. Bachar.  That's

11   one of Micro Focus' engineers.  He provided testimony

12   through video.

13        And the question was asked from him:  How many

14   different types of mobile applications are there?

15        And he said, "There are mainly three.  The first

16   one will be a native application.  The second one will be a

17   Mobile Web application.  And the third one will be

18   hybrid-based application."

19        And so the difference between these is that a

20   native application is an application that is native to the

21   device.  So, for example, an iOS application only executes

22   on iOS, versus an Android application only executes on a

23   Android device.  That's a native application.

24        Then you have a second category of mobile

25   applications, which are called Mobile Web applications.

Jury Trial, Volume 5                        1215

1   These are applications that can execute on different kinds

2   of devices.  They use Web technology.

3           And the third category is a hybrid, where it is

4   basically combination of native and Web technology for

5   constructing apps.

6           Now, the importance of this is that one of the

7   questions that may have come up is why there are two mobile

8   testing protocols in the case that I've pointed to, because

9   different protocols of the Micro Focus product is used for

10  testing different kinds of application.

11          So there is the native mobile testing protocol,

12  which is used for testing a native and hybrid-based

13  applications, and there is the mobile TruClient protocol

14  that is used for testing of Mobile Web applications.

15  Q.  I believe Dr. Shoemake specifically took issue with

16  whether or not, in that second case, the Mobile Web

17  application, whether you actually tested a mobile

18  application or whether -- I think he called it a Firefox

19  browser.

20          How do you respond to that?

21  A.  Again, you know, with all due respect to Dr. Shoemake,

22  he misrepresented my infringement analysis here.

23          My infringement analysis is not that I'm testing

24  the browser; I'm testing the Bank of America application

25  that is shown here.  So this is a Mobile Web application.

Jury Trial, Volume 5                         1216

1           As Mr. Bachar testified, this is one category, one
2    important category of mobile applications.  It's a Mobile
3    Web application where the implementation of the application
4    is through Web technology.
5           He misrepresented my opinion that I'm opining that
6    I'm testing the browser.  I'm testing the Bank of America
7    application in this experiment that I've done here.
8    Q.  And how do you know that by looking at this picture?
9    A.  Well, you can see Bank of America in the right-hand
10   side.  That's the -- and I think the test that I actually
11   did was to put in a ZIP code.  In the Bank of America
12   application, there is a place where you can search for your
13   local bank branch.  And I put in a ZIP code and I searched.
14          And we have a video of that, but we didn't have
15   time to show it to the jury.  But I've actually recorded
16   another video for that.
17   Q.  There was also some question about whether Micro Focus'
18   products could be used to develop applications.  How do you
19   respond to that?
20   A.  Well, my opinions are that the products are used for
21   development.  Development, as I've testified, involves
22   writing of the source code and testing of the source code.
23          And Micro Focus' own documents agree with my
24   understanding of software development.  Here, you can see
25   on the right-hand side, they say, "...integrations to

Jury Trial, Volume 5                    1217

 1    support end-to-end mobile app development."

 2           And if you look below that, the first bullet, it

 3    says, "...to record and run load and performance tests for

 4    mobile apps."

 5           So Micro Focus' own documentation confirms my

 6    opinion that testing is part of software development.

 7    Q.  Another theme that we've heard from some of Micro

 8    Focus' witnesses are, well, this is just a datasheet.  It's

 9    a marketing document.  We just give these two to our

10    customers.

11           How do you respond to that?

12    A.  Yes.  So I've heard testimony that these are marketing

13    documents, but you have to -- well, first of all, I have

14    not only relied on marketing documents, I've also relied

15    on -- in addition to source code, I've also reviewed user

16    guide, which is a technical document.

17           But some of the material that I've relied on, some

18    of it is marketing documents.  There are two points to be

19    made about this.

20           One is that a marketing team is not going to

21    create a document without consulting the engineers in the

22    company, because marketing folks are going to have to know

23    what the product does.  They talk to engineers, they figure

24    that out, and they write it.  So there is a collaborative

25    effort that goes into producing marketing documents.

Jury Trial, Volume 5                    1218

1            The second point to be made here is that you have

2    to consider who are the customers of LoadRunner?  Who are

3    the customers of Micro Focus products?  They are engineers,

4    right?

5            So the person that is going to go and look at

6    these marketing documents to determine if they actually

7    want to purchase that product is an engineer, is a software

8    engineer.

9            So these marketing products are written in a

10   technical way.  They are technical documents because they

11   are intended for consumption by software engineers.

12   Q.  So, with respect to Dr. Shoemake's first issue

13   regarding the application and ability to develop it with

14   Micro Focus' products, did you determine that limitation in

15   the preamble is infringed; and if so, for which products?

16   A.  Yes.  I determined that it's infringed, and it's

17   infringed by all the products.

18   Q.  I'd like to move on to the next issue he raised with

19   your analysis.  And I believe he said that the accused

20   products are not, quote, a software authoring interface.

21            How do you respond to that?

22   A.  Well, I disagree with him.

23   Q.  And why do you disagree with him?

24   A.  I think we have -- yes.  So a software authoring

25   interface basically means a software development

 1  environment, which involves writing source code and testing

 2  the source code.

 3       And I've showed lots of evidence to the jury as to

 4  Micro Focus' own documents that describe their tools as

 5  tools for software development and for testing.

 6  Q.  We see an excerpt from a LoadRunner User Guide.  Can

 7  you explain how this supports your determination that Micro

 8  Focus' products do include a software authoring interface.

 9  A.  Right.  So this is LoadRunner User Guide that talks

10  about VuGen.  VuGen is a virtual user generator.  It's the

11  tool that you use to create the test script.  You saw that

12  in my video, but you also saw that in Mr. Staten's video

13  that he had prepared.

14       So, as you may recall, in VuGen, that's where you

15  actually create the script, the test script.  And so it

16  satisfies the notion of a software authoring interface

17  because you are developing the test script for software

18  development.

19  Q.  And, for the record, I believe you are reading from

20  PX-40.  That's at dash 42; is that right?

21  A.  Yes, sir.

22       MR. ALBERTI:  Tom, can we get the next slide?

23  BY MR. ALBERTI:

24  Q.  I think we've got another document.  Again, this is

25  from the LoadRunner User Guide, PX-40.  It's at dash 55.

Jury Trial, Volume 5                    1220

1          Can you explain how this shows that the accused

2    products do, in fact, include a software authoring

3    interface.

4    A.  Yes.  So, again, in addition to the videos that I

5    showed to the jury, and also Mr. Staten himself showed

6    videos of using VuGen to edit and create test scripts, here

7    is explicit statement from LoadRunner User Guide that says:

8    VuGen's editor enables you to edit recorded scripts.

9          So if you are editing these scripts, you are

10   obviously authoring the -- it meets the limitation of a

11   software authoring interface.

12         MR. ALBERTI:  Can I get the next slide, Tom.

13   BY MR. ALBERTI:

14   Q.  So, based on your analysis, were you able to determine

15   that the accused products infringe this limitation; and, if

16   so, which products?

17   A.  Yes.  They infringe, and all of the products infringe.

18         MR. ALBERTI:  Next slide.

19   BY MR. ALBERTI:

20   Q.  The next issue that Dr. Shoemake took with your

21   analysis was that he claims the accused products do not

22   meet the, quote, one or more profile display windows

23   limitation.

24         Do you agree with that?

25   A.  I don't agree with his opinion, no.

1    Q.  And to refresh everyone's recollection we know there

2    was a Court's claim construction for this term.  Can you

3    explain -- or is that your understanding of the

4    Court's claim construction that we see here?

5    A.  Yes.  So this is -- this is Court's construction of

6    this part of the claim language.  Basically, the Court has

7    provided clarification as to what is the meaning of that

8    highlighted text.

9         And the Court has construed that to mean "emulate

10   simultaneously, and display one or more windows showing

11   resources of the mobile device that are available to the

12   application."

13        The Court has also construed "emulate" to mean

14   "simulate."  And so that is the Court construction that

15   I've applied in my analysis.

16   Q.  And were you able to determine that the accused

17   products, in fact, do satisfy this claim limitation?

18   A.  Yes.

19   Q.  So with reference to your test -- this is PX-35-291 --

20   can you explain how this, in fact, does include display

21   windows that emulate and show resources of the mobile

22   device.

23   A.  Yes, sir.  So this, again, is a screenshot of me using

24   the product in my testing and analysis.

25        On the right-hand side, as I explained, is when

1    I'm running the test as the application is executing.  As

2    I'm testing the application, I'm able to obtain these

3    displays, right?  The tool shows these displays that are

4    showing resources of the mobile device that are being

5    simulated.

6            The tool itself refers to it as "simulation."

7            And as I've testified earlier, device metrics like

8    CPU, memory, and throughput, these are resources of the

9    mobile device that are being simulated and are being

10   displayed.

11   Q.  And, again, we've heard from Micro Focus throughout

12   this trial and its witnesses that they don't really do an

13   emulation or a simulation; instead, it's a reflection.

14           How do you respond to that?

15   A.  I have never heard of the word "reflection" in the

16   context of mobile application testing.  It is not a term of

17   art.  It's not clear what it really means or what they

18   really mean by that.

19           And, you know, the claims don't require

20   reflection.  The claims require simulation or emulation.

21   And I don't understand how that opinion supports the

22   infringement.

23   Q.  But what do their own products say, for example, when

24   you're running this test?

25   A.  Their product is saying simulation.  As you can see,

Jury Trial, Volume 5                                    1223

1    that's -- I've basically zoomed in on the text from their

2    product.

3    Q.  And did your review of the source code also confirm

4    that, internally, Micro Focus calls this an emulation?

5    A.  Yes.

6           So, as I've said, I've reviewed the source code

7    for my analysis; I haven't just relied on documents.  And

8    when I look at the source code, I see the word "emulation,"

9    "simulation," everywhere.  And I actually see the source

10   code performing emulation and simulation.

11          I have reviewed thousands of pages of source code.

12   I have printed about, you know, close to 500 of them.  And,

13   you know, due to time constraints, I wasn't able to show

14   you all of it, but here's an example of source code from

15   the accused product with the function name "start

16   emulation," which I think is pretty self-explanatory what

17   it's doing.

18   Q.  Moving on to your other test, I understand that there

19   was some issue that was raised regarding throughput.  Can

20   you explain how throughput is a display of resources of the

21   mobile device during execution.

22   A.  Yes.  So this is for -- this is showing the interface

23   of -- the user interface of LoadRunner for the second --

24   one of the second tests that I did, and you can see that

25   one of the graphs that you get is average throughput.

Jury Trial, Volume 5                              1224

1              And so I also presented in my testimony on Tuesday

2    what is the definition of throughput.  In the field,

3    throughput is defined in terms of resources of the mobile

4    device.

5              And I think if you go to -- there's a next slide

6    here that also shows that Micro Focus also agrees that

7    throughput is a resource of the mobile device.

8              On the right-hand side you can see that the

9    average throughput graph in their own documentation -- and

10   this is a technical document, this is the LoadRunner User

11   Guide -- they define it as resource usage on the Y-axis on

12   that graph, as you can see on the legend, over time.  And

13   so this confirms my own understanding of what is

14   throughput.

15             You can see that it shows the client data.  And,

16   again, client machine is mobile device in this context.

17   And I've highlighted the parts of the description of the

18   throughput that talks about that as well.

19   Q.  And I believe you were referencing PX-40-1339 and 1340.

20             How does that compare to the resource usage that's

21   discussed in Mr. Poulin's patents?

22   A.  They are basically the same.  You saw the graphs from

23   the patents where we have the bar chart.  Well, here,

24   instead of a bar chart, we have, I think, some kind of -- I

25   don't know what this kind of chart is called, but it's a

Jury Trial, Volume 5                    1225

1   different kind of chart that we're looking at.  But it's

2   basically capturing the same information, and it has the

3   same usage.

4        This is important for developers because they can

5   understand how their application behaves when they execute

6   these tests on different types of networks and different

7   types of devices.

8   Q.  I want to clear up one potential area of confusion

9   yesterday.  Dr. Shoemake referred to a test that he

10  performed, and I think we're looking at it right here.  Did

11  this -- does this test have anything to do with the actual

12  products that are at issue in this case?

13  A.  No.  So I just want to be -- I just want to make sure

14  that it's clear to the jury that this is not LoadRunner

15  product.  He didn't actually perform a test with the

16  LoadRunner product.

17       This is a screenshot of a completely different

18  product called Speedtest.  You know, you can go to

19  Speedtest.net, is a website basically that people use all

20  the time to test the speed of their home network.  So if

21  you have -- if you're having network problems or if your

22  network is not fast, you can test to see how fast is your

23  network.

24       He had access to LoadRunner products.  He could

25  have performed the test using LoadRunner products to show

Jury Trial, Volume 5                          1226

1   throughput -- or, potentially, rebut my opinion that

2   throughput is not a resource of the mobile device.

3   Instead, he's doing something completely different.  He's

4   testing a completely different product here.

5   Q.  Okay.  Now, the final issue he took -- and, to be

6   frank, I didn't quite track what his position was with this

7   last issue.  Apparently, he argued that the products do not

8   meet, quote, a software authoring interface configured to

9   profile display windows...when executing the application.

10          Were you able to understand his position here?

11  And, if so, what's your response?

12  A.  I couldn't quite clearly determine what is his opinion

13  here because he was throwing different arguments when he

14  was explaining this part of his opinion.

15          He mentioned reflection, which, as I said, doesn't

16  have really a particular meaning in this area of mobile

17  application testing.  But, nevertheless, I have slides to

18  show that the product meets this limitation.

19          As I've showed -- I've showed this multiple times,

20  even today -- on the right-hand side where we see the 2,

21  plus, minus, that is an actual application.  Actually, that

22  turns out to be Micro Focus' own application called

23  Advantage Shopping.  So, basically, it's an application for

24  e-commerce, for example, purchasing -- similar to Amazon,

25  for example.

Jury Trial, Volume 5                           1227

1            And I'm running a test on that application on the

2     right-hand side.  And, as you can see, as I'm executing the

3     application during the test I'm able to see the resources

4     of the mobile device that are simultaneously being

5     displayed here.

6     Q.  And you're referring now to PX-35-291?

7     A.  Yes, sir.

8     Q.  So, in summary, were you able to determine -- even

9     notwithstanding whatever argument Dr. Shoemake presented

10    yesterday -- that the accused products satisfy this

11    limitation; and, if so, which products?

12    A.  Yes.  They all -- all of the accused products satisfy

13    this claim limitation.

14    Q.  So, as a summary, can you tell us, for both Claims 1

15    and 2 of the '192 Patent, which of the accused products did

16    you determine infringed these claims?

17    A.  All of the accused products infringe the claims.

18    Q.  We move now to the '864 Patent, Claims 1 and 2.  Which

19    of the accused products did you determine infringed both of

20    these claims?

21    A.  All of the accused products infringe the claims.

22    Q.  We can move now to the '678 Patent, Claims 45 and 49.

23    Which of the accused products did you determine infringed

24    these claims?

25    A.  All of the accused products infringe the claims.

Jury Trial, Volume 5                    1228

1    Q.  There are a couple other points I'd like you to

2    address, and they relate to the importance or the value of

3    network simulation, the types of inventions that Mr. Poulin

4    came up with.

5            And the first issue I want to address with you

6    relates to a point that Dr. Shoemake raised, that this

7    functionality is actually, quote/unquote, given away for

8    free by Apple, and they started to do this in 2012, seven

9    years after Mr. Poulin came up with this invention.

10           Does that opinion support -- or does that fact

11   support your opinion, or does it support an opinion that

12   this has no value?

13   A.  I believe it supports my opinion that it has a lot of

14   value.

15   Q.  Why is that?

16   A.  Well, Apple is providing this for free because they

17   want developers to build and test high-quality useful

18   applications for consumers to upload to their App Store,

19   from which they make a ton of money.  So for every app that

20   you purchase on App Store, Apple gets, I believe,

21   30 percent of that revenue.

22           And also, if App Store didn't have any apps on it

23   or didn't have a lot of apps on it, nobody would want to

24   buy iPhone; because iPhone, without apps, is useless.

25           So they have -- Apple has a ton of incentives to

Jury Trial, Volume 5                          1229

1    provide this product to make sure developers are developing

2    high-quality applications; they can properly test the

3    applications; that the applications work on different

4    iPhones and on different networks.

5            So then the platform, as a whole, becomes more

6    successful.  People buy more iPhones because it has great

7    apps on it.  But also, when people purchase apps on iPhone

8    App Store, they're also paying significant portion of the

9    revenue from that to Apple.

10   Q.  Is it fair to say that Apple makes billions of dollars

11   a year because people can test applications and put them on

12   their App Store?

13   A.  Yes, sir.

14   Q.  And I believe we saw a slide in this case from HPE that

15   talked about the fact that Network Virtualization was

16   needed to, quote/unquote, accelerate time to market.  Do

17   you remember that?

18   A.  Yes, sir.

19   Q.  How does that allow Apple to make even more money when

20   using this network emulation software?

21   A.  Well, more developers are willing to develop Apple

22   apps, or iOS iPhone apps, because it's easier for them to

23   develop it.  It makes it faster for them to develop it and

24   put it on the market, so they can make money faster.  Which

25   is also good for Apple, because they're going to make money

Jury Trial, Volume 5                    1230

 1   faster as well.

 2   Q.  And I believe there was also some mention of Android

 3   Studio.  Can you explain the similarities between Google

 4   giving this stuff away for free and Apple giving this stuff

 5   away for free and the benefit, monetary benefit to Google.

 6   A.  It's the same analysis.  So Android is a competitor to

 7   Google through Android.  It's competing with Apple's iPhone

 8   and iOS.  And so they also provide the same Network

 9   Virtualization testing capabilities, being Android Studio,

10   because they would like developers to develop high quality

11   applications, make it easier for them to develop more

12   applications, develop it faster, be able to put it on

13   Android play store; so, that way, they can compete with

14   iPhone.

15   Q.  And do you know if Google makes in the billions of

16   dollars a year because of this software?

17   A.  Yes.  So when you put your app on -- to put your app --

18   to put your Android app on Google App Store, you actually

19   have to pay them a fee.  And then, after that, if it's a

20   purchase, you also have to pay a certain portion of that to

21   Google.  So they also make a lot of money by having a

22   successful what we call app ecosystem.  That means, you

23   know, a system where there's lots of apps available for

24   consumers.

25   Q.  Are you familiar with the Google search engine?

Jury Trial, Volume 5                    1231

 1   A.  Yes, sir.

 2   Q.  Is that, quote/unquote, free?

 3   A.  Well, it is -- obviously, it's a very useful service

 4   provided to people for free, but then Google is actually

 5   making a lot of money from the advertising that they're

 6   able to serve on Google pages.

 7        It's a very effective tool.  Because when you

 8   search for a term -- like, for example, I can search for,

 9   you know, any kind of product.  For example, I'm searching

10   for Nike shoes.  Right?  If I put that in, Google can

11   determine my intention, which is that I'm a consumer, I'm

12   looking for buying Nike shoes.  Then they are able to serve

13   advertisement that is targeted towards me.  And so they

14   make their money off of that free service that they are

15   providing.

16   Q.  So even though the Google search engine is,

17   quote/unquote, free, do you think it has a lot of value to

18   Google?

19   A.  I would say it's the backbones.  It's the core

20   functionality of what makes Google, you know,

21   billion-dollar company.

22   Q.  I want to ask you a little bit about these,

23   quote/unquote, scripting protocols.  And there was some

24   discussion that the damages should be limited because only

25   certain protocols are relevant.

Jury Trial, Volume 5                    1232

1              Do you recall that?

2   A.  Yes, sir.

3   Q.  And we saw this slide in Dr. Shoemake's presentation

4   that apparently shows some protocols.

5              First of all, is this slide out of any Micro Focus

6   document?

7   A.  No.  This -- I understand it, is something that someone

8   from Micro Focus has created, but it's not a Micro Focus

9   document.  It's for the purposes of litigation.

10  Q.  And are all protocols here equal as far as value goes?

11  A.  No, they are not.

12             So this slide is really misleading.  And the

13  reason for -- there are several reasons for that.

14             First of all, software is not bunch of boxes,

15  right?  It's not like you can -- like, this figure, this

16  picture, makes it seem like you can only choose one of

17  these boxes.  But, in reality, when you use LoadRunner

18  product, you can use multiple of these protocols together.

19  Not only you can, but you often do use multiple of these

20  boxes together.

21             Second -- right -- so first is that these boxes

22  are not separate.  The picture makes it sound like you can

23  choose one or the other.  They are not mutually exclusive.

24  They work together.  And in most testing you actually run

25  multiple -- you use multiple of these protocols.

Jury Trial, Volume 5                          1233

1           The second issue is that they are not -- they are

2    not all equal size.  Some of these are more valuable than

3    others.  Most systems nowadays -- and we all know it,

4    intuitively -- most systems have mobile apps.  Right?  So

5    mobile is the way you actually access all sorts of

6    services, from the way you purchase your -- purchase things

7    on Amazon, to Facebook, to Instagram.  Most people are

8    using mobile to access those resources.

9           So these mobile protocols that are shown here are

10   actually much larger in size than some of these other

11   protocols that are shown here, which are basically obsolete

12   technologies or very old technologies.  It is just people

13   don't develop technologies in that way, and there is not a

14   lot of need for testing them.

15          And so, for those reasons, I think this is a

16   misleading figure to use for apportionment analysis.

17   Q.  And I believe we also saw another -- an actual Micro

18   Focus document in this case that said, you know, NV, you

19   know, emulates for all protocols.

20          Do you recall that?

21   A.  Yes, sir.

22   Q.  And how does that relate to this analysis?

23   A.  Well, NV can be used with all of these protocols,

24   because NV is Network Virtualization, and all of these

25   protocols are -- have something to do with network.  And

1    so, yeah, so NV also ties in with all of these protocols

2    shown here.

3            And I think the main point here is that these

4    boxes are not independent of each other.  When you look at

5    source code, it doesn't look like this.  It looks

6    different.  And so there is lot of dependencies.  They can

7    be used together.  And the boxes are not of equal size.

8    Some are just significantly more important than others.

9    Q.  The other argument Dr. Shoemake made to try to

10   drastically reduce the value of Mr. Poulin's inventions is

11   he focused on, quote/unquote, available graphs.

12           Do you recall that?

13   A.  Yes, sir.

14   Q.  And he presented this slide.

15           First of all, is this slide from any Micro Focus

16   document in this case?

17   A.  No, sir.

18   Q.  So how do you respond to the fact that, you know,

19   according to him, well, you know, you only see a couple

20   graphs in your testing; and, therefore, we should only, you

21   know, divide by the number that you showed us examples,

22   versus all these possible graphs you had with the product?

23   A.  Yeah.  So, again, I think this figure is misleading.

24   Because there is a presumption here that without the

25   innovations, without the invention, these graphs would be

 1    useful.

 2              As we saw from Micro Focus' own documents and as

 3    I've testified, Network Virtualization allows you to do

 4    much more accurate testing of your product.  And so what

 5    these graphs are doing is that they are showing the result

 6    of the testing that you do.

 7              Now, if you take away the invention, it means that

 8    the testing that you are doing is inaccurate.  You are able

 9    to display it using the graph, but the graph would be

10    completely useless because what it's displaying is

11    inaccurate results.

12              My opinion is that without the invention all of

13    these graphs would be useless because what they are showing

14    at that point is inaccurate testing results.

15              As a developer, I cannot rely on those graphs for

16    determining how my application performs because I'm missing

17    the core part of the product which allows me to do accurate

18    testing of my application on different types of networks.

19    Q.  And speaking of -- again, I think you called it a core

20    part of the product.  I'll take us way back, again, to the

21    very beginning of the case when you talked about the

22    architecture.

23              Do you recall that?

24    A.  Yes, sir.

25    Q.  And when you do an apportionment analysis it's

Jury Trial, Volume 5                    1236

1   important to say, okay, what's -- you know, what does the

2   scope of this invention cover with respect to the

3   architecture.

4           Referring now again to the LoadRunner

5   architecture, can you explain to the jury how much of this

6   is covered by Mr. Poulin's inventions?

7   A.  Yes.  So the way you perform an apportionment, and the

8   way I did it, is that I started with the invention.  I

9   started with the claim language.

10          The claim language doesn't talk about protocol;

11  doesn't talking about graphs.  Those two words don't show

12  up anywhere in the claim.  So I think just use those for

13  apportionment just is arbitrary.

14          So I start with the invention.  I determine what

15  is the boundary, what is the scope of this invention.  And

16  then I mapped it to the LoadRunner product.

17          And at a high level, as I testified, LoadRunner

18  product has these components:  VuGen, controller, analysis,

19  and Network Virtualization.  And the Poulin invention has

20  elements in all these four components.

21          So I mapped the invention to the entirety of the

22  system, not just specific arbitrary parts of the system.

23  Q.  Now I want to go to one last thing.  And -- were you

24  here for Dr. van der Weide's testimony regarding the

25  validity of Mr. Poulin's inventions?

Jury Trial, Volume 5                    1237

1   A.  Yes, sir.

2   Q.  And do you know what an element-by-element analysis is

3   as it pertains to validity?

4   A.  Yes.  So element-by-element analysis is basically what

5   I did on Tuesday when I walked the jury through each

6   element of asserted claim.  Each element of an asserted

7   claim has certain limitation.

8        For infringement analysis, I have to show that the

9   accused products have that limitation; they actually

10  practice that particular limitation that is in the

11  invention.

12       For the case of validity or invalidity analysis,

13  the expert has to do the same exact thing that I did for

14  infringement except they have to show that each limitation

15  of each claim is met in some prior art.

16  Q.  Now, we didn't see that yesterday, so I don't really

17  have anything to ask you about an analysis that we never

18  saw.  But I just want to hit a couple -- just a couple key

19  points, because I know you have some response to at least

20  the things that you did hear.

21       And one of the things that we heard was that the

22  primary reference that Dr. van der Weide said invalidates

23  all of these patents, right, was this J2ME toolkit.

24       Do you recall that?

25  A.  Yes, sir.

1  Q.  And how many documents regarding that J2ME toolkit did

2  he present to the jury yesterday?

3  A.  One.

4  Q.  Okay.  Do you know whether the Patent Office considered

5  that in -- that toolkit in granting Mr. Poulin's

6  inventions?

7  A.  Yes, sir, they did.

8  Q.  Did they consider even more documents than just that

9  one document before they analyzed the patents and issued

10 them?

11 A.  Yes, sir.

12       So, here, I'm showing the documents that USPTO --

13 that's the United States Patent Office -- considered in

14 granting the patents, the Poulin patents; in this case, the

15 '192.

16       And you can see that they have cited, I believe,

17 nine documents -- nine documents, including the user guide

18 that we were looking at yesterday -- they have cited nine

19 documents in the patent itself.

20       There is a section in the patent that talks about

21 references cited.  These are the documents or prior art

22 that the examiner has considered in granting the patent.

23       And you can see that they have looked at or they

24 have considered nine J2ME documents in granting the

25 patents.

1  Q.  And you're reading right from the patent, right?  PX-3

2  and PX-2?

3  A.  That's right.

4  Q.  So they looked at nine documents related to J2ME,

5  right?

6  A.  Yes.

7  Q.  He looked at one, fair?

8  A.  Yes, sir.

9  Q.  So, given the fact that the Patent Office considered

10 all nine and he only considered one, who did more due

11 diligence there?

12 A.  I would say the Patent Office did.

13 Q.  Did Mr. Poulin also explain to the Patent Office why

14 his invention is completely different from J2ME?

15 A.  Yes.

16       So, in the patent itself, in the specification of

17 the patent, Mr. Poulin describes the differences between

18 his invention and J2ME.  And I've highlighted -- this is

19 actually text from the patent itself where the patent

20 itself describes how it's different from J2ME.

21 Q.  And I believe you are looking at an excerpts from PX-3,

22 the '192 Patent, at Column 4, lines 12 through 20.

23 A.  Yes, sir.

24 Q.  So Mr. Poulin explained to the Patent Office why, look,

25 we're way better than J2ME.  He gave the Patent Office nine

Jury Trial, Volume 5                     1240

1    different documents about J2ME to look at, right?

2    A.   Yes.

3    Q.   And what did the Patent Office do?

4    A.   They granted the patents.  They found it to be novel

5    and innovative over the prior art.

6    Q.   There was also some discussion in this case about

7    whether HP knew about these Poulin patents.

8            Do you recall that?

9    A.   Yes, sir.

10   Q.   And do you know whether or not that is correct?

11   A.   I believe it's correct.

12   Q.   And how do you know that?

13   A.   Well, you can see here that the Poulin patents have

14   been -- have been documents that have been cited in some of

15   the HPE and Micro Focus' own patents.

16   Q.   And I believe you are reading here from PX-363.029,

17   033, 077, 117, 157, and 200; is that correct?

18   A.   Yes, sir.

19   Q.   Finally, Dr. van der Weide made some discussions about

20   what's called written description and enablement.

21           Do you recall that?

22   A.   Yes.

23   Q.   And if I understand him correctly -- and it was a very

24   short presentation, so I'm not sure I follow 100 percent.

25   But I think what he was saying is that, for some reason,

1    the patents don't show testing on an actual mobile device.

2            Is that your understanding?

3    A.  Yes, sir.

4    Q.  Okay.  First, can you explain to the jury what a proper

5    written description and enablement analysis would look

6    like.

7    A.  Yes.

8            So it would be the same as what we talked about.

9    You have to evaluate the claim limitations and then

10   determine if those claim limitations are actually described

11   with certain level of detail in the specification itself.

12   Q.  Did you hear that yesterday?

13   A.  No.  His analysis was basically -- you know, with all

14   due respect, was a lot of hand waving.  He didn't go

15   through the claims element by element.

16   Q.  Did you see even one claim yesterday when he was trying

17   to testify that six of Mr. Poulin's inventions should be

18   taken away?

19   A.  He -- I don't believe he showed any claims in his

20   presentation.

21   Q.  So let's just address the one point he was trying to

22   make, this point about there's no real mobile device in

23   Mr. Poulin's patents.

24           Do you agree with that?

25   A.  No.

1    Q.  Why not?

2    A.  Well, I mean, one of the figures itself shows the

3    mobile device.  I think it's pretty clear that the patent

4    is describing -- you know, in this example -- these are

5    examples, by the way, from the spec.  There are two

6    embodiments that are being discussed here, right?  There is

7    the testing of the mobile application in an emulated

8    setting, which is the top portion, the unhighlighted part

9    at the top.  And there's the testing of it on an actual

10   mobile device.

11        And then the figure itself is accompanied with

12   text that says "Step 714 is optional and is particularly

13   suited for testing applications running on a mobile device

14   that is a mobile phone."

15        I think the spec itself is also very clear that

16   you can perform this kind of testing on a real device.

17   Q.  And in the patent, just to be clear, does it -- what

18   does it describe mobile phone -- mobile device 114 to be?

19   A.  That to be a physical real mobile device.

20   Q.  So a person of ordinary skill in the art reading this,

21   would there be any doubt in their mind that Mr. Poulin

22   describes testing on a real mobile device?

23   A.  No.  So when you perform an analysis of a patent you

24   have to do it from the perspective of a person of ordinary

25   skill in the art.  In this case all the experts have agreed

1   that that is someone with a bachelor's degree in computer

2   science or electrical engineering or computer engineering

3   and at least one year of experience.

4         And I believe somebody with that level of

5   expertise would know about testing and would know about

6   testing of mobile applications on a mobile device.

7   Q.  I see on your final slide here you've got a couple

8   excerpts from the patent.  I see PX-2 at Column 7, 11

9   through 17; PX-3 at Column 6, line 65 through Column 7,

10  line 3, and Column 10, lines 15 through 25.

11        Again, just very briefly, a person of ordinary

12  skill in the art, would they have any trouble understanding

13  or enabling the claimed inventions here?

14  A.  No.  I think -- so these are disclosures about testing

15  on a real mobile device from the spec itself.  And I think

16  a person of ordinary skill in the art would have no trouble

17  reading this and understanding how to do it.

18  Q.  One final question, sir.  Are Mr. Poulin's patents

19  valuable?

20  A.  Yes, they are.

21        MR. ALBERTI:  No further questions.

22        THE COURT:  Cross-examination?

23        MR. SHELTON:  Yes.  Thank you, your Honor.

24                              *

25                              *

Jury Trial, Volume 5                    1244

1              CROSS-EXAMINATION OF SAM MALEK

2    BY MR. SHELTON:

3    Q.  Good morning, Dr. Malek.

4    A.  Good morning.

5          MR. SHELTON:  Could I have PDX-3.32, please.

6    BY MR. SHELTON:

7    Q.  Now, the first thing that you were asked about,

8    Dr. Malek, was about your testing of the combination of

9    LoadRunner, Network Virtualization, and UFT Mobile, right?

10   A.  Yes, sir.

11   Q.  And you were asked about your testing; and,

12   specifically, about whether UFT Mobile emulates resources

13   of the mobile device that's being tested, right?

14   A.  I believe so, yes.

15   Q.  And you showed the jury a little snippet of source code

16   on that blue paper, right?

17   A.  I believe so, yes.

18   Q.  And in that source code, if I understood it right, you

19   were telling the jury that source code is what actually

20   emulates resources on the mobile device.  Is that what you

21   were saying, sir?

22   A.  I believe -- I don't recall the source code right now.

23          So I have source code citations for emulation of

24   resource of mobile device, and I've also have source code

25   citations for emulation of network.

Jury Trial, Volume 5                    1245

1    Q.  But the impression that you wanted to leave with the

2    jury is that that source code related to emulating

3    resources on a mobile device; isn't that correct?

4    A.  I don't believe so.  I was basically pointing out the

5    fact that I've relied on source code in addition to my

6    testing and documentation.  And the source code citations

7    also support my opinions about, you know, the elements that

8    I've identified in the accused products.

9    Q.  Let's go back to the claim language.

10          You certainly do agree, don't you, Dr. Malek, that

11   as Wapp's infringement expert you have to show for each of

12   the two combinations of Micro Focus software that that

13   software is actually programmed to meet all the limitations

14   of the claims?

15   A.  Yes.  I have to show that the system has the infringing

16   features, yes.

17   Q.  Right.  All of them, right?

18   A.  Yes, sir.

19   Q.  And would you agree that -- and I'm showing you Claim 1

20   of the '192 Patent.

21          Do you agree, sir, that this claim requires that a

22   mobile application is tested, whether real or emulated?

23   A.  It requires -- it requires a system for developing and

24   testing an application for -- yeah, uh-huh.

25   Q.  And so it does require that you have an actual mobile

1  device, whether real or emulated?

2  A.  Yes.  It requires a mobile device, either real or

3  emulated, yes.

4  Q.  Okay.

5        MR. SHELTON:  Now could we go to PDX-3.53.

6        Thank you.

7  BY MR. SHELTON:

8  Q.  And so you testified that this screen on the right-hand

9  side -- this is from LoadRunner, right?

10 A.  Yes.

11 Q.  And it was your testimony today that this screen shows

12 that the resources of the mobile device are being emulated,

13 correct?

14 A.  Yes, sir.

15 Q.  And then --

16        MR. SHELTON:  Now let's go to PDX-3.57.

17 BY MR. SHELTON:

18 Q.  And you cited this this morning as evidence to the jury

19 that you found source code that shows emulation of the

20 resources, right?

21 A.  This is showing -- this is showing the starting of the

22 emulation of -- I believe this is with respect to network

23 emulation, actually.

24 Q.  Right, sir.

25        So that has nothing to do with emulating resources

1   of a mobile device; isn't that true?

2   A.  No, that's not true.  Because when you're emulating the

3   resources the resource emulation itself gets impacted by

4   network emulation.  So the two are actually related.

5          MR. SHELTON:  Well, let's go back to PDX-3.53.

6   BY MR. SHELTON:

7   Q.  You testified that this screen shows that resources of

8   a mobile device are being emulated.  And then your counsel

9   took you to the source code I just showed you, and you told

10  this jury, under oath, sir, that that source code is what

11  performs that action, did you not?

12  A.  I think you're misrepresenting what I testified.

13         What I said is that, in addition to all the

14  documents that I've reviewed and also all the testing that

15  I've done, I have also reviewed the source code.  And -- I

16  have reviewed thousands of pages of source code.  There is

17  about 500 of them that I've printed and I've cited to in my

18  report.  For the purposes of -- for time purposes I can't

19  show all the 500 source code citations that I've printed

20  that are in my report.  And I'm showing excerpts of source

21  code that are relevant as examples of the evidence that

22  I've relied on to the jury.

23  Q.  Now, will you even see -- this screen on the right that

24  shows that reflection of the mobile device -- will you see

25  that in LoadRunner if there are no mobile devices connected

1    to UFT Mobile server?

2    A.  If you don't have mobile devices connected, no, then

3    you won't be able to do the test.

4    Q.  Right.  And you will never see the screen, correct?

5    A.  You would -- no, you wouldn't see the right side of the

6    screen.  You would still be able to see the left side of

7    the screen.

8    Q.  Right.  But the -- what you're saying is on the left --

9    I'm sorry -- the right side of the screen is the mobile

10   device that's being tested and the resources of the mobile

11   device, correct?

12   A.  Yes.

13   Q.  And do you agree, sir, that if you do not have a mobile

14   device connected to UFT Mobile you can't even start this

15   test?

16   A.  If your system -- I mean, this is a system consisting

17   of these products that are intended to work with each

18   other.  If they can't work with each other because they're

19   disconnected, yes, then you can't do the testing.

20   Q.  And so if you have the software LoadRunner, Network

21   Virtualization, and UFT Mobile, and you don't have that

22   physical mobile device that you used in your test, you will

23   not see this screen, correct?

24   A.  If the system is not set up as a system, if they're

25   disconnected from each other, yes, you wouldn't be able to

1    run a test.

2    Q.  Now, you also were asked about the TruClient Mobile Web

3    theory.  And, in that one, you agreed on Tuesday that that

4    TruClient browser is actually a Firefox browser.  Do you

5    recall that?

6    A.  Yes.

7    Q.  You freely admitted it.

8           And so, today, you say that the Bank of America

9    site that is being viewed within the Firefox browser is a

10   Mobile Web application.  Did I hear that right?

11   A.  That has always been my opinion.

12          So what I'm testing is not the browser.  I'm

13   testing the application that is loaded in that emulation of

14   the mobile device, which is, as you said, is a resized --

15   it's a browser that is sized to emulate the actual mobile

16   device.

17          A mobile application always -- because it is a

18   Mobile Web, so it's a web technology -- it is, by default,

19   always included in a browser technology.

20   Q.  And would you agree, sir, that in the -- when you're

21   using TruClient Mobile Web scripting protocol with Network

22   Virtualization and LoadRunner, as in your theory, that

23   there is no mobile device that's being tested?

24   A.  There is a mobile device that is being emulated.

25          There is not a physical mobile device, if that's

Jury Trial, Volume 5                          1250

1   what you're asking.

2   Q.  Well, what is, in your opinion, the mobile device

3   that's being emulated?

4            The browser?

5   A.  Well, it's partly that.  It's partly what I showed on

6   my screenshot.

7            And then part of the other emulation is what you

8   see in the throughput screenshot.

9            So there are different parts of the mobile device

10  that are being emulated.

11  Q.  So there's two mobile devices?  Is that your testimony

12  now?

13  A.  No.  No.  What I'm saying is that there are different

14  parts of the mobile device that are being emulated.

15           The claims don't require to emulate the entirety

16  of the mobile device; they're required to emulate parts of

17  the mobile device.  And that's exactly what the accused

18  product is doing.

19  Q.  And you do agree, though, in your TruClient Mobile Web

20  theory, that there are no resources of a mobile device such

21  as CPU, correct?

22  A.  Yes.

23  Q.  And there's also no resources of a mobile device, such

24  as free memory, correct?

25  A.  Yes.  The resource that I'm pointing to there is the

1  throughput, which is an aggregate representation of various

2  resources of a mobile device.

3  Q.  Just please answer my question, sir.

4        Is there or is there not any graph for free memory

5  of a mobile device when you use TruClient Mobile Web?

6  A.  No, not for that protocol.

7  Q.  And there is also not a graph that is shown for the

8  amount of available memory when using TruClient Mobile Web,

9  correct?

10  A.  Yes, that's true.

11        MR. SHELTON:  Thank you, your Honor.  No further

12  questions.

13        THE COURT:  Anything additional?

14        MR. ALBERTI:  No, your Honor.  Thank you.

15        THE COURT:  Okay.  Ladies and gentlemen, if you

16  have additional questions for this witness -- whether you

17  have them or not, please fold a piece of paper and pass it

18  over to the court security officer.

19        You may step down.  Thank you.

20        THE WITNESS:  Thank you.

21        THE COURT:  What's next for the plaintiff?

22        MS. DAY:  Your Honor, plaintiffs call Roy

23  Weinstein to the stand.

24        THE COURT:  Sir, you understand you are still

25  under oath?

Jury Trial, Volume 5                    1252

1            Sir, do you understand you are still under oath?

2            THE WITNESS:  Yes, sir, I do.

3            THE COURT:  Okay.  Very good.

4            Ms. Day, go ahead.

5            MS. DAY:  Thank you, your Honor.

6                DIRECT EXAMINATION OF ROY WEINSTEIN

7            CALLED ON BEHALF OF THE PLAINTIFF/DEFENDANT

8    BY MS. DAY:

9    Q.  Mr. Weinstein, were you here yesterday for Mr. Nelson's

10   testimony?

11   A.  Yes, I was.

12   Q.  And what is your understanding of what Mr. Nelson did

13   in this case?

14   A.  What Mr. Nelson did is he adopted the framework for

15   calculating damages that I devised.  He adopted my

16   framework, but then he changed the assumptions to that

17   framework.  But the framework itself that he adopted was

18   mine.

19   Q.  And so he agreed with your approach; is that right?

20   A.  He did.  He adopted the entire framework that I

21   developed and provided.

22   Q.  And I believe Mr. Nelson yesterday testified about some

23   changes he made.  Do you agree with the changes he made to

24   your analysis?

25   A.  I do not.

Jury Trial, Volume 5                    1253

 1   Q.  Let's go through those quickly, if we could.

 2        Let's take a look at your revenue number, the

 3   $423 million number.  Did Mr. Nelson make an adjustment to

 4   that number?

 5   A.  Yes.  Mr. Nelson adjusted my revenue number.  So the

 6   answer to your question is yes, he made a change.

 7   Q.  And why is the adjustment that Mr. Nelson made to your

 8   revenue number incorrect?

 9   A.  It's incorrect because he didn't follow the

10   interrogatory answer that Micro Focus itself provided in

11   December of last year, just three months ago.

12        And so that interrogatory answer was quite clear

13   that, as of August 2015, Network Virtualization was

14   integrated into the LoadRunner products.  That's exactly

15   what the interrogatory answer said.

16        And what Mr. Nelson did is he left out a very

17   significant number of LoadRunner product sales, and thereby

18   ignored that interrogatory answer.

19   Q.  How much of the revenue sales of LoadRunner integrated

20   with Network Virtualization did Mr. Nelson leave out of his

21   analysis?

22   A.  He left out roughly two-thirds of the sales, which is

23   totally inconsistent with the interrogatory answer.

24        What I did is I followed the interrogatory answer

25   and took the spreadsheet of LoadRunner sales provided by

1    Micro Focus and tabulated those numbers to get the

2    $423 million.

3    Q.   What is the next area of disagreement between you and

4    Mr. Nelson?

5    A.   The next area of disagreement relates to the use of

6    profit figures -- and that's the second line on my slide --

7    and which profit figures are appropriate.

8    Q.   And would you please explain to the jury what analysis

9    you undertook compared to what Mr. Nelson did.

10   A.   Yes.  I followed both the contemporaneous business

11   records prepared by HP on this very subject as well as

12   deposition testimony by Ms. Rubenstein on how Micro Focus

13   looked at profitability with respect to ADM products.

14        And so what I did is I followed the actual way

15   that the company looked at this group of products -- both

16   companies looked at this group of products.  That's what I

17   did.

18   Q.   Now, did Mr. Nelson include executive compensation in

19   his costs?

20   A.   Yes.  What Mr. Nelson did is different from the way in

21   which both companies examined this area.

22        And so what he did is he included things like

23   executive compensation, payroll costs.  And the effect of

24   the additional costs that he included, which were not

25   included in the way in which the companies looked at this

Jury Trial, Volume 5                    1255

1    product group, was to reduce the profit margins from what

2    the companies themselves saw with this product group to a

3    much lower number.

4    Q.  What is the next area of disagreement between you and

5    Mr. Nelson?

6    A.  The next area of disagreement between me and Mr. Nelson

7    has to do with line 4 on this slide, which is the

8    appropriate way to apportion down to the value associated

9    with the patents-in-suit.

10   Q.  And would you please remind the jury, what is

11   apportionment?

12   A.  Well, apportionment is the way to limit payments made

13   for use of the patented technology to contributions that

14   that technology provides to the products, in other words,

15   to the sales of the products that are shown on the top line

16   of this exhibit.

17   Q.  And we see that 61.6 percent number.  Is that your

18   apportionment number?

19   A.  Yes.  That's the number that I used, and that's based

20   on the analysis done by Dr. Malek.

21   Q.  Did Dr. Malek isolate the value of the patented

22   features?

23   A.  He did.  And he did it based on a value analysis.  That

24   is, he looked at the value of the key features associated

25   with Network Virtualization relative to all the key

Jury Trial, Volume 5                    1256

1    features associated with sales of the patented products.

2    And he did that based on Micro Focus' own documents.

3             And so, in doing the apportionment analysis, which

4    I relied on, Dr. Malek worked from value propositions

5    associated with Network Virtualization.

6    Q.  Did Mr. Nelson isolate value?

7    A.  I don't believe so.  What Mr. Nelson did is he relied

8    on computer protocols, which are software instructions

9    about how data are to be transmitted.

10            And that's not a financial measure.  That's not

11   the kind of measure that a financial analyst or an

12   economist would use for purposes of apportioning to value.

13   They are two different things.

14            And so I believe that Mr. -- what Dr. Malek did

15   here is appropriate, and that's what I relied on.

16   Q.  And what is the final area of disagreement between you

17   and Mr. Nelson?

18   A.  The final area of disagreement has to do with what I'm

19   referring to as the "bargaining split."  And that's, once

20   the apportioned profits attributable to use of the patents

21   have been determined -- and that's the $223 million on this

22   slide -- how are those profits going to be distributed as

23   between the inventor here, which is Wapp Tech, and Micro

24   Focus.

25            And so that's the final -- that's the final step.

Jury Trial, Volume 5                    1257

1   And here, once again, I disagree with what Mr. Benson *(sic)*

2   did.

3   Q.  And would you please remind the jury how you determined

4   your 77.3 percent?

5   A.  Yes.  As an economist and a financial analyst, I used a

6   financial concept:  Return on invested capital.

7           That's a financial concept that companies like

8   Micro Focus and virtually every company itself use as a

9   measure of their return on investment.  And that's a

10  financial concept, and that's what I did.

11  Q.  What did Mr. Nelson do?

12  A.  He didn't rely on a financial concept.  He just said

13  there would be a 50/50 split.  There were no documents that

14  he relied on.  It's almost as if it came from thin air.

15          It's not a financial concept to say that there is

16  a 50/50 split.  I relied on a financial concept that gives

17  Micro Focus the same return on its use of these patents as

18  it makes in other areas of its business.  And at the

19  hypothetical negotiation, it would have been willing to

20  accept that return.

21  Q.  Are any of Mr. Nelson's adjustments to your analysis

22  proper?

23  A.  I've reviewed each of them.  I do not believe they are

24  appropriate.

25  Q.  And would you please remind the jury what damages Micro

Jury Trial, Volume 5                    1258

1  Focus should pay to Wapp Tech for infringement of

2  Mr. Poulin's patents.

3  A.  Based on my work in this case, I've concluded that

4  damages for the period January 1, 2015, through July 31,

5  2020, are $172,554,269.

6  Q.  And, Mr. Weinstein, just one more question.  You've

7  been valuing patents for over 30 years.  Are Mr. Poulin's

8  patents valuable?

9  A.  I believe they are.  I started in this area in the

10 1980s.  That's when I first wrote about it and studied it

11 seriously.  And I believe these are valuable patents.

12 Q.  Thank you, Mr. Weinstein.

13         MS. DAY:  No further questions, your Honor.

14         THE COURT:  Any questions?

15             CROSS-EXAMINATION OF ROY WEINSTEIN

16 BY MR. SEARS:

17 Q.  Mr. Weinstein, time is limited, so I'll be brief.

18         First, I think I heard you characterize

19 Dr. Malek's apportionment as a financial measure.

20         Did I hear that right?

21 A.  It's a value measure.

22 Q.  I know.  I think you also referred to it as a financial

23 measure.

24 A.  I'm comfortable with that, sure.

25 Q.  Okay.  All right.  So I just want to be sure we're

1  clear.

2         So you, the economist, relied on Dr. Malek, the

3  technical expert, for a financial measure.

4  A.  It is a financial value measure.  It's very clear that

5  it was appropriate for me to rely on it.

6  Q.  All right.  And with regard to this interrogatory

7  response you referenced, did the interrogatory response say

8  anything about add-on licenses no longer being required?

9         Did those words or anything like those words

10 appear in that interrogatory response?

11 A.  No.

12 Q.  Okay.  Thank you.

13         THE COURT:  Anything else?

14         MS. DAY:  No further questions, your Honor.

15         THE COURT:  Okay.  Ladies and gentlemen, let's --

16 you know the drill.  If you have additional questions,

17 please -- and whether you do or not, please fold a piece of

18 paper and pass it over to the court security officer.

19         Okay.  There are no questions.

20         You may step down.  Thank you.

21         THE WITNESS:  Thank you, sir.

22         THE COURT:  Okay.  What says the plaintiffs?

23         MR. DACUS:  At this time, your Honor, the

24 plaintiff closes.

25         THE COURT:  Okay.  Does defense close?

Jury Trial, Volume 5                    1260

1           MR. SEARS:  Yes, your Honor.

2           THE COURT:  Okay.  Very good.

3           Okay.  So, ladies and gentlemen, you have now

4    heard all of the evidence in the case.  I have to meet with

5    the attorneys for a few minutes.  And, when we come back,

6    we will come back with hearing the closing arguments and

7    then my final instructions.

8           Even though you've heard all the evidence, you

9    still can't start discussing among yourselves, because you

10   have to wait for the closing arguments and my final

11   instructions.

12          So, again -- I know I'm a broken record -- please

13   don't discuss it among yourselves or anybody else.  And I'm

14   going to send you back to the jury room.

15          And as soon as we're ready -- this could take a

16   few minutes.  This is part of every trial, this next step,

17   that you don't get to hear about.

18          But when we come back, we will continue, and then

19   the case will be yours.  Again -- and then I guess we'll

20   get your lunch orders, too, during this break as well.

21          Okay.  Have a good break, and then we'll call you

22   back as soon as we're ready.

23          (The jury exits the courtroom, 10:01 a.m.)

24          THE COURT:  Okay.  Anything further from the

25   parties?

  
1          MR. DACUS:  I just have one procedural question,

2    your Honor.  I could not remember for purposes of closing

3    whether or not the Court has any requirement on the amount

4    of time for the plaintiffs' original versus rebuttal.

5          THE COURT:  Yeah.  My only rule is you cannot

6    reserve more than half your time.

7          MR. DACUS:  That's what I recall.  Thank you, your

8    Honor.

9          THE COURT:  There are no motions?

10          MR. SEARS:  Oh.  Excuse me.  If now is the time,

11    yes, I'll turn it over to Mr. Coburn.

12          THE COURT:  Well, it's now or never so...

13          MR. SEARS:  I misunderstood the inquiry.  Thank

14    you.

15          MS. DAY:  May we be seated, your Honor?

16          THE COURT:  Yes, you may be seated.  Thank you.

17          I mean, if there are no motions, that's fine, too.

18    I'm not encouraging them, but both sides have indicated you

19    were going to so...

20          MR. COBURN:  Your Honor, we have just a couple of

21    Rule 50 motions.

22          The first one, your Honor, relates to willfulness.

23    We believe that we're entitled to a directed verdict on no

24    willfulness.

25          The only evidence that's been presented with

1    respect to --

2            (Brief interruption.)

3            MR. COBURN:  So the first issue is willfulness.

4        And based on communications with opposing counsel,

5    it sounds like there's a pre-suit and a post-suit angle to

6    both of this.

7            As far as pre-suit evidence that has come in,

8    there are only a few lines of testimony from Mr. Poulin

9    regarding some patent prosecution history for an HPE patent

10   that ultimately issued and then was subsequently acquired

11   by Micro Focus.  And in that patent prosecution history

12   the -- none of the asserted patents here, but the parent

13   patent was referenced; and then, ultimately, became a cited

14   reference on the patent that issued to HPE.

15           And there is just a plethora of case law, your

16   Honor, that has been provided to chambers with respect to

17   the fact that just mere communications from the Patent

18   Office with respect to the existence of another patent are

19   insufficient for a willfulness finding.  And, yet, that's

20   all we have with respect to the basis for any sort of

21   pre-suit willfulness argument.  So that's the first point.

22           And then I understand from -- if I'm wrong, I'm

23   happy to be corrected -- but I understand that there is a

24   argument from the other side -- although, I haven't heard

25   it -- about post-suit willfulness.

Jury Trial, Volume 5                    1263

1              And this calls to mind the tortured history, your

2     Honor, of the infringement contentions in this case and the

3     notice -- really, the lack of notice that the parties on

4     our side have been -- have had with respect to the

5     infringement theories.

6              There have been seven different versions of the

7     infringement contentions in this case.  Four of those came

8     in the last four and a half months.  The last one being

9     November 17th, 2020.

10             We proceeded for about six weeks, thinking we

11    finally had this nailed down.  And then, in Dr. Malek's

12    deposition, we heard for the first time that all 37

13    protocols were accused.  Which, of course, was different

14    from what had been in the last set of infringement

15    contentions, which were limited to the two protocols,

16    TruClient Mobile Web and TruClient Native Mobile.

17             Then we got a declaration from one of our opposing

18    counsel saying no, no, no, no; you know, Dr. Malek

19    misspoke; it really is the two protocols.

20             That ended up, as your Honor knows, mooting what

21    was a motion to supplement our invalidity contentions if

22    the theory had, indeed, changed.  Everything seemed fine.

23             And then, of course, as we have come to trial --

24    and we just heard it.  We just heard it from Dr. Malek, and

25    we heard it yesterday, that it's all 37 protocols.

1              And so, you know, this has been a constantly

2    moving target.

3              And so under those circumstances, between the lack

4    of pre-suit notice -- which is, just as a matter of law,

5    the Patent Office communications do not count -- and then

6    the constantly moving target which, you know, is moving

7    even as of today, as a matter of law, we believe we're

8    entitled to no willfulness and would like that instruction

9    not to go to the jury.

10             THE COURT:  Thank you.

11             And a response?

12             MR. BELLOLI:  This may be a combination of both me

13   and Mr. Dacus, your Honor.

14             I'll start with the post-suit because I

15   think that's -- I'm sorry -- easier.

16             THE COURT:  You can just speak from there.

17             MR. BELLOLI:  Okay, great.  Thank you, your Honor.

18             THE COURT:  Just to make it easier.

19             MR. BELLOLI:  As to post-suit, there's definitely

20   case law on point.  We can point to the *Caltech-Broadcom*

21   case, which allowed post-suit willfulness to go forward.

22   Actually a pretty famous case that resulted in a large

23   verdict for Caltech against Broadcom and Apple.  That is

24   2019 WestLaw 88077924, talking about how post-suit

25   willfulness is okay.

Jury Trial, Volume 5                1265

1              The Court's Final Jury Instructions talk about

2    post-suit willfulness acts, including whether or not Micro

3    Focus tried to cover up its infringement as one of the

4    factors.

5              I think we've seen ample evidence of that in this

6    case:  The changing of the marketing documents, the

7    stopping calling it secret sauce, saying it's free after

8    the case and not changing the product in any way.

9              I'd say one totality of the circumstance factor is

10   bringing a really thin invalidity case.  They really didn't

11   even point to a single claim element in 30 minutes.

12             So when you look at the totality of the

13   circumstances, there's more than enough evidence to support

14   post-suit willfulness.  And there's no dispute that,

15   post-suit, they had notice of these patents.

16             So that goes to the post-suit willfulness.

17             As to the pre-suit willfulness, HP was told about

18   Mr. Poulin's patents not once, not twice; a plethora of

19   times.  And, again, we're going to look at the totality of

20   the circumstances here.

21             So if it had just been one correspondence to HP, I

22   agree, that might not make it.  But we have some other

23   facts here that infer, based on the totality of the

24   circumstances, they either knew or should have known or

25   willfully stuck their head in the sand on this issue.

1          So HP is told about the patent -- Mr. Poulin's

2    patents a bunch of times, both pre-suit -- or, I'm sorry --

3    both pre-acquisition and after the acquisition.  That HP

4    patent was assigned to one of the defendants in this case.

5    Their lawyer gets the file.  He's going to see that this

6    happened.

7          Not only that, but there was due diligence

8    involved in this transaction.  We heard there was a lot of

9    due diligence involved in the transaction whereby the Micro

10   Focus products went from HP to Micro Focus.  We would

11   assume that diligence included looking through the IP

12   portfolio.  It had to because Micro Focus decided to take

13   on that liability for HP.  So they were looking into -- and

14   for patent infringement.

15         So they were looking at this.  They would have

16   seen the files of HP -- Micro Focus would have seen the

17   files of HP; seen that Mr. Poulin's patent was cited to

18   them a bunch of times; agreed to take on that IP; agreed to

19   take on those products; and agreed to take on that

20   liability, in light of the diligence they did and they saw,

21   which includes these disclosures of Mr. Poulin and his

22   patents.

23         So we would submit that, based on the totality of

24   the circumstances, there's sufficient evidence that they

25   knew or should have known, or were willfully blind to the

Jury Trial, Volume 5                    1267

 1    fact, before suit, of Mr. Poulin and his patents.  Thus,

 2    there is substantial evidence to support pre-suit

 3    willfulness in addition to post-suit willfulness, your

 4    Honor.

 5            And I don't know if Mr. Dacus -- do you have

 6    anything else?

 7            MR. DACUS:  I do not.

 8            MR. COBURN:  Your Honor, virtually none of what

 9    was just mentioned is in evidence.

10            With respect to the pre-suit communications,

11    again, they're all Patent Office communications.  You know,

12    this due diligence angle, not in evidence.

13            Yes, there was an acquisition; but there was no

14    exploration of what kind of due diligence was done.

15            There are standard stock purchase agreements that,

16    of course, liabilities get assumed.

17            You know, the multiple inferences that are being

18    made to try and get to some kind of willfulness, I mean,

19    that's exactly what the very clear case law on these Patent

20    Office communications is designed to prevent.  I mean,

21    it's -- the idea that -- well, first of all, the fact that

22    the patent issued would suggest that there's not a problem,

23    number one.

24            Number two, the impracticality of a mere cited

25    reference in -- a mere cited reference on a patent giving

Jury Trial, Volume 5                    1268

1    indication to the entire company that this establishes

2    knowledge for purposes of willfulness, again, it's totally

3    impractical.  And that's why, as a matter of law, it is not

4    permitted.

5           And that's all we have here in this case.  It's a

6    few snippets of -- I mean, it's literally -- I emailed it

7    to your clerk this morning, your Honor.  The testimony from

8    Mr. Poulin is about six to eight lines long, and that's all

9    there is on the pre-suit angle.

10          THE COURT:  Okay.

11          MR. COBURN:  On the post-suit angle, there's

12   certainly been no effort to cover up infringement.  You

13   know, everything has been provided.  The documents -- we

14   heard testimony from Christine Ewing.  They are dynamic

15   marketing documents by their nature.  They have been

16   provided with all the versions.  I mean, that's why we have

17   them.  These were publicly available documents on the

18   website to begin with.

19          So, you know, there's a lot of shading going on.

20   But when you look at the evidence, there is really nothing

21   there.

22          THE COURT:  Thank you.

23          I'm going to overrule the objection.

24          First of all, the Court is only seeking an

25   advisory opinion from the jury anyways.  So -- this Court

```
 1   is not bound by their finding, but I'll let them see what

 2   they have to say on the matter, so...

 3          Okay.  Anything else?

 4          MR. COBURN:  I do have one more motion, your

 5   Honor.

 6          THE COURT:  Okay.  Go ahead.

 7          MR. COBURN:  This one, your Honor, we believe

 8   we're entitled to a directed verdict of noninfringement on

 9   the theory related to TruClient Mobile Web.  This is the

10   one where Dr. Malek just admitted that there is no mobile

11   device, emulated or real, involved in the infringement

12   theory.

13          And then the second theory is the TruClient Native

14   Mobile.  That's the Firefox browser where Dr. Malek --

15   honestly, I'm not really clear on what he's testifying to.

16   I don't know if it's that he believes a browser is a

17   emulated mobile phone, or if we heard him conceding that

18   all their testing is the Bank of America website, and that

19   is not an emulated mobile phone.

20          So, either way, we just heard from Dr. Malek that,

21   under each theory, there is not a real or emulated mobile

22   device.

23          And going back to the TruClient Mobile Web one,

24   you know, the disconnection of the phone from the system

25   removes, you know, a critical software element of that
```

Jury Trial, Volume 5                    1270

1    system, as he just admitted.

2            And so under either theory, you know, they're

3    lacking the critical element of the real or emulated mobile

4    device, and he just admitted that in both instances.

5            MR. ALBERTI:  Your Honor, I'm not sure what

6    testimony he was listening to, but he actually testified to

7    the opposite of that.

8            First of all, as to the -- as to a real mobile

9    device, I think the argument is one that you already ruled

10   on in the MIL.  You said you don't need a -- to provide the

11   hardware.

12           The fact that they don't provide the actual phone

13   hardware is irrelevant to the claim.  The claim is a system

14   for testing a mobile application.  They provide the

15   software.

16           The fact that they don't provide the hardware is

17   something that they're not even allowed to argue, so I'm

18   kind of shocked that I'm hearing that today.

19           Secondly, as far as the emulated mobile device, we

20   saw in their own documents, it literally says TruClient

21   Mobile Web, quote, emulates a mobile device.  So I think

22   the jury heard substantial evidence here.

23           MR. DACUS:  I just want to also say, your Honor,

24   as one who's about to participate in the closing, those

25   questions and this argument cause me concern, because I am

1    concerned that we're about to hear that hardware is

2    required for the claim.  That's where the questions were

3    going this morning, in a very skilled and roundabout way.

4    That's where this argument lies.  And the Court has said

5    very clearly that it's not.

6          So I just raise it because I don't want to have to

7    stand up in the middle of a closing.

8          THE COURT:  I understand.

9          And I stand by the Court's ruling, and I'm going

10   to overrule your motion.

11         MR. COBURN:  Thank you, your Honor.

12         THE COURT:  Anything else?

13         MR. COBURN:  That's all I have, your Honor.

14         THE COURT:  Okay.  Anything from the plaintiffs?

15         MR. BELLOLI:  Yes, your Honor.  First, the 50(a)

16   on invalidity under 102 and 103.

17         The defense expert didn't point to a single

18   limitation in any asserted claim and point to where any

19   limitation may be found in the prior art references.

20   That's insufficient.

21         Generalized and conclusory statements about prior

22   art and invalidity are not sufficient to survive a

23   Rule 50(a) motion.  The *Fresenius* case is directly on point

24   here.  That's 582 F.3d 1288 at 1300.  That's the Federal

25   Circuit in 2009.

1           There's tons of cases on point, as we've provided

2      them to chambers.

3           But there was nothing.  There was really no

4      invalidity case put on here as to 102 and 103.  And the

5      *Frensenius* case says, you know, if an expert fails to

6      identify where one limitation is missing in the prior art.

7      So they do all the limitations but one and don't point to

8      that, the opinion is out; the art is out.

9           And, here, we have a complete failure on any

10     limitation to describe where they are in the prior art and

11     link it in any way.  No claim was pointed to.

12          And just another point in the case law.  There is

13     a lot of case law saying expert testimony is required for

14     these matters of infringement and invalidity when they are

15     of a technical nature like this.  And while there is expert

16     testimony -- not on these points, so they can't just put

17     the two documents, the two prior references, before the

18     jury and say, look, we think they are invalid, that would

19     be improper.

20          So that's the motion as to 102 and 103.

21          As to 112, there was enablement and written

22     description.  Same issue.  Generalized and conclusory

23     testimony is not sufficient for both flavors of 112 that

24     they are proffering.

25          There is no specific reference in the transcript

 1    to any claim or claim limitation.  He just kind of says:  I

 2    don't think this concept has support.  But he doesn't link

 3    it to any asserted claim or claim limitation.

 4          And so, under the *WBIP* case, the *Streck* case, the

 5    *CytoLogix* case, the *Alcon* case, these four cases we

 6    submitted to chambers, both of these defenses should go out

 7    as well.

 8          One more reason to get rid of the enablement

 9    defense is that there is -- they never addressed the fact

10    that -- whether or not a person of ordinary skill in the

11    art could enable or, you know, use the invention without

12    undue experimentation.

13          And there's case law -- and, in fact, the *Alcon*

14    case, 745 F.3d 1180 -- I don't have the pinned cite, I'm

15    sorry -- Federal Circuit 2014, that says when you don't

16    address that issue JMOL is proper on enablement as well.

17          Sorry, a lot of concepts here this morning.

18          And, you know, finally, I think there may even be

19    an implicit admission by defendants on this because the

20    only case law they submitted was on written description,

21    not 102, 103, or enablement.

22          And the one case they cite, the *Synthes* case, is

23    not a 50(a) motion.  It's where a Court found that --

24    affirmatively found, made a finding, like on summary

25    judgment or posttrial briefing, that, you know, as a matter

1  of law, the Court found that written description was

2  lacking.  It's not sufficiency of evidence or argument case

3  under Rule 50.

4          And, again, we just think that it was way too

5  general, way too conclusory; and, most importantly, just

6  not directing the jury to any claim or claim limitation in

7  making the argument.  So we think the whole invalidity case

8  fails as a matter of law.

9          THE COURT:  Thank you.

10          Response?

11          MR. SHELTON:  Thank you, your Honor.

12          I will freely admit that, as to Section 102, 103,

13  and validity, the examination was limited by our time

14  constraints.  And so I want to focus your Honor on the

15  Section 112 written description aspect of the invalidity

16  case.

17          And, there, I don't think there is any question

18  that Dr. van der Weide did provide detailed analysis.  And

19  it wasn't necessary, because of the nature of the written

20  description defense here, to go into the claims and go

21  element by element, because the issue there was -- and it

22  was clearly framed in each of the questions that were posed

23  to Dr. van der Weide -- was whether the asserted claims

24  were supported by the specification with regard to whether

25  the mobile device that's tested in the claims could be a

Jury Trial, Volume 5                    1275

1   real mobile device.

2          So that was stated precisely as the predicate for

3   each of the questions.  And Dr. van der Weide -- so there's

4   11 pages in the trial transcript, your Honor, starting on

5   page 1120 yesterday.  And in each case, Dr. van der Weide

6   went through the four passages in the patents, and that

7   same language is in each of the patents that are asserted,

8   and Figures 1A and Figure 7.  And Dr. van der Weide

9   explained that each passage that the parties agreed

10  constitutes the sole disclosure of testing on a physical

11  mobile device.

12         And Dr. van der Weide presented opinion testimony,

13  consistent with his expert report, that the written

14  description requirement was not met.  So I can't imagine

15  what more he could have presented to the jury to allow a

16  finding that the written description requirement has not

17  been met here.

18         THE COURT:  And let me ask:  Are you conceding

19  anticipation and obviousness?

20         MR. SHELTON:  Yes, your Honor.

21         THE COURT:  Okay.  So based on your conceding

22  that, I will grant the motion as to those two.

23         And then do you want to respond to the written

24  description?

25         MR. BELLOLI:  Are you conceding enablement as

1   well?

2           MR. SHELTON:  We'll concede enablement.

3           MR. BELLOLI:  Okay.  So with written description

4   again, it's just naked testimony about sections of the

5   specification and figures.  It's not tied to any claim.

6           He's not asked, you know, is this claim limitation

7   lacking support.  And it's just a couple of pages of the

8   trial transcript.  It's page 1120 to -- 1120 for both

9   enablement and written description, so that's not all of

10  it.

11          But, again, there is just no linking, and it's

12  conclusory testimony.  It's just:  Does this

13  specification -- does this cite support your opinion,

14  essentially?  Yes.

15          Does this figure support your opinion?  Yes.

16          And then it's just conclusory.  There is no

17  explanation.  You have to explain why the written

18  description is lacking.

19          And, again, under the cases we submitted, such

20  high-level generalized conclusory testimony is just not

21  sufficient.

22          But I really think that where you can cut it off

23  is it is just never linked to any claim in this case.  He

24  didn't give an opinion that this claim, this element,

25  lacking written description.

Jury Trial, Volume 5                    1277

1          And I would really just submit that there is nine

2     pages.  They are a pretty quick read.  And if the Court

3     sees those nine pages, it will agree that this was cursory

4     and not sufficient and not pointing to any claim or claim

5     limitation.

6          MR. SHELTON:  Your Honor, I would make the same

7     suggestion to the Court, that your Honor read the nine

8     pages.  And you will see that for each of the four

9     passages, Dr. van der Weide wasn't just asked, does this

10    support your opinion, which would be cursory and

11    conclusory.

12         But, instead, he was asked, what would this teach

13    a person of ordinary skill in the art and then is that

14    sufficient, in your opinion, to show that the inventor

15    possessed the full scope of the invention, which this Court

16    has decreed involves testing on both emulated mobile

17    devices and real mobile devices.

18         So if your Honor took, you know, a moment to read

19    this testimony, I think you will see -- and, of course, you

20    were here -- that that was more than ample support for the

21    jury to find that the written description requirement has

22    not been met for any of the six claims.

23         MR. BELLOLI:  Okay.  Last thing, your Honor, are

24    just the slides that they showed.

25         Okay.  All the slide says, was the inventor in

```
 1  possession of the claimed invention?  And it points to,

 2  like, a figure.  It just points to figures.  They never

 3  link it to any claim.  They never link it to any claim in

 4  any way, shape, or form or specific claim limitation.

 5          You have to have a claim limitation that fails the

 6  written description requirement of 112, and they just don't

 7  do it.

 8          I don't know -- really, other than to formally

 9  brief this, I don't know how to put it out -- or to have

10  the Court review the testimony and make a determination if

11  it's too general, too conclusory, too cursory, and not

12  linked to any claim or claim limitation.  I think that's --

13          MR. SHELTON:  Your Honor, may I read one question?

14          THE COURT:  Go ahead.

15          MR. SHELTON:  And this is from the -- this is the

16  first element -- I'm sorry -- the first passage.

17          So I asked Dr. van der Weide --

18          MR. BELLOLI:  What page again?

19          MR. SHELTON:  I haven't said.

20          Trial transcript 1121, starting on line 18.  And I

21  asked Dr. van der Weide:  "And what I'm going to do, sir,

22  is I'm going to take you through each of those; and I'm

23  going to ask you if, in your opinion, the passage will

24  demonstrate to a person of ordinary skill in the art at the

25  time of the invention that the inventor, Mr. Poulin,
```

 1    actually invented the concept of meeting all the claim

 2    limitations that are asserted in this case but using a real

 3    mobile device as opposed to an emulator."

 4            I mean, that sets the full necessary predicate.

 5    It's not conclusory, and it --

 6            And then, in his answer --

 7            THE COURT:  Well, let me ask you:  I mean, how

 8    does that meet clear and convincing evidence?  You have to

 9    show that by clear and convincing evidence.  And so how

10    does that one question get you there?

11            MR. SHELTON:  How does -- I'm sorry.  What?

12            THE COURT:  I mean, you have to show by clear and

13    convincing evidence.  And so, those nine pages and that

14    question and answer you just gave me, how does that get you

15    there?

16            MR. SHELTON:  I just read the question, sir.  I

17    didn't read the answer.

18            THE COURT:  Well, I understand.  But, I mean...

19            MR. SHELTON:  Well, when you're talking about

20    written description, it supports that something is missing.

21    And the parties agree that there is only four passages.  He

22    went through all four.

23            And his opinion was that it's not sufficient to

24    show.

25            And he used Figure 1A and showed, for example,

 1   that the authoring environment -- the authoring tool has a

 2   one-way arrow to the mobile device.  It's not two-way.

 3           And there's -- I mean, Dr. Malek admitted on

 4   cross-examination on Tuesday that every embodiment, every

 5   embodiment of all three patents, deals only with the

 6   emulator.  That's their expert.  He admitted that.

 7           So there is no embodiment that teaches testing on

 8   a real mobile device that would meet the claim limitations,

 9   and the only four passages that the parties agree have

10   anything to do with a real mobile device have been shown by

11   a qualified expert to not have anything to do with meeting

12   the limitations of the claims.

13           I can't imagine what more could have been done.

14   And I think, your Honor, that it more than meets the clear

15   and convincing evidence standard.

16           MR. BELLOLI:  I think the question he asked and

17   read, your Honor, as his best evidence of a question just

18   says, did Mr. Poulin actually -- I mean, he's asking him

19   basically did Mr. Poulin actually invent the concept of

20   meeting all claim limitations that are asserted in this

21   case.

22           You know, might as well just put the patent in

23   front of the jury and say, hey, you figure out if a written

24   description is here.

25           THE COURT:  Okay.  Well, of course, the Court

1   hates pulling things away from the jury.  But in this

2   situation I just don't see how the defense gets there,

3   because the written description requires potential evidence

4   that's not conclusory.  And that's the problem, is the

5   evidence you have is conclusory.

6          And, of course, in the case that's been cited to

7   the Court, in *WBIP* 829 F.3d 1317, the Federal Circuit

8   affirmed the District Court's denial of JMOL that the

9   asserted claims lack written description.

10          There, the written description defense went to the

11   jury, which found for the plaintiff.  Defense appealed and

12   argued the JMOL should have been granted.

13          While this is not in the same procedural stance,

14   because the Court is faced with granting plaintiffs' JMOL

15   as opposed to denying defendants' on invalidity, the

16   Federal Circuit discussed the expert's testimony and

17   explained why it was legally insufficient.

18          In *WBIP* the expert answered three questions on

19   written description.  The attorney was doing more

20   testifying than the expert, as the attorney asked long,

21   leading questions; and the expert replied succinctly and

22   referred back to the slides.

23          The Federal Circuit said that the defendant never

24   presented the jury with the detailed argument required to

25   establish invalidity by written description.

Jury Trial, Volume 5                          1282

1            The Federal Circuit called this general conclusory

2    testimony that does not suffice as substantial evidence of

3    invalidity.  This evidence does not rise to the level of

4    clear and convincing evidence, is a quote from the Federal

5    Circuit.

6            Similarly, in this case, the defendants' expert

7    addressed written description in, really, a quick fashion.

8    While, in this case, it's more than three questions, it was

9    approximately just five minutes of his testimony, total.

10            The attorney on direct examination asked long,

11    leading questions, designed to speed things up.  And the

12    defendants' expert referred back to his slides so much that

13    the transcript does not clearly state his opinions.  This

14    is the type of general, conclusory testimony that is

15    legally insufficient to demonstrate invalidity.

16            And I looked at the case y'all had cited, and I've

17    looked at the testimony as well.  The case you cited -- is

18    it -- I'm not -- it's S-Y-N-T-H-E-S.  It was very

19    different, and it had a lot more detailed testimony than we

20    have in this case.

21            So I am going to grant the plaintiffs' motion and

22    exclude the written description defense from going to the

23    jury.

24            Anything else?

25            MR. BELLOLI:  We do have kind of a four-part 50(a)

1    on infringement, your Honor.  I don't think there needs to

2    be argument.  I just want to read into the record to

3    preserve it, if that's okay.

4           THE COURT:  Go ahead.

5           MR. BELLOLI:  Okay.  So pursuant to Federal Rule

6    of Civil Procedure 50(a) plaintiffs move for judgment as a

7    matter of law with respect to the issue of infringement.

8           Defendants have not presented a legally sufficient

9    evidentiary basis for a reasonable jury to find for them on

10   their defense of noninfringement.

11          Four noninfringement arguments were in this case.

12          The first was Micro Focus argued that none of the

13   accused products include, quote, an application for a

14   mobile device, as required by the preamble of the three

15   patents.

16          This argument fails as a matter of law.  The

17   reason it does is as follows:  The claims do not require an

18   application for a mobile device to infringe.  The preamble

19   of Claim 1 of the '192 Patent requires a system for

20   developing an application for a mobile device.  And the

21   preamble of Claim 1 of the '864 Patent and the Claim 45 of

22   the '678 Patent require a system for testing an application

23   for a mobile device.

24          Accordingly, developing and testing an application

25   for a mobile device is the purpose of the claimed system,

1   but the application itself is not part of the claimed

2   system.

3          Therefore, Micro Focus' first noninfringement

4   argument fails as a matter of law.

5          The second Micro Focus noninfringement argument is

6   that none of the accused products infringe either Claim 1

7   or 2 of the '192 Patent because they do not satisfy

8   independent Claim 1's requirement of a software authoring

9   device on the ground that LoadRunner -- the LoadRunner

10  products VuGen interface is for developing test scripts and

11  not for writing source code for a mobile application.  This

12  argument was made in the trial transcript at pages 1036 to

13  1039.

14         This argument also fails as a matter of law.

15  Plaintiffs demonstrated that a software authoring device is

16  a software tool that a developer is using for development

17  and testing of an application.  Trial transcript page 368.

18         Testing is part of the development process so

19  testing software qualifies as software for software

20  authoring.

21         Plaintiffs further showed that the LoadRunner's

22  VuGen software, which is accessible for all LoadRunner

23  products, allows for creating and editing scripts which

24  meets this limitation.  And this was unrebutted.  This is

25  pages 368 to 370 of the trial transcript.

1          Micro Focus' third noninfringement argument was

2    that the accused products do not display one or more

3    windows showing resources of the mobile device as required

4    by the Court's construction for each of the asserted

5    claims.

6          This argument fails as a matter of law.

7          With respect to the LoadRunner products with

8    Network Virtualization using TruClient Mobile Web,

9    plaintiffs demonstrated that the accused products show

10   throughput and page load event graphs that show resources

11   of the mobile device.  This is trial transcript pages 380

12   to 382.

13         Plaintiffs also introduced PX-371 and PX-465,

14   which show additional graphs that show resources of the

15   mobile device.

16         This is unrebutted.  Dr. Shoemake did not address

17   this at all.

18         With respect to the LoadRunner products with

19   Network Virtualization and UFT Mobile, TruClient Native

20   Mobile, plaintiffs also demonstrated that during a

21   TruClient Native Mobile test the accused products display

22   CPU, memory, and throughput metrics that each show

23   resources of the mobile device.  This is at trial

24   transcript 371 to 374.  This was unrebutted.

25         Finally, Micro Focus' noninfringement argument

```
1    Number 4.  Here, they argue that none of the accused

2    products are programmed to execute the application for a

3    mobile device within, as required by each of the asserted

4    claims.  This argument fails as a matter of law for the

5    same reasons as the -- their first argument that also fails

6    as a matter of law.

7              That's the motion.

8              THE COURT:  Well, those will be denied, so...

9              MR. BELLOLI:  Thank you.

10             THE COURT:  Okay.  Anything else?

11             MR. BELLOLI:  No, your Honor.

12             MR. SEARS:  Just a housekeeping question.

13             The instructions are going to be taken up --

14   objections -- record is going to be made on that after

15   the jury --

16             THE COURT:  Yeah.  We'll do objections to the

17   charge right after -- when the jury goes out.  So there

18   will be no waiver for that.

19             Okay.  So I have new copies that have the

20   invalidity taken out.  And so we'll give you copies of

21   those, if you want to use those during argument in any way,

22   and the verdict as well.

23             We'll take maybe ten minutes and then get started.

24   Maybe 15.  I know the jury has been waiting, but y'all can

25   get set up, and we'll get started with closing arguments.
```

Jury Trial, Volume 5                          1287

```
 1   Of course, those will be first.  And then we'll hear my
 2   instructions.
 3            My plan would be to try to push through and have
 4   their lunch come a little later.
 5            I don't know if you talked to them about that.
 6            Yeah, so we'll get the closing arguments done.
 7   And if they need a break, we'll do both closing arguments,
 8   I'll take a short break if they need one.  If not, I'll
 9   push through, do my instructions.  Then they can go up and
10   have their lunch.  Okay?  And then we can do objections to
11   the charge and a verdict at that point.
12            Anything else before we take -- we'll take a
13   break, and then we'll start back in 15 minutes.
14            MR. BELLOLI:  Thank you, your Honor.
15            THE COURT:  Okay.
16            (Recess, 10:36 a.m. to 10:56 a.m.)
17            (Open court, all parties present, jury not
18   present.)
19            THE COURT:  Please be seated.
20            One thing before I bring the jury in, I am going
21   to tell the jury what I've done on the issue of invalidity
22   so -- because the jury doesn't -- and the void.
23            So I am going to instruct them to disregard the
24   testimony of their expert and that invalidity is no longer
25   part of the game.
```

Jury Trial, Volume 5                    1288

1           How do you pronounce your expert's last name?

2           MR. SHELTON:  It's Dr. van der Weide.

3           THE COURT:  Weide, okay.  Thank you.

4           MR. SHELTON:  Yes, sir.

5           THE COURT:  Okay.  Let's bring the jury in.

6           (The jury enters the courtroom, 10:57 a.m.)

7           THE COURT:  Please be seated.

8           Okay.  Ladies and gentlemen, first, let me

9    instruct you that, members of the jury, that yesterday you

10   heard testimony from the defendants' expert,

11   Dr. van der Weide, on invalidity.  I have since now -- this

12   is what happened while you were gone -- I have since

13   dismissed the defendants' invalidity claims, and it is no

14   longer part of this case.

15           This means you should disregard his testimony on

16   invalidity.  You will not be asked to determine if the

17   asserted claims are invalid.  Instead, I'm instructing you

18   you should presume the asserted claims are valid.

19           And so now we will hear the closing arguments, and

20   the plaintiffs will go first.  Mr. Dacus.

21           MR. DACUS:  Thank you, your Honor.

22           May it please the Court, your Honor?

23           THE COURT:  Yes.

24           MR. DACUS:  Thank you.

25           Good morning.  I want to start this morning where

Jury Trial, Volume 5                    1289

1  we started on Monday morning.  And in some ways that Monday

2  morning feels like yesterday, and in some ways it feels

3  like it was a month ago.  But I want to say to you a very

4  sincere thank you.

5       I said to you on Monday morning that we would not

6  be here if this case was not important.  I hope by now you

7  understand what we meant when we said that.

8       And I want to say one thing.  As Donavan and I

9  talked last night about what's happened this week and

10 what's to occur today, I know one thing he wants me to make

11 sure that I say to you is this is an unconditional thank

12 you.  It's not a conditional thank you based on you

13 answering these questions one way or the other; it's

14 unconditional.

15      He's asked for one thing, an opportunity to

16 present his case for what he believes, what we believe is a

17 very serious wrong.

18      Now, when we came together on Monday, I showed you

19 this timeline.  Everything in this timeline, I think, has

20 proven to be accurate.  But you now have a lot more facts

21 related to this timeline.  You know that when, in the early

22 2000s, when Donavan was developing these apps, when he was

23 developing these testing systems for these apps, he was way

24 ahead of his time.  Sort of the proof is in the pudding

25 that he was ahead of his time.

 1          You remember those questions to him about the fact
 2   that, boy, you sure had a hard time raising money.  You had
 3   a hard time getting people invested.
 4          That's all true.  No one has ever denied that, in
 5   the early 2000s.
 6          Mr. Weinstein and I were talking at the hotel on
 7   that Tuesday after Donavan testified.  And he said to me,
 8   you know, those questions are a little unfair because
 9   people didn't realize in the early 2000s exactly how
10   explosive these apps and these mobile applications were
11   going to become and exactly how valuable this testing would
12   become.
13          And that's the truth.  People didn't understand
14   that.  And that's true with many inventors who have the
15   ability to look ahead.
16          You also know from this timeline that, indeed,
17   mobile applications and the testing of them did explode.
18   We all know how common mobile apps are, how common our
19   smartphones are, all through the middle 2000s and up to
20   today.
21          You also know an additional piece of information;
22   and that, is in 2017, Micro Focus purchased the LoadRunner
23   division of Hewlett Packard, and they paid $8.8 billion for
24   that.  $8.8 billion.
25          Hewlett Packard had spun this division off.

Jury Trial, Volume 5                    1291

1    Hewlett Packard, who was on notice of Mr. Poulin's patents,

2    had spun this division off and essentially said, we're

3    separating ourselves from it, we don't want anything to do

4    with it.

5         Micro Focus shows up and says, we think it's very

6    valuable.  Our business has some issues.  We have some

7    deficiencies at our business.  We want to purchase this

8    software division.

9         Hewlett Packard apparently said to them, you can

10   do that, but there's potential problems with this,

11   including potential infringement.

12        And Micro Focus said, that's okay.  We'll take it.

13   We'll take it.

14        That's how desperate and how in need they were for

15   this business.

16        You also know, to add to this timeline, that

17   because of the fight that these folks over here have waged

18   that Mr. Poulin had to give up 40 percent of his business.

19   He had to give up 40 percent of his business, a business

20   where these three patents are the foundation of the

21   business, where he is the sole inventor on those patents.

22   And he's been forced to give up 40 percent of it.

23        Now, what did Micro Focus tell you on Monday?

24   What did Micro Focus -- this is the very first slide they

25   showed you.  This is what they told you, "Micro Focus is an

Jury Trial, Volume 5                    1292

 1   innovative software company."

 2           You now know, at best, that is a misleading

 3   statement.  There is no innovation related to these

 4   LoadRunner products.  These folks didn't innovate these

 5   products.

 6           They know we're here about the LoadRunner, UFT and

 7   Network Virtualization products.  They didn't innovate

 8   these.  They bought them.

 9           They also said one other thing to you, oh, we have

10   1800 patents.  Okay.  That may be a true fact, but none of

11   those patents cover the technology related to this

12   LoadRunner product or related to Donavan's technology.

13           You know for a fact that if they had patents that

14   covered and were related to these LoadRunner products --

15   what would they have done?  They would have run to that

16   witness stand to show you and tell you, hey, we don't use

17   his patents because we have our own on this very stuff.

18           You didn't hear any of that.  It's because they

19   don't.  It's a little bit of a misdirection.

20           The second thing they told you is, Micro Focus'

21   software products are for testing servers.

22           Well, again, that's kind of a half-truth.  They

23   are for testing servers, but what they didn't say is they

24   are also for testing mobile applications.

25           I cannot count the number of documents that we

 1  have seen in the evidence in this case that say the

 2  LoadRunner is for testing mobile applications.

 3          So, again, if this was a completely truthful

 4  statement to you, they would have said the products are for

 5  testing servers and mobile applications.

 6          They also said that they are very different from

 7  the Wapp patents because they do test servers.  You know

 8  from the evidence that's not true.

 9          Donavan took the stand and told you, my patents

10  cover testing of applications.  That includes an

11  end-to-end, meaning when you are testing the app you

12  necessarily have to test the network that the app is on,

13  including the server.  You have to test all the way from

14  the app to the server and all the way back, end-to-end.

15  Dr. Malek confirmed that, that that's what these patents

16  are about.

17          So this LoadRunner and Network Virtualization

18  product is not different than the patents; it's exactly

19  like them.

20          They also said Wapp's patents are invalid because

21  they are defective.  And you remember the lawyer stood up

22  here and said, they are anticipated, they are obvious,

23  there is lack of written description, there is lack of

24  enablement; we're going to prove all that to you.

25          You know that's just not true.  The judge just

1   found you two minutes ago he's found these patents are not

2   defective; they're presumed to be valid.

3        Finally, they said Wapp's damages claim grossly

4   overreaches.  Nothing could be further from the truth.

5   Absolutely not.  These folks paid $8.8 billion for this

6   technology.  $8.8 billion.

7        What Mr. Poulin has said -- and we're going to

8   walk through this in detail -- what Mr. Poulin has said is,

9   hey, some of that value my patents contributed to, so I'd

10  like my fair share that the law requires.

11       Now, when we talked on Monday, I told you there

12  were going to be two questions.  I think, yesterday, they

13  said somehow I misled you and told you -- and I should have

14  told you there were going to be three.  Turns out there are

15  two.

16       The first one is; do these folks include in their

17  product these three patents?  As you well know by now,

18  that's what we call infringement.

19       You well know what the law is.  The Judge is going

20  to read you some instructions, after we sit down from

21  closing arguments, and he's going to give you detailed

22  instructions about how to go about this infringement

23  analysis.  It's going to look exactly like what I think

24  I've told you previously.

25       But there are two things I want you to be aware of

Jury Trial, Volume 5                    1295

1    when the Micro Focus lawyer talks.  When you're judging

2    infringement, you are to look at the patent claim.  That's

3    the actual language in the patent entitled claim.

4         You are not to look at the figures and you are not

5    to look at the specification.

6         The figures are simply examples.  They are not the

7    full claim.  They are not the full fence around your

8    property.  They are just examples to show people how you

9    could do this.

10        So if they start pointing to figures when they

11   start talking to you here in a minute, or if they start

12   pointing to the specification, you need to think:  Why are

13   they doing that, because that's not what I'm supposed to be

14   comparing this to.

15        And you need to ask yourself why they are asking

16   you to look there, rather than at what the Judge is going

17   to tell you to do, and that is look at the claim.

18        Now, you've heard a bunch of evidence.  You heard

19   Dr. Malek take the stand for three or so hours on Tuesday.

20   He has walked through with you, including this morning, all

21   the evidence.

22        He's identified for you all the things he's looked

23   at, the source code, the technical documents, the marketing

24   documents, the depositions of the employees, on and on and

25   on, to identify specifically for you where every phrase and

Jury Trial, Volume 5                    1296

1   limitation in those claims is found in the LoadRunner

2   products.

3          I'm not going to stand up here and attempt to do

4   that.  If I did, I'm sure Dr. Malek would cringe at how

5   imprecise I am.  There is no way, in the 40 or so minutes

6   that I have, to walk through all that evidence.

7          And I'm confident, I don't need to.  I'm confident

8   you heard him; you understood what he said.  And at the end

9   of the day all of these LoadRunner products with Network

10  Virtualization and/or UFT Mobile infringe Claims 1 and 2 of

11  the '192 Patent, Claims 1 and 2 of the '864 Patent, and

12  Claims 45 and 49 of the '678 Patent.

13         I do want to comment on a few things related to

14  the evidence, some things you did hear and some things you

15  didn't hear.

16         So think about who likely knows these products

17  best.  Converse to what was said from the witness stand, I

18  don't think it's their customers.  It's the engineers who

19  developed these products, right?

20         So what often happens in these cases is if you are

21  sued for patent infringement your engineers take the stand

22  and say:  Hey, we don't use this patent.  Let me explain to

23  you how this product was developed, exactly how it works.

24  Let me show you the design drawings for the development,

25  all of our notes related to the development.

1           That didn't happen at all.  It didn't happen at

2    all.

3           In fact, the only engineer who knows about this

4    product, from 2014 forward, back from his days at Hewlett

5    Packard, all the way through his days at Micro Focus, was

6    the first gentleman you heard from Israel, Sharon -- I

7    think Levin or Levine.  And what did he say about all of

8    this?

9           Remember all these arguments about we don't

10   emulate, there is no virtualization.  So this is a guy who

11   has been with the product -- unlike Mr. Roboostoff, who

12   didn't come into the picture until 2017 -- Mr. Levin says,

13   with respect to the LoadRunner product, it fully emulates

14   this entire environment.

15          He went on to say everything is being emulated.

16          And there, at the bottom, he said, "Using this

17   technique while everything is being virtual.  Literally,

18   everything is being virtualized."

19          So here is the engineer -- these folks are here

20   telling you nothing is emulated.  Here is the engineer who

21   has been with this product the entire time that it's been

22   infringing on Donavan's patents, and he says:  Yeah, it's

23   emulate.  Of course, it's emulating.  Of course, it's

24   virtualized.

25          Think about this also.  Often in these cases what

1    you see are employees who are -- engineers, particularly,

2    who are familiar with the products testify -- and you may

3    have been expecting this yourself -- to say:  No, we don't

4    infringe.  I know this product inside and out.  I've looked

5    at the patent, and we don't infringe.

6         Not a single employee, not a single employee, not

7    a single engineer from Micro Focus took the stand and said,

8    hey, I read these patents and then I looked at our

9    products, and we don't do this.

10        Think about how incredible that is.  Not a single

11   one of them did that.

12        In fact, I asked Mr. Roboostoff -- remember, this

13   lawsuit has been going on for two and a half years.  I

14   asked Mr. Roboostoff, I said:  Have you looked at these

15   patents?  I mean, you've been fighting us for two and a

16   half years.  You said you've been in a bunch of meetings

17   with Wapp Tech representatives.  Have you bothered to read

18   the things?

19        And he said:  No, I haven't, but I've looked at

20   some excerpts.  I've looked at some excerpts.

21        Not a single engineer from Micro Focus took the

22   stand and said:  I've looked at the patent; and here, Mr.

23   and Mrs. Juror, here is where we don't do this.

24        Now, they did hire somebody and paid them a good

25   wage to come in here and tell you they didn't do it.  But

 1   that's very different than someone from this company taking

 2   the stand, raising their right hand, saying, I know the

 3   product and we don't do it.  No one did that.

 4           Mr. Staten came and testified on their behalf.

 5   Flew in from Atlanta.

 6           Have you read the patents, Mr. Staten?

 7           No, I haven't read them.

 8           Lawsuit's been going on for two and a half years,

 9   Mr. Staten.  When did you first get contacted about this?

10           December of 2020.  December of 2020.

11           That's the gentleman they bring here to testify;

12   but, apparently, not to say they don't infringe.  But he

13   hasn't even read the patents.  Hasn't even bothered to read

14   the patents.

15           Now, if you find that, in fact, these products

16   include these three patents, you already know the Court is

17   going to ask you to determine what the reasonable or fair

18   value of damages are.

19           You know there is a fight about how much revenue

20   these folks made on these products.  We say it's

21   $423 million.

22           You've heard a lot of evidence from both sides --

23   or at least argument from both sides -- that that number is

24   wrong.

25           The issue turns on, as you now know well, whether

1   or not Network Virtualization was included in LoadRunner as

2   far back as 2015, because that's what Mr. Weinstein

3   counted.  That's what the issue is.

4          What do the documents say?

5          This is Plaintiffs' Exhibit 63.

6          When you go back in the jury room, if you want the

7   exhibits, you can have them.  For those of you who are

8   taking notes, you can write this down if you choose to.

9          Plaintiffs' Exhibit 63, what does it say on this

10  issue?  Remember, this is a Hewlett Packard document,

11  sometime before March of 2017, and it says Network

12  Virtualization is integrated in LoadRunner.

13         And then that first bullet point says Network

14  Virtualization is part of LoadRunner.

15         They took the witness stand and told you it's not.

16         Again, this is one of those issues where I said at

17  the beginning of the trial you may need to draw a line down

18  the middle of your paper, compare what they say on the

19  witness stand to what the documents say.

20         This is a document that came from Hewlett Packard,

21  transferred to Micro Focus.  It was their internal

22  documents.  And it says exactly what they try to convince

23  you is the opposite now.

24         It's not the only document.  This is the owners

25  manual from 2015.  It's Plaintiffs' Exhibit 40.  Again, if

1    you want to look at it, you can look at page 1364.  It says

2    clearly, in 2015, "The LoadRunner setup wizard prompts you

3    to install Network Virtualization at the conclusion of the

4    installation."

5            So, again, they took the stand and tried to

6    convince you that Network Virtualization is not part of

7    LoadRunner, and the documents say just the opposite.

8            And, by the way, none of those witnesses who took

9    the stand were even at Hewlett Packard, including

10   Mr. Roboostoff.  So that from 2015 through September

11   of 2017, when they purchased Hewlett Packard, that's part

12   of what they owe us for.  None of these people who took

13   this stand were even at Hewlett Packard.

14           Hewlett Packard's documents say exactly what we

15   say to you:  Network Virtualization was part of LoadRunner,

16   and so those revenues should be included.

17           And me saying that out loud prompts me to say one

18   other thing.  From 2015 to September of 2017, these were

19   Hewlett Packard products, Hewlett Packard issues.  How many

20   people from Hewlett Packard came here, raised their right

21   hand, looked you in the eye, and testified to corroborate

22   and support what they say?  How many?  Not a single one.

23   Not a one.  Not a one.

24           I mean, when you're judging credibility, wouldn't

25   you want to hear from the people who were actually there?

1    I mean, they knew we were going to show this document.  Why

2    didn't someone from Hewlett Packard come and say, "No, that

3    document's wrong.  Even though it's an owner's manual, a

4    technical document, it's wrong"?

5         Because it's not.  It's absolutely accurate and

6    correct.

7         When you include those revenues, you have to -- as

8    Mr. Weinstein explained, you have to apportion down to the

9    profits.  The law says we're not entitled to all that

10   423 million; you have to figure out what profit these folks

11   make.  And that's exactly what he did, and he used the

12   gross profit margin.

13        As he explained originally, and as he explained

14   this morning, he used the exact profit calculation that

15   these folks use in their -- in the conduct of their

16   business.  He used the exact one.

17        What they came here and told you is, well, if you

18   deduct all of the expenses, we don't make any money.

19   Which, of course, begs the question:  What does all of the

20   expenses mean?

21        And we now know.  We now know.  You've got the

22   gang of six, the six directors who make $54 million, not

23   just in one year, but the entire time that they should be

24   paying Donavan for his invention, 2015, '16, '17, '18, '19,

25   '20, those people are -- those six, we're not even talking

Jury Trial, Volume 5                    1303

1    about the other 14,900 and whatever it is that work there,

2    we're talking about six.

3          In addition to that, in 2018 alone, they're buying

4    back $400 million of their own stock.  And we know why

5    they're doing that.  Mr. Roboostoff told us.  I gave him

6    every chance to say that this company respects property

7    rights, patent rights, constitutional rights, and small

8    inventors.  Every chance.  And what did he say?  We care

9    about our customer, and we care about our investors and

10   shareholders.

11         THE COURTROOM DEPUTY:  You've used 20 minutes.

12         MR. DACUS:  Thank you.

13         That's exact -- I mean, it was astonishing, just

14   to be frank.  Astonishing that he wouldn't say, "And we

15   care about inventors.  We care about constitutional

16   property rights."  He told you exactly what they care

17   about.

18         It's no surprise.  Their own annual report that we

19   looked at told you, look, we don't judge our employees on

20   whether or not they're good corporate citizens, whether or

21   not they do the right thing.  We don't judge them on that.

22   We judge them on how much money we make.

23         That's not me saying that; that's their own

24   document saying that.

25         When you apportion this to the profits and then

1    you further apportion so that you get it down to just the

2    patented invention, what you wind up are profits related

3    to, profits solely attributable to Donavan's patents, are

4    $223 million.

5            They would have never made any of that money.

6    Those are the profits solely attributable to Donavan's

7    patents.

8            But Mr. Weinstein didn't stop there.  He said,

9    look, I don't think that you would get to keep all those

10   profits.  You're going to have to give Micro Focus the

11   normal amount of return -- the return on invested capital,

12   as he said -- that they normally earn, and that would allow

13   you, Donavan, to keep 77 percent.  That's how this

14   negotiation would have gone.

15           Their own expert, Mr. Nelson, says, well, I think

16   it would have been 50/50.  So it's somewhere between

17   50 percent and 77 percent.

18           But 50/50, how -- what math went into that?  I

19   think Mr. Weinstein said this morning it's as if it just

20   fell out of thin air, and I really don't disagree.

21           So, in the end, if you find there's infringement,

22   the amount of damages that the law requires, the fair value

23   to Mr. Poulin is $172.5 million.

24           I'm going to sit down now.  These folks are going

25   to get a chance to talk for a bit.  And then, when they're

 1    done, I'll have a chance to revisit with you.

 2           Thank you.

 3           THE COURT:  Thank you, Mr. Dacus.

 4           Would the defense like to give their closing

 5    arguments?

 6           MR. SHELTON:  Thank you, your Honor.

 7           May it please the Court.

 8           Good morning, ladies and gentlemen.  It's my

 9    pleasure to speak on behalf of Micro Focus and our team.

10           And this is a special day for me.  I had my first

11    trial nearly 20 years ago in this courtroom before the

12    Honorable Judge Brown, and so it's very special for me to

13    have tried this case.  This is the first time I've tried a

14    case in Sherman since then.

15           And it's really my pleasure to advocate on behalf

16    of my client, Micro Focus.

17           And you've heard a lot of evidence in a short

18    amount of time.  We know it's been difficult.  We know

19    there's been a lot of technical jargon and concepts thrown

20    at you.  You've been introduced to client-server

21    architecture that you probably never thought about or cared

22    about before.  And I'm sure that you're anxious, now having

23    heard all the evidence, to get to work and decide the

24    questions that have been posed before you.

25           In about an hour, Judge Mazzant will send you to

1    the jury room, and you will have a verdict form with a

2    couple of key questions that you need to decide.  And don't

3    ever forget that you are the judges of the facts.  You've

4    now heard all the evidence.  You've seen all the witnesses.

5    Some appeared live.  Some appeared by deposition.  And

6    you've seen all kinds of documents, and those that have

7    been admitted will be in the jury room for you to inspect.

8            And the first question that you have to decide,

9    starting today, soon, is whether Wapp has proven by a

10   preponderance of the evidence that Micro Focus infringed

11   any of the asserted claims.

12           Now, I found it quite striking that Mr. Dacus,

13   who's a very skilled lawyer -- along with all of the

14   skilled lawyers who represent Wapp -- that he put up one

15   slide about infringement.

16           Make no mistake about it, this case is about

17   infringement.  They have made a very serious charge that

18   Micro Focus has infringed the three patents, and all that

19   you heard about their infringement was a bunch of green

20   checkmarks on a slide.

21           So I'm going to spend most of my time with you

22   showing you, once again, as our experts have, why Micro

23   Focus doesn't infringe.  That is the central question in

24   this case.

25           And if you answer "no" to Question 1 on

1   infringement, you're done.  You're done.

2        And the -- as you know, the question asks:  Has

3   Wapp proven their burden of proof by a preponderance of the

4   evidence.

5        You've heard about the feather.  You saw the

6   little video of a feather floating down and landing on the

7   scale.  That doesn't mean that all they have to do is say:

8   Micro Focus infringes; we're done; please go to the jury

9   room and check "yes."  They have to prove their case, and

10  they have to prove that it is more likely than not that

11  Micro Focus infringes.

12        Now, we don't have a burden of proving that we

13  don't infringe.  And, yet, we have proven that Micro Focus

14  software, when sold in the United States, does not

15  infringe.

16        Judge Mazzant will soon instruct you that the

17  evidence you are to consider consists of, one, the

18  testimony of the witnesses; two, the documents and other

19  exhibits admitted into evidence; and any, three, fair

20  inferences and reasonable conclusions you can draw from the

21  facts and circumstances that have been proven.

22        And let's talk about witnesses for a moment.  The

23  only fact witness that Wapp presented is the inventor,

24  Mr. Poulin.  He told you nothing about infringement.  He

25  told you nothing about damages.  But it did seem that, if

1   there was a purpose to his testimony, it was to leave the

2   firm impression in your minds that he has somehow been

3   wronged and has never been able to be successful because

4   Micro Focus infringed.

5          The reality is -- you may recall, when he was

6   introduced and started his testimony, that a list of four

7   awards was shown.  Now, those had nothing to do with the

8   inventions that are at issue here, but they were awards for

9   his other businesses.  The reality is that Mr. Poulin is a

10  successful, sophisticated businessman.  He has enjoyed

11  success in his other ventures.

12         And the reality is, you saw his software.  Every

13  bit of software that Mr. Poulin wrote when he was the only

14  member of Kiwi International, when he was working on what

15  he called myMCOM, which was to be the realization of the

16  patents at issue here, we showed you every application he

17  wrote.  And I know, I can say without any doubt, any

18  hesitation, that we have shown you everything, that they

19  were produced to us.  And Mr. Poulin's lawyers told us that

20  we had all the source code, and we showed you all six

21  applications.

22         Now, you saw during Mr. Poulin's cross-examination

23  that he had testified under oath that he actually

24  implemented Network Virtualization.  But when we played

25  those six soccer videos, you didn't see that.

1          So if there was any purpose to Mr. Poulin's

2     testimony here, it didn't have anything to do with the

3     facts that you have to decide; it had to do with tugging at

4     your heartstrings.  That is improper.

5          Judge Mazzant will also instruct you that you may

6     not be influenced by passion, prejudice, or sympathy.  And

7     I ask you to follow that instruction.

8          Now I want to turn to infringement because that is

9     the central and first question that you will have to

10    resolve as jurors.

11         I think you know by now -- you've heard it many

12    times -- that there are three Micro Focus products at issue

13    here:  LoadRunner, Network Virtualization, and UFT Mobile.

14         The way that the plaintiffs have put on their case

15    you would not be mistaken to think that there was only one

16    product at issue called Network Virtualization.  That's the

17    product that over the damages period sold $2 million.

18         So you've seen this $423 million revenue number

19    over and over, but the plaintiffs are completely fixated on

20    Network Virtualization.

21         And it's quite curious because their allegations

22    of infringement are that, in one instance, selling

23    LoadRunner with Network Virtualization infringes, when that

24    software is sold in the United States.  And, secondly, when

25    LoadRunner, Network Virtualization, and UFT Mobile are sold

1    in the United States, that that infringes as well.  So

2    Network Virtualization has never been contended to infringe

3    by itself.  It's a combination of software.

4           Now I'd like to show you a claim.  So there was

5    very little closing argument from Mr. Dacus about

6    infringement, and so I thought it quite fitting that we

7    look at the claims again.  And this is the claim charts

8    that Dr. Shoemake testified about.

9           And as you retire to the jury room and you begin

10   your deliberations I'll ask you to look for what Dr. Malek

11   admitted is required.  And that is that -- these are the

12   three independent claims of the three patents.  And

13   Dr. Malek admitted, just this morning, again, that in order

14   for the software that Micro Focus sells to infringe these

15   claims, it must be actually programmed to meet all the

16   limitations that you see before you.

17          Dr. Shoemake testified that the other three

18   claims, which are dependent claims, rise and fall with

19   these.  In other words, if any or all of these three

20   independent claims are not infringed, the dependent claims

21   are automatically not infringed either.

22          And so I suggest that this is where you should

23   start in your inquiry.

24          And what's very important about all of these

25   claims is that they all require a mobile device.  And it

```
1    can be -- as the Court has instructed the parties -- it can

2    be real or it can be emulated.  But something in the

3    software has to execute an application for a mobile device.

4    And that makes perfect sense, because you're testing the

5    application to see what the resource usage is.

6            And you'll see that the claims, although

7    different, they have a lot of parallel requirements.  And

8    whether the claim starts off a system for developing an

9    application for a mobile device or it says -- that was

10   Claim 1 of the '192 -- or it says a system for testing an

11   application for a mobile device -- notice that phrase,

12   "application for a mobile device."  And so let me suggest

13   to you, ladies and gentlemen, that you look for an

14   application for a mobile device.

15           And so your jobs, as judges of the facts in this

16   case, is to consider and decide whether Wapp has met its

17   burden of proof of a preponderance of the evidence that the

18   accused software is actually programmed to meet all of

19   these limitations.

20           Now I'm going to step you through the reasons why

21   they do not.  And this is what Dr. Matthew Shoemake, an

22   extremely accomplished engineer and the former chairperson

23   of the WiFi committees that brought WiFi to us, testified

24   about.

25           First, let's talk about the UFT -- I'm sorry --
```

Jury Trial, Volume 5                          1312

1    the TruClient Mobile Web protocol.  Now, we've heard a lot

2    about this.  And you now know, because Dr. Shoemake

3    testified and Dr. Malek admits, that that Bank of America

4    website there, that's running in what's called a Firefox

5    browser.  That is not a mobile device.  That browser you

6    can use on your desktop at home or on your laptop.  And I

7    know because I use one myself.

8            And we're going to see a video -- it's the one

9    that Mr. Bachar showed during his deposition.  But you

10   heard Dr. Malek on Tuesday admit that this is just a

11   Firefox browser; and, if you click the maximize button, it

12   will go full screen.

13           So if you are at home and you use a browser and

14   you use it either full screen or you make it smaller, as

15   sometimes people do, that's not a mobile device.  We know

16   what a mobile device looks like.  We have real ones and

17   you've seen examples of emulated ones.

18           Whether it's one of those two, that is what has to

19   be tested to fall within the scope of these claims.  And

20   Micro Focus software must be actually programmed to do

21   that, or it does not infringe.

22           So let's take a look at the Mobile Web theory.  So

23   the accused software is, first, LoadRunner.  And the bullet

24   list below it shows that it has been used to record

25   scripts, to run those scripts in a test, and to generate

 1   graphs.  This is according to Dr. Malek's infringement

 2   theory.

 3            Next, we have Network Virtualization.  And there's

 4   been an awful lot of testimony and documents about this

 5   product, and it was used to emulate network conditions.

 6            Does anybody see what's missing?  There is no

 7   mobile device.  There is a Firefox browser.  There is no

 8   emulated mobile device.  There is no real mobile device.

 9   And the testimony of Mr. Bachar was that if you had

10   UFT Mobile --

11            MR. DACUS:  Your Honor, I'm sorry, but I'm going

12   to have to object.

13            THE COURT:  Okay.  I'll sustain the objection.

14            MR. DACUS:  Can we get an instruction that there

15   is not a mobile device required?  We talked about this

16   before.

17            THE COURT:  Yes.

18            I will instruct the jury a mobile device is not

19   required.

20            Go ahead and continue.

21            MR. SHELTON:  Thank you, your Honor.

22            We do know from the claims that an application for

23   a mobile device is absolutely required because that is what

24   is being tested.

25            And I submit to you, ladies and gentlemen, that a

Jury Trial, Volume 5                         1314

1   Firefox browser, which is a computer browser running on a

2   computer, is not an application for a mobile device.

3           Let's talk about the other theory of infringement.

4           Next slide, please.  Thank you.

5           And before we do, let's look at what Dr. Malek

6   said about the TruClient Mobile Web protocol theory.  He

7   admitted that that right-hand side was simply a Firefox

8   browser; and if someone clicked on the maximize button it

9   would go full screen.

10          And if you recall from his testimony on direct, he

11  said that it emulated a mobile device because the screen

12  size of that Firefox browser was changed to what the screen

13  size would be of a mobile device.

14          But that doesn't make it a mobile device or an

15  application for a mobile device.

16          (Video presentation to the jury.)

17          Okay.  Here, we're seeing Mr. Bachar's video.

18  He's actually creating a script in VuGen for the TruClient

19  Mobile Web.

20          And you recall during his testimony he was able to

21  maximize it.  This was running on a computer that he was

22  running this test on, and he's clicking around.

23          And you can see on the left-hand side that script

24  is being created by his actions.  He's just made it go full

25  screen again.  And you can see it's just like a browser

Jury Trial, Volume 5                    1315

1   that would be on your home computer.

2           Let's talk about the second infringement theory.

3   This is a combination of LoadRunner, Network

4   Virtualization, and UFT Mobile.  And you have heard

5   testimony from both Dr. Malek and Dr. Shoemake about this

6   infringement theory.

7           And you heard this morning again that Dr. Malek

8   tested physical mobile device that was connected to the

9   UFT Mobile server, and he admitted this morning that if

10  that mobile device was not connected you could not run a

11  test.

12          And so, again, you have to ask yourself this

13  question when you retire to the jury room:  Can the

14  combination of LoadRunner, Network Virtualization, and

15  UFT Mobile run an application on a mobile device, emulated

16  or real, so that the resources of that application running

17  on the mobile device can be shown, as the claims require.

18          So here are the three software components:

19  LoadRunner, Network Virtualization, and UFT Mobile.  And

20  you can see that they do not meet all the limitations of

21  the claim.

22          There is additional software.  You may recall at

23  the end of Dr. Malek's testimony on Tuesday, I asked him:

24  Why don't you show the software necessary to run the

25  application?  And he did not have an answer.

1          Next, please.

2          Now, you all heard the testimony of Dr. Shoemake.

3   He presented four independent reasons why there is no

4   infringement of any of the three patents by the accused

5   software.

6          Now, Dr. Malek, on cross-examination, freely

7   admitted that his infringement theories for both TruClient

8   Mobile Web and TruClient Native Mobile rise and fall

9   together.  And what that means is if there is one

10  limitation of these claims that isn't met there is no

11  infringement and your duty is done.

12         Now, let's talk about Dr. Malek.  He told you,

13  over the course of several hours, along with many documents

14  that were used, just how critical Network Virtualization

15  was to testing mobile devices.  It informs the very basis

16  of their opinions on damages.

17         And you've heard over and over, including in the

18  closing argument this morning, that the most important

19  software of the three was Network Virtualization.

20         And we heard that Dr. Malek was one of the

21  country's foremost experts on mobile application

22  development and testing.

23         And after telling you, the members of this jury,

24  over and over how important it was to use virtualized

25  networks and how important it was to test mobile

Jury Trial, Volume 5                    1317

1   applications using a virtualized network, it turned out

2   that he had never done it.  His career of testing and

3   developing mobile applications is longer than 20 years, and

4   he had never, ever done it, not for geographically based

5   network testing and -- he gave the excuse that he is just a

6   professor.  He's not in a real company.  He's not creating

7   applications.

8            But this was after he testified, you may recall,

9   that he had personally written dozens of mobile

10  applications, but that his software for testing mobile

11  applications had been used for hundreds of thousands of

12  mobile applications.  That was his testimony.

13           And, yet, when it came to being confronted with

14  the fact that he had not once, in over 20 years, done the

15  kind of testing that he told you was essential, he said:

16  I'm just a professor.

17           Now, I have to talk about damages.  I only get one

18  opportunity to speak with you, and so I'm going to go

19  through this analysis and explain why Wapp has grossly

20  overreached in their damages claim.

21           As with its burden to prove by a preponderance of

22  the evidence that Micro Focus has infringed by selling its

23  software, Wapp has the same burden of proof, by

24  preponderance, of proving damages.

25           Let me be clear, just as clear as Mr. Roboostoff

1    was on the stand the other day:  Micro Focus does not

2    infringe.  And I'm confident, when you retire to the jury

3    room and all of you consider the evidence, that you will

4    come to that same conclusion.

5             But Wapp hired Mr. Weinstein at $750 per hour to

6    put up this whopper of a number, $172 million.

7             Now, I don't know if you found it ironic that

8    during Mr. Roboostoff's vigorous cross-examination the

9    other day that Mr. Dacus suggested over and over that my

10   client has an unhealthy and abnormal fixation on profits.

11   And, yet, what have you heard about more in this trial?

12   Have you heard more about money from Wapp or have you heard

13   more about infringement?

14            Because the order is quite clear.  They have to

15   prove to you that Micro Focus infringes.  If they do not,

16   if you decide that Micro Focus does not infringe and you

17   answer no on Question 1 of the verdict form, you don't

18   reach damages.  There are no damages.  They are zero.

19            So there is nothing wrong, of course, with Micro

20   Focus and any other corporation attempting to make a

21   profit.

22            We certainly know that Mr. Poulin has been

23   successful in business and there is absolutely nothing

24   wrong with that.  There is nothing wrong with any company

25   trying to make a profit.  And there is, of course, nothing

1    wrong with the fact that Micro Focus has been successful.

2           So we start with the overstated accused product

3    revenue, as Mr. Nelson testified about yesterday and

4    finishing this morning.  And with Mr. Nelson's adjustments,

5    that number goes down by a staggering amount and instead is

6    $154,025,319.

7           But that's not the only adjustment that had to be

8    made because the profit margin that was calculated by

9    Mr. Weinstein is also way too high because it doesn't

10   include all the expenses that Micro Focus incurs in the

11   course of its business.  It's not fair.

12          So let's see what Mr. Nelson adjusted for the

13   profit margin.  That goes down from 85.5 percent to

14   37.9 percent when the expenses are properly taken into

15   account.

16          Then, next, you heard Dr. Malek testify on Tuesday

17   about technical apportionment percentage.  And do you

18   recall that he said that 80 percent of the value of

19   LoadRunner and the other accused products was due to

20   virtualized network testing?  It is not just for mobile but

21   in general.

22          And, again, if you recall that Dr. Shoemake

23   testified that virtualizing a network is like putting --

24   having a straw and pinching it or having a hole in the

25   straw.  So you are making intentional impairments to a

1  network to make it worse to do testing.

2       And so it should strike you as ironic that if

3  80 percent of the value of the products -- which

4  Mr. Weinstein pegs at $423 million -- if it's so important,

5  why is it that one of the country's foremost experts on

6  developing and testing mobile applications had never done

7  it himself, not once in over 20 years?

8       The other part of Dr. Malek's apportionment was

9  that 77 percent number that he plucked out of one analyst

10 report about the proportion of people going online on a

11 mobile device in one month, June of 2019.

12      One month is not indicative of the period from

13 December 2014 to the present.  It's a single data point.

14 You can't draw any conclusions from that.

15      Dr. Malek simply multiplies 80 percent times

16 77 percent and he gets 61.6 percent.

17      And you might remember that Dr. Malek relied on a

18 figure of 86 percent representing the number of UFT Mobile

19 customers that also had LoadRunner, and it was proven to be

20 wrong.

21      So the real technical apportionment percentage, as

22 determined by Dr. Shoemake, is substantially lower.  And

23 one of the reasons, as Mr. Staten, who you recall traveled

24 here all the way from Atlanta.  Despite his ailing

25 mother -- he testified that there is -- and we're going to

Jury Trial, Volume 5                    1321

1  see a video that he showed -- that he testified that there

2  is a setting within LoadRunner that has existed there for

3  some time that allows a form of network virtualization to

4  be used and it has nothing to do with the product Network

5  Virtualization.

6          Let's see that.

7          (Video presentation to the jury.)

8          MR. SHELTON:  So this, once again, is -- you may

9  even recognize it by now -- is VuGen.  And he is going in,

10  and he's going to set up speed simulation, which allows him

11  to change the bandwidth -- that's one of those network

12  conditions that you've heard about in this trial -- and to

13  set it to something higher or something lower, and to use

14  that speed simulation for the network during a test.

15          You've also heard about the protocols.  You've

16  heard many times that there are 37 different protocols.

17  You heard Dr. Malek this morning say that some of them

18  aren't that important, some are more important.  But you

19  never heard any evidence or testimony about the relative

20  importance of these different protocols.

21          You did hear about TruClient Mobile Web and

22  TruClient Native Mobile, but you didn't hear much about the

23  others.  And there is a considerable amount of value in

24  those other protocols.

25          I'm sure you have heard now from several witnesses

1    that the primary purpose of LoadRunner is not testing

2    mobile applications, not testing mobile devices, but

3    testing servers.

4           You recall that screenshot from TxDOT on

5    February 19?  I took that.  I took that screenshot.  I went

6    to TxDOT to see what the road conditions were, and I was

7    appalled at how completely broken that website was.  That

8    is an example of what happens when companies, entities,

9    state governments don't test their infrastructure.  And so

10   many of the other protocols that you see on this box are

11   used to perform very large-scale testing of servers, on the

12   order of hundreds, thousands, millions of users against

13   websites.

14          So, as you see here with the yellow and the

15   orange, you recall that Dr. Shoemake testified that those

16   two protocols are the only ones that have been identified

17   by Dr. Malek in his testing.  Those are the only two that

18   are possibly relevant.  But he did not take into account

19   the value of the other 35.  That's a critical error in his

20   analysis.

21          And there were some questions of Mr. Staten when

22   he was here live about the SMP and the SAP mobile platform

23   scripting protocols.  And those are for mobile

24   applications, as he testified.  And they're not valued.

25   They're not even considered by Dr. Malek in his

Jury Trial, Volume 5                    1323

1    apportionment.

2         We see here that Dr. Malek has testified that the

3    only two protocols that he relies upon are TruClient Native

4    Mobile and TruClient Mobile Web.

5         We heard from Mr. Weinstein; and he understands,

6    from talking to Dr. Malek, before he worked on his expert

7    report, that the only scripting protocols relied upon in

8    this case by Dr. Malek are the two that we've been

9    discussing.  And, yet, there was no apportionment that took

10   into account either of those protocols relative to the

11   other 35 by either Mr. Weinstein or by Dr. Malek.

12        So let's take a look at Dr. Shoemake's

13   apportionment theory, which was used by our damages expert,

14   Mr. Nelson.

15        First, we have VuGen.  You've seen that in action

16   in the -- by the video that Mr. Bachar showed you in his

17   testimony.  And this is -- relates to all those blocks.

18   So, again, there's two out of 37, and there they are.

19        Now let's talk about the controller.  The

20   controller is the part of LoadRunner that coordinates those

21   massive load tests against servers, where it will have as

22   many as millions of users, virtual users, that are working

23   against servers to test them.  And controller doesn't have

24   anything to do with this case because, as you saw, there is

25   nothing about load testing or stress testing in the patents

1   that are before you.

2          Now let's talk about analysis.  You heard

3   testimony from Dr. Shoemake that there are 82 reports that

4   are possible; and there is only four, though, that

5   Dr. Malek relied upon.

6          And so you can see this pie chart, that there are

7   four out of 82 graphs that are contended by Dr. Malek to

8   infringe, and two out of 37 of those protocols that are

9   contended to infringe.

10         So the end result of Dr. Shoemake's apportionment

11  theory is that 2.6 percent of the value of the patented

12  inventions is found if Dr. Malek was correct, maximum.  Not

13  61.6 percent; 2.6.

14         So now let's see what happens when we apply a more

15  reasonable technical apportionment percentage from

16  Dr. Shoemake.  We go from 61.6 to 2.6 percent.

17         And now let's talk about the profit split.  You

18  heard that, on one hand, Mr. Poulin was so disadvantaged

19  and so injured that he was -- as you heard from his

20  testimony on direct, he was not permitted to be successful.

21  Others stood in his way.  Others got in his way.

22         And yet, ironically, Wapp suggests that he would

23  have had a much stronger bargaining position relative to,

24  at the time, HP.

25         So you have to ask yourself:  Does that make any

1    sense.  How could you have a stronger position while you

2    were the weaker party?  Because that's what they argued.

3            You have to use your common sense.  You have to

4    use your experience in life as people to help you decide

5    the issues in this case.

6            So you have to ask yourself what is more

7    reasonable, that Mr. Poulin would have had a 77.3 percent

8    profit split -- in other words, for every dollar that was

9    brought in to Micro Focus on these products, he would have

10   gotten 77.3 percent of the split -- or 50 percent, which is

11   the split that was testified to by our expert, Clarke

12   Nelson.

13           And the difference is quite striking when you

14   apply those adjustments.  The worst case, the worst case

15   under our damages expert's analysis, would be 754,000.  But

16   I submit to you, ladies and gentlemen, that the real number

17   is zero; because, again, Micro Focus does not infringe, and

18   Wapp has not proven that Micro Focus infringes.

19           Now I want to talk about another issue in the

20   case, and that's called willful infringement.  And

21   willfulness, you'll hear from the Judge's instruction, uses

22   words like "callus disregard" and "a high or excessive

23   danger of infringement."

24           And I hope you'll agree that in the first

25   instance, when you're looking at Question 1, that you will

Jury Trial, Volume 5                    1326

1   answer "no" as your unanimous verdict, that Micro Focus

2   does not infringe.

3          But if you consider that Micro Focus did -- you

4   heard the testimony from Mr. Roboostoff.

5          Let's see that.

6          He was asked why not get rid of it completely,

7   "it" being Network Virtualization.

8          Again, you see this singular focus on only one of

9   the accused products.  He's not asking about all of them,

10  but why not get rid of Network Virtualization.

11         Because you've heard the testimony that despite

12  the best efforts of Micro Focus and its predecessors, HP,

13  that it was not selling.  Customers didn't want it.

14         And it's really easy in any business, especially

15  software, to know when you have a hit product, because

16  people buy it.  When people stop buying it or their sales

17  decline -- every business faces a decision:  Do we just

18  stop selling this?  Do we stop making it?  Do we stop

19  supporting it?  And that's exactly what the facts have

20  shown to be the case with this product.

21         And so there's something that's very important in

22  Mr. Roboostoff's testimony.

23         First of all, he was unequivocal on the stand that

24  Micro Focus doesn't infringe.

25         But, secondly, he said that the reason why we

Jury Trial, Volume 5                    1327

1    didn't just simply eradicate that product from our lineup

2    is that we did have some customers, 140, who used it.  140

3    out of over 4,000 customers that used LoadRunner.

4          And so you heard over and over from Mr. Roboostoff

5    that a key focus of Micro Focus in its business is its

6    customers.  And that should make all the sense in the

7    world, every business should have that singular focus.

8          Now, there were a lot of questions for

9    Mr. Roboostoff about executive compensation for Micro Focus

10   for its board of directors.  And the suggestion was made

11   that instead of compensating those individuals Micro Focus

12   just ought to pay all that profit to Mr. Poulin.  But,

13   again, this is an attempt to elicit sympathy from you.  It

14   is not proper.

15         You are the judges of the facts and you must

16   answer the questions on the jury verdict form in accordance

17   with the law as the Court instructs you.  You should not

18   let yourself be swayed by prejudice, bias, sympathy, or

19   maybe hate or ill will towards large companies.

20         You heard from other Micro Focus witnesses.  You

21   heard from five total witnesses.  We had two witnesses who

22   appeared by trial depositions.  They wanted to be here;

23   they could not.

24         One, Mr. Bachar, is the product manager for

25   UFT Mobile.  He's a very talented software engineer.  He's

1    been with the company for 13 years.  You heard him testify

2    about UFT Mobile and how it works.  You saw his video about

3    TruClient Mobile Web.  And he wanted very much to travel to

4    the United States, all the way from Israel; but, right now,

5    no one can leave Israel.  You cannot fly here.

6          You heard from Ms. Christine Ewing, who is a

7    senior director -- a director in product marketing.  She

8    also wanted to come here, but she has an immune-suppressed

9    person in her family, and she was very concerned about

10   coming here and going home with COVID.

11         We did see Mr. Mike Staten.  He may not have been

12   the most polished witness.  And the poor gentleman found

13   out the night before he came here that none of his suits

14   fit him.  And, yet, he traveled all the way here from

15   Atlanta.  Left his mother with Alzheimer's, to come here

16   and to tell you the truth about LoadRunner and to explain

17   how it works.

18         You also heard from Mr. Sharon Levin, who's

19   another engineer in Israel.

20         This case means an awful lot to Micro Focus.  It's

21   a terrible thing for any person or any company, no matter

22   what size, to be accused of not only infringing patents but

23   willfully infringing patents, meaning that we knew we were

24   infringing, didn't care, continued to do it with callous

25   disregard for the patent rights of Wapp.  That just did not

1    happen.

2          Micro Focus is a large company, and it has its own

3    intellectual property.  You've heard it has over 1800

4    patents.  But regardless of how many patents it has, it

5    respects the intellectual property rights of everyone:

6    Individuals, small companies, large companies.

7          And so I want to just simply say at the end, thank

8    you for your attention.  I know it's been a challenging

9    week.  And I ask that you follow the Judge's instructions

10   to the letter, and I ask you to return a verdict of no

11   infringement.  Thank you.

12         THE COURT:  Thank you, Mr. Shelton.

13         Mr. Dacus, if you would like to complete the

14   arguments.

15         MR. DACUS:  Ms. Conrad, can you tell me how much

16   time I have, please?

17         THE COURTROOM DEPUTY:  Twenty-two minutes.

18         MR. DACUS:  How much?

19         THE COURTROOM DEPUTY:  Twenty-two.

20         MR. DACUS:  Twenty-two.  Thank you very much.

21         When you retire to deliberate in just a few

22   minutes, the Court's going to give you a form that looks

23   just like this.  And the first question is going to be:

24   Has Wapp proven, by a preponderance of the evidence, that

25   Micro Focus infringed any of the asserted claims.

1              And you're going to have to answer that either

2    "yes" or "no."

3              I told you at the beginning it's not my duty, it's

4    not my job here to answer this for you.  It's my job to get

5    you the evidence as best as I can to the best of my

6    ability.

7              Now, Mr. Shelton is right about one thing, I

8    didn't stand up here and talk about infringement a whole

9    lot, because you've heard probably four hours of testimony

10   from Dr. Malek.

11             But I do want to say one thing about infringement.

12   And you've probably figured out, I'm not the most technical

13   lawyer in this courtroom.  I'll admit that.  But the

14   evidence doesn't come from lawyers.  The evidence is to

15   come from the witness stand and from the experts.

16             But there is one thing I know.  These claims,

17   these inventions, Donavan's inventions -- what they want

18   you to believe is that the invention was an application or

19   a device.  That's what he just argued to you.  And you

20   heard the Court say to you disregard that; that's not the

21   invention.

22             So you have to ask yourself -- or at least you

23   should ask yourself -- why are they arguing something to

24   you that they know is absolutely wrong?  Why not pick out

25   something that's actually missing and argue that to you?

Jury Trial, Volume 5                          1331

1           So, again, I'm not the most technical person; but

2      I'll say that my mother was an English teacher for -- a

3      ninth grade English teacher for 42 years, so I can read.

4           And so here's what they want you to do.  They want

5      you to believe that these inventions are an application for

6      a mobile device.  That's not the invention.  The invention

7      is a system for developing or a system for testing an

8      application for a mobile device.

9           We didn't invent an application.  We didn't invent

10     a device.  We developed -- I mean, we invented a system for

11     testing and developing.  It's just that simple.

12          And for them to try to make it more complex than

13     that, you have to ask yourself why they're doing that.

14          When you retire to the jury room and you consider

15     all the evidence, it's your decision, but we certainly

16     believe that the evidence says that there has been

17     infringement; that they have included these patents in

18     their LoadRunner, UFT, and Network Virtualization products.

19          And there is no fixation by us on Network

20     Virtualization.  All three of those products infringe.

21     They should pay for all three of those products.

22          Now, the second question the Judge is going to ask

23     you is:  Was there willful infringement.

24          And I'll admit, I did not say this to you at the

25     beginning of this case, because judges don't always submit

Jury Trial, Volume 5                    1332

1   this question, and I didn't know if he would or not in this

2   case; but he has.

3           And so he's going to read to you instructions

4   about what you need to find from the evidence as to whether

5   or not there has been willful infringement.  He's going to

6   read these to you.  You will have these instructions with

7   you in the jury room.  You can look at them.

8           But what he's going to tell you is, if you find

9   that these folks acted in bad faith, if they acted

10  deliberately, if they acted consciously wrongful or

11  flagrantly, then you can find they are willful.  And that's

12  an "or."  If you find any of those things, you can find

13  they are willful.

14          If you find that they acted with conscious

15  disregard -- in other words, if they should have known that

16  they were doing something bad but they stuck their head in

17  the sand -- that's willfulness.

18          You can read the instruction.  You don't have to

19  trust me.  You can go read what the Court's instruction is.

20          And he's going to give to you, in that

21  instruction, these five factors to look at.  You don't have

22  to find all of them.  You don't have to find any of them.

23          But I do think it's -- when I read these last

24  night from the Court, I think it fits very well with this

25  case.  And here's why I'll say that.  I'm going to take

Jury Trial, Volume 5                              1333

1    them in reverse order.

2          The Judge says look to see whether or not Micro

3    Focus tried to cover up its infringement.

4          We've all heard the phrase "the cover-up is worse

5    than the crime."  And I'm going to tell you, this case

6    should be the poster child for that.  It should absolutely

7    be the poster child because the cover-up is worse than the

8    crime.

9          They took their marketing documents, the ones that

10   said the very thing that is accused, the very thing that

11   used Donavan's invention, the secret sauce, and as soon as

12   this lawsuit was filed, what did they do?  That document

13   disappeared.

14         Think about it.  That document had been in

15   existence at Hewlett Packard for a decade.  Hewlett Packard

16   had been out there telling people that the thing that

17   Donavan invented was the secret sauce.  This lawsuit was

18   filed, that document goes away.

19         What else went away?  The datasheets.  Do you

20   remember, Ms. Ewing testified; and, at the very end, she

21   was asked did you rewrite the datasheets after this

22   lawsuit?  She not only said we rewrote them, we completely

23   rewrote them.  Completely rewrote them.

24         What else do we know?  They came to this courtroom

25   and told you that Network Virtualization is free.  Network

1   Virtualization is free.  They said:  We're including it now

2   in LoadRunner and it's free.  Don't have to pay for it.

3            Use your common sense here.

4            And I realize it was difficult to tell yesterday

5   if I knew the difference between McDonald's and Walmart;

6   but I do, believe it or not.  But if McDonald's adds an

7   apple pie to their Happy Meal -- you know what -- I'll bet

8   the price goes up.  If it doesn't go up, I guess you could

9   say the apple pie was free.

10           And that's what they want to try to convince you

11  here; that, in fact, that's what occurred.  But you know

12  from what you heard this morning, when I questioned

13  Mr. Nelson, when they actually put Network Virtualization

14  into LoadRunner, they said -- internally, now; they didn't

15  know this was ever going to see the light of day --

16  internally, they said:  We're going to double the price to

17  our customers.  Just by putting Network Virtualization into

18  LoadRunner, we're going to double the price.

19           Does that sound like they're giving it away for

20  free, or does that sound like it's very valuable?

21           This document -- you can look at it when you go

22  back.  It is Exhibit D-82.  You don't have to trust me.

23  Pull it out.  You'll see.  They said:  We're going to

24  increase our price.  Our justification is Network

25  Virtualization, and we're going to double the price.  And

 1    if you believe that's free, I'm doing a poor job.

 2          Now, the Judge, as part of this willfulness, he

 3    says:  Look at whether or not Micro Focus made a good-faith

 4    effort to avoid infringing.

 5          And I gave them every chance in this trial.  You

 6    may remember it.  I said:  Did y'all change anything?  You

 7    keep saying Network Virtualization is worthless.  Did you

 8    just take it out?

 9          And what did they say?  No, we did not and we're

10    not going to.

11          And the Judge says that's bad faith.  That's

12    willful infringement.

13          What else does the Judge tell you to look at?

14    Look at Number 3, whether or not Micro Focus reasonably

15    believed it did not infringe or that the patent was

16    invalid.

17          Well, let's take it in reverse order.

18          Did they really believe this thing was invalid?

19    We fought them for two and a half years on invalidity.  At

20    the end of that, they put someone on the witness stand to

21    testify for 30 minutes.  That's five minutes per invention

22    here, to hand wave and say you should take these patents

23    away from Donavan.

24          I want to put this in perspective for you.  The

25    burden to take away a patent is the same to take away a kid

Jury Trial, Volume 5                              1336

1   in the state of Texas.  And in many ways I'm confident

2   these patents are like Donavan's kids.  He spent two

3   decades of his life on these things.

4            And these folks fight for two and a half years and

5   then trot somebody up there for 30 minutes to try to have

6   you take them away.  If that's not bad faith, I don't know

7   what is.  If that's not willfulness, I don't know what it

8   is.

9            And then it says:  Did they reasonably believe

10  they did not infringe.

11           They didn't have a single person at their company

12  read the patents.  They just put up Mr. Roboostoff's

13  testimony where he said:  I don't believe we infringe.  In

14  the second breath, he said:  I didn't read the patents.

15           You know from what the Court is instructing you,

16  in order to determine infringement, you at least need to

17  read the patents.

18           Does that sound like bad faith?  Does that sound

19  like people who are doing the right thing?

20           Number two says you're supposed to look at whether

21  or not Micro Focus copied Wapp's product.  That's not

22  applicable to this case.  We don't have a product.  We

23  don't contend that they copied it.

24           The first one that the Judge tells you to also

25  look at is whether or not Micro Focus acted consistently

Jury Trial, Volume 5                    1337

 1    with standards of behavior.

 2            I think there is a couple of things to look at

 3    here and to think about.  Mr. Shelton is right, we do

 4    contend these folks have an unhealthy view of the world.

 5    They do put too much emphasis on a dollar, to the detriment

 6    of people who have constitutional patents.

 7            And he's right, we do say that they should not pay

 8    those executive directors $54 million a year when they

 9    don't pay Donavan a penny.

10            But let's be clear about one thing, who started

11    this fight.  What they stood up here and told you on Monday

12    was they should not have to pay us anything because they

13    don't make a profit.

14            So one thing that Mr. Roboostoff said to me is --

15    I don't know if he said I'm old or I'm old-fashioned.  But

16    either way those are probably the truest things that he

17    said on the stand because both are true.  Both are true.

18            And when you stand here on Monday and you say, we

19    don't have to pay you because we don't make a profit, we're

20    going to fight back and we're going to say, well, why

21    didn't you make a profit?  Why didn't you make a profit?

22            And now we know, because you're paying these

23    people lavishly, excessively.  And you're trying to trick

24    this jury to believe that these products are not profitable

25    at all, when nothing could be further from the truth.

1             We also know that related to this Hewlett Packard

2    transaction -- we're talking about whether or not these

3    people acted with the kind of code of conduct and standards

4    of behavior that we all expect.  When those executives

5    bought Hewlett Packard, they got stock options, which means

6    they get options on these stocks.  Millions of dollars as

7    you saw, millions of dollars worth of stock.

8             But they only get those options -- they are called

9    an option because you have to meet some contingencies or

10   requirements.  You have to make a certain percentage of

11   return on that investment before you get those options.

12   And those options don't do what they call "vest," as we

13   talked about, until this year, 2021.

14            So what those executives did is, rather than pay

15   Mr. Poulin the fair value for his patents -- because every

16   dollar they paid him would come out of the profits and the

17   return -- they didn't pay him a penny, because they wanted

18   to make sure that they earned every bit of those tens of

19   millions of dollars of stock options.

20            That's not within anyone's standard of conduct, to

21   deny someone their constitutionally protected property

22   rights so that you can reap tens of millions of dollars.

23            So when you go back to the jury room -- and please

24   look at the Court's instructions closely.  The question

25   will be:  Did Wapp proof by a preponderance of the evidence

1    that Micro Focus willfully infringed any of the asserted

2    claims that you found were infringed?  Did they willfully

3    do so?

4            It's your decision; but we certainly believe that

5    the evidence proves -- not by a preponderance of the

6    evidence, which is all that's required -- but way down here

7    (demonstrating), that these folks willfully infringed these

8    patents.

9            Now, I want to talk about the final question that

10   you're going to be asked, and that is what sum of money, if

11   any, paid in cash, has Wapp proven by a preponderance of

12   the evidence would compensate Wapp for its damages

13   resulting from infringement through July 31 of 2020.

14           There are a couple of things that I want to be

15   clear on here.  You've heard several times these folks say:

16   Well, you need to apportion according to these protocols.

17   You need to apportion according to these graphs.

18           Do you remember, in opening, I said to you:  If

19   you hear that word "protocol," there need to be some alarm

20   bells going off in your head, because it's like a big

21   garbage or dump truck about to back over you.  And it's

22   true.  It's true.  And here's why I say that.

23           When you get the Court's instructions on

24   damages -- and, again, we can't read them all here.  He's

25   about to read them.  Pull them out when you get in there --

Jury Trial, Volume 5                    1340

1    he's going to tell you that what you are to value is the

2    patented inventions.  That makes sense, right?  We have a

3    patent.  You need to value the invention.

4          What defines the invention?  The claims, right?

5          So here's what I want you to do.  With all this

6    talk about protocols and graphs and apportioning based on

7    that, I want you to read every claim when you get back

8    there, and I want you to see if the word "protocol" is

9    anywhere in these inventions.

10         Why are they asking you to apportion based on

11   something that's not even in the invention?

12         I want you to see if the word "graph" is anywhere

13   in the invention.

14         You're supposed to, according to the Judge's

15   instructions, apportion based on the invention.  They are

16   asking you to do something completely contrary to what the

17   Court's instructions are.

18         Now, damages can get very detailed, and I realize

19   that.  And so I was thinking last night what's a good way

20   to put this in perspective.

21         You saw them -- you saw their expert say and them

22   say to you just now that they think $750,000 is a fair

23   value for these patents, when they made $423 million.

24         So it occurred to me last night:  What percentage

25   of $423 million is 750,000?

1          So I have a calculator, thank goodness.  And the

2   answer is .0012.  So one one-thousandth -- not even one

3   one-hundredth -- but one one-thousandth.

4          You know, we have so many details in all these

5   cases.  I know it's like drinking water through a firehose

6   for five days.  Sometimes it's good to step back and just

7   think about this at a high level.

8          So here's what these folks have the gall to

9   propose that you should say to Donavan for these

10   inventions.

11          THE COURTROOM DEPUTY:  You have five minutes.

12          MR. DACUS:  Thank you.

13          For every dollar that they make, for every dollar,

14   this is a penny.

15          They don't even want to give us one penny.  Think

16   about one one-thousandth is.  This is one one-hundredth.

17          They would say:  You need to cut that penny in ten

18   pieces, and we'll give you one of those ten pieces of this

19   penny.

20          For every dollar that they make, they won't even

21   give us a penny.  That takes some nerve.  It really does.

22          The truth is, when you're talking about damages --

23   and, probably, the real reason we're here, in part, is

24   because these folks think about one thing, and they told

25   you what that is.  They think about their investors.  They

1  think about their stock price.  Every eighth tick of a

2  point of that stock price, that's what they care about.

3  And every dollar they can save off of that 172 million, I

4  promise you they will walk out of this courthouse

5  high-fiving, because that's what this is about.

6  Absolutely, what it's about.

7          The law says that the rightful amount to pay for

8  these inventions is $172.5 million.  We don't ask for a

9  penny more; and, candidly, we don't ask for a penny less.

10          I'm going to sit down.  I hope there's no

11  clapping.  But I want to end here.

12          I know I am, I know every lawyer on this team, are

13  really, really proud of Donavan Poulin.  Really proud.

14  There's no way for me to express to you what this fight has

15  been like, and there's no way for me to express to you how

16  many times along the way I could not believe he didn't

17  quit.  It really is a privilege to stand here.

18          I am old-fashioned.  I do believe in right and

19  wrong.  And as you heard from the Court's video when you

20  came to court, I'm not the person that can stop the wrong;

21  Donavan is not the person that can stop the wrong; we have

22  to ask you to do that.

23          And this conduct needs to stop.  This conduct

24  needs to stop.  This day of thinking that you can step on a

25  small inventor's throat -- just like they said to you just

```
 1   20 minutes ago, he's crazy if he thinks he could get

 2   77 percent.

 3           Well, he has a constitutional right.  He has a

 4   property right in a patent.  That's why he's entitled to

 5   that money.  It doesn't matter how big you are, you have an

 6   obligation to do what the law requires.

 7           So that's what we ask you to do, is to stop this

 8   kind of activity, stop this kind of conduct.

 9           I appreciate very much the attention that you've

10   given to this case.  It's not lost on anyone at our table

11   that you have devoted every bit of your attention to this

12   case, and we very much look forward to your verdict.  Thank

13   you very much.

14           THE COURT:  Thank you, Mr. Dacus.

15           Ladies and gentlemen, are you okay continuing and

16   then we'll go -- I have to do my final instructions, which

17   will take about 20, 25 minutes.  Okay.

18           I'll try to read fast.

19           Is everyone okay continuing without a break?

20           Okay.  I'm going to have my lawyer give you a

21   copy.  I'm giving you give you a copy, one you can take

22   back to the jury room with you, of my instructions.

23           And the law requires me to read them, so you have

24   to listen to me, but you can also follow along if you so

25   desire.
```

1              But, either way, you'll have a copy to take back.

2              Okay.  Ladies and gentlemen, thank you for paying

3     such close attention to everything.  And so let's begin.

4              Members of the jury, it is my duty and

5     responsibility to instruct you on the law that you are to

6     apply in this case.  The law contained in these

7     instructions is the only law you may follow.  It is your

8     duty to follow what I instruct you the law is, regardless

9     of any opinion that you might have as to what the law ought

10    to be.

11             If I have given you the impression during the

12    trial that I favor either party, you must disregard that

13    impression.  If I have given you the impression during the

14    trial that I have an opinion about the facts of this case,

15    you must disregard that impression.

16             Remember, you are the sole judges of the facts of

17    this case.

18             Other than my instructions to you on the law, you

19    should disregard anything that I have said or done during

20    the trial in arriving at your verdict.

21             You should consider all of the instructions about

22    the law as a whole and regard each instruction in light of

23    the others, without isolating a particular statement or

24    paragraph.

25             The testimony of the witnesses and other exhibits

1  introduced by the parties constitute the evidence.  The

2  statements of counsel are not evidence; they're only

3  arguments.  It is important for you to distinguish between

4  the arguments of counsel and the evidence on which those

5  arguments rest.  What the lawyers say or do is not

6  evidence.  You may, however, consider their arguments in

7  light of the evidence that has been admitted and determine

8  whether the evidence admitted in this trial supports the

9  arguments.

10         You must determine the facts from all the

11  testimony that you have heard and other evidence submitted.

12  You are the judges of the facts; but in finding those facts

13  you must apply the law as I instruct you.

14         You are required by law to decide this case in a

15  fair, impartial, and unbiased manner, based entirely on the

16  law and on the evidence presented to you here in the

17  courtroom.  You may not be influenced by passion,

18  prejudice, or sympathy you might have for the plaintiff or

19  the defendant in arriving at your verdict.

20         Plaintiff Wapp Tech Limited Partnership and Wapp

21  Tech Corp., referred to as "Wapp," has the burden of

22  proving its case by a preponderance of the evidence.

23         To establish by a preponderance of the evidence

24  means to prove something is more likely so than not so.  If

25  you find that Wapp has failed to prove any element of its

1  claim by a preponderance of the evidence, then it may not

2  recover on that claim.  This standard is different from

3  what you have heard about in criminal proceedings where a

4  fact must be proven beyond a reasonable doubt.

5          The evidence you make -- you are to consider

6  consists of the testimony of the witnesses, including

7  witnesses whose testimony was provided by prior deposition,

8  the documents and other exhibits admitted into evidence,

9  and any fair inferences and reasonable conclusions you can

10 draw from the facts and circumstances that have been

11 proven.

12         Now, generally speaking, there are two types of

13 evidence.  One is direct evidence, such as the testimony of

14 an eyewitness.  The other is indirect or circumstantial

15 evidence.

16         Circumstantial evidence is evidence that proves a

17 fact from which you may logically conclude other facts

18 exist.

19         As a general rule, the law makes no distinction

20 between direct and circumstantial evidence but simply

21 requires that you find the facts from a preponderance of

22 all the evidence, both direct and circumstantial.

23         Certain charts and summaries have been shown to

24 you solely to help explain or summarize the facts disclosed

25 by the books, records and other documents that are in

1   evidence.  These charts and summaries are not evidence or

2   proof of any facts.  You should determine the facts from

3   the evidence.

4         Some exhibits have been presented to you as

5   illustrations.  Demonstrative evidence can be used to

6   describe something involved in this trial, but it is not

7   itself evidence.  If your recollection of the evidence

8   differs from the exhibit, rely on your recollection.

9         You alone are to determine the questions of

10  credibility or truthfulness of the witnesses.  In weighing

11  the testimony of the witnesses, you may consider the

12  witness' manner and demeanor on the witness stand, any

13  feelings or interest in the case, or any prejudice or bias

14  about the case that he or she may have, and the consistency

15  or inconsistency of his or her testimony considered in the

16  light of the circumstances.

17        Has the witness been contradicted by other

18  credible evidence?  Has he or she made statements at other

19  times and places contrary to those made here on the witness

20  stand?  You must give the testimony of each witness the

21  credibility you think it deserves.

22        Even though a witness may be a party to the action

23  and, therefore, interested in its outcome, the testimony

24  may be accepted if it is not contradicted by direct

25  evidence or by any inference that may be drawn from the

1   evidence if you believe the testimony.

2          You are not to decide this case by counting the

3   number of witnesses who have testified on the opposing

4   sides.  Witness testimony is weighed; witnesses are not

5   counted.  The test is not the relative number of witnesses

6   but the relative convincing force of the evidence.  The

7   testimony of a single witness is sufficient to prove any

8   fact, even if a greater number of witnesses testified to

9   the contrary, if, after considering all of the other

10  evidence, you believe that witness.

11         When knowledge of a technical subject matter may

12  be helpful to the jury a person who has special training or

13  experience in that technical field is permitted to state

14  his or her opinion on those technical matters.  During the

15  trial you have heard testimony from the following

16  individuals who expressed expert opinions:  Sam Malek,

17  Wapp's technical expert; and Ray *(sic)* Weinstein, Wapp's

18  damages experts; Matthew Shoemake, Micro Focus' technical

19  expert; and Clarke Nelson, Micro Focus' damages expert.

20  You are not required to accept these opinions.  As with any

21  other witness, it is up to you to decide whether to rely

22  upon them.

23         Now, as I told you in my preliminary instructions,

24  I have given you the opportunity to give me written

25  questions anonymously after a witness testified when you

1    had an important question of that witness that was strictly

2    limited to the substance of the witness' testimony.

3    Remember that I asked you not to be offended if I did not

4    present your question to be asked by the witness *(sic)*.

5    You should not speculate on the answer to any unasked

6    question, and you should not speculate on or consider any

7    facts or events outside the testimony and exhibits you have

8    heard and seen in this courtroom.

9            The testimony of a -- when testimony or an exhibit

10   is admitted for a limited purpose, you may consider that

11   testimony or exhibit only for the specific limited purpose

12   for which it was admitted.

13           A stipulation is an agreement.  When there's no

14   dispute about certain facts, the attorneys may agree or

15   stipulate to those facts.  You must accept a stipulated

16   fact as evidence and treat that fact as having been proven

17   here in the court.  Here, the parties have stipulated to

18   the following:

19           One, Plaintiff Wapp Tech Limited Partnership is a

20   Delaware limited partnership organized and existed --

21   existing under the laws of the State of Delaware.

22           Two, Plaintiff Wapp Tech Corp. is a body corporate

23   organized and existing under the laws of the province of

24   Alberta, Canada.

25           Three, Defendant Seattle SpinCo, Inc., is a

1  Delaware corporation with its principal place of business

2  at 4555 Great America Parkway, Suite 400, Santa Clara,

3  California, ZIP code 95054.  Seattle SpinCo is a direct

4  wholly owned subsidiary of Micro Focus (US) Group, Inc.

5            Defendant Micro Focus, LLC, is a Delaware

6  corporation with its principal place of business at 4555

7  Great America Parkway, Suite 400, in Santa Clara,

8  California -- I'm not sure what the 6 there is for -- ZIP

9  code 9 -- unless that's -- yeah -- ZIP code 75054 *(sic)*.

10 Micro Focus, LLC, is a direct wholly owned subsidiary of

11 Seattle SpinCo.

12           Defendant Micro Focus Interactive Israel Limited

13 is incorporated in Israel and has offices at Rehov Avraham

14 Atalef 5 -- I'm sorry, I'm really mispronouncing those --

15 5621600 in Israel.

16           Six, Defendant Micro Focus Government Solutions,

17 LLC, is a Delaware corporation, with its principal place of

18 business at 8609 Westwood Center Drive, Suite 700 in

19 Vienna, Virginia, ZIP code 22182.  Micro Focus Government

20 Solutions, LLC, is a wholly owned subsidiary of Micro

21 Focus, LLC.

22           Seven, Defendant Micro Focus (US) Inc. is a

23 Delaware corporation, with its principal place of business

24 at One Irvington Center, 700 King Farm Boulevard, Suite 400

25 in Rockville, Maryland, ZIP code 20850.

1            B, the asserted patents.  Their stipulation as to

2     that is:

3            One, the asserted patents are U.S. Patent

4     Number 8,924,192, which we refer to as "the '192 Patent";

5     9,971,678, as we refer to as "the '678 Patent"; and

6     9,298,864, as we refer to as "the '864 Patent"; or,

7     collectively, referred to as the "patents-in-suit."

8            Second, the U.S. Patent Number -- I'm going to

9     refer to it as "the '192" -- was filed on November 9th,

10    2012, and issued on December 30th, 2014.  It names Donavan

11    Poulin as the inventor.

12           Three, U.S. Patent -- we will refer to it as "the

13    '678 Patent" -- was filed on December 23rd, 2014, and

14    issued on May 15th, 2018.  It names Donavan Poulin as the

15    inventor.

16           And, four, the U.S. patent -- the '864 Patent, was

17    filed on November 19th, 2013, and issued on March 29th,

18    2016.  It, again, names Donavan Poulin as the inventor.

19           C, the accused products:

20           The products that are alleged to infringe are:

21           One, LoadRunner Professional (formerly LoadRunner)

22    Version 12.0 through 2020 SP2-SP3 with Network

23    Virtualization alone and/or in combination with

24    UFT Mobile/Mobile Center through Version 3.4 (the

25    "LoadRunner Professional Accused Systems");

Jury Trial, Volume 5                1352

1              And, two, LoadRunner Enterprise (formerly

2   Performance Center) Version 12.0 through 2020 SP2 versus

3   SP3 with Network Virtualization alone and/or in combination

4   with UFT Mobile or Mobile Center through Version 3.4 (the

5   "LoadRunner Enterprise Accused Systems"); and --

6              Isn't the third one, the Cloud, not there?

7              MR. DACUS:  That's what I was about to raise, your

8   Honor.

9              THE COURT:  I'm not sure how that got removed.

10  Let me find...

11             And you probably still have the preliminary

12  instructions, so if you want to see the -- I'm just going

13  to read it to you and not supplement this.

14             But in the preliminary instructions, page 13, it

15  also -- the third product of the accused products is the

16  LoadRunner Cloud (formerly StormRunner Load) Versions 1.2

17  through 2020.10, with Network Virtualization alone and in

18  combination with UFT Mobile/Mobile Center through

19  Version 3.4 (the "LoadRunner Cloud Accused Systems").

20             And so just -- that third one should be included

21  there, and I'm letting you know to include that as part of

22  this.

23             And then these may be referred to simply as the

24  "accused products" or the "accused instrumentalities."

25             Summary of contentions.

1           As I did at the start of the case, I will give you

2    a summary of each side's contentions in this case.  I will

3    then provide you with detailed instructions on what each

4    side must prove to win on each of its contentions.

5           The plaintiffs, again, in this case are Wapp Tech

6    Limited Partnership and Wapp Tech Corp., often referred to

7    as "plaintiffs" or "Wapp."

8           The defendants in this case are Seattle SpinCo,

9    Inc., Micro Focus, LLC, Micro Focus Interactive Israel

10   Limited, Micro Focus Government Solutions, LLC, and Micro

11   Focus (US) Inc., often referred to as simply "defendants"

12   or as "Micro Focus."

13          The patents involved in this case are the '192

14   Patent, the '678 Patent, and the '864 Patent.

15          Wapp asserts that Micro Focus infringes Claims 1

16   and 2 of the '192 Patent, Claims 45 and 49 of the '678

17   Patent, and Claims 1 and 2 of the '864 Patent.

18          Wapp seeks damages from Micro Focus for allegedly

19   infringing these claims.

20          The products that are alleged to infringe are the

21   LoadRunner Professional (formerly LoadRunner) Versions 12.0

22   through 2020 SP2-SP3 with Network Virtualization alone or

23   in combination with UFT Mobile/Mobile Center through

24   Version 3.4, which is also referred to as the "LoadRunner

25   Professional Accused Systems"; LoadRunner Enterprise

 1   (formerly Performance Center) Versions 12.0 through 2020

 2   SP2-SP3 with Network Virtualization alone or in combination

 3   with UFT Mobile/Mobile Center through Version 3.4, which is

 4   referred to as the "LoadRunner Enterprise Accused Systems";

 5   and LoadRunner Cloud (formerly StormRunner Load)

 6   Versions 1.2 through 2020.10 with Network Virtualization

 7   alone or in combination with UFT Mobile/Mobile Center

 8   through Version 3.4 (the "LoadRunner Cloud Accused

 9   Systems"), which it is referred to as that.

10           These, again, may be referred to simply as the

11   accused products or accused instrumentalities.

12           And I apologize for the repetitiveness, but at

13   least in this paragraph on page 8 you have all three

14   accused systems.

15           Micro Focus denies that it has infringed or

16   infringes the asserted claims of the patents-in-suit.

17           Those are the positions of the parties that are

18   before you today.  Your job will be to decide whether or

19   not the asserted claims have been infringed.

20           If you decide that any claim of the asserted

21   patents have been infringed, you will then need to decide

22   any money damages to be awarded to Wapp to compensate it

23   for the infringement.

24           If you decide that Micro Focus does not infringe,

25   then you will not need to decide any monetary damages.

1              Claims of the patent.

2              Before you can decide many of the issues in this

3    case you will need to understand the role of the patent

4    claims.

5              The patent claims are numbered sentences at the

6    end of each patent.  The claims are important because it is

7    the words of the claims that define what the patent covers.

8              The figures and the text in the rest of the patent

9    provide the description and/or examples of the invention

10   and provide a context for the claims, but it is the claims

11   that define the breadth of the patent's coverage.

12   Therefore, what a patent covers depends, in turn, on what

13   each of its claims covers.

14             The patents at issue in this case have been

15   provided to you in your juror notebooks.  Remember that

16   only certain claims of the three patents are at issue.  Do

17   not attempt to determine infringement with respect to any

18   other claim included in the patents-in-suit.

19             Claims are usually divided into parts called

20   limitations or elements.  When a thing, such as an accused

21   product or accused instrumentality, meets all of the

22   requirements of the claim, the claim is said to "cover"

23   that thing and that thing is said as to "fall" within the

24   scope of that claim.

25             In other words, a claim covers a product or

1    process where each of the claim elements or limitations is

2    present in that product or process.

3          For example, a claim that covers the invention of

4    a table may recite the tabletop, four legs, and the glue

5    that secures the legs to the tabletop.  In this example,

6    the tabletop, legs, and glue are each separate limitations

7    or elements of the claim.

8          Now, this case involves two types of patent

9    claims:  Independent claims and dependent claims.

10         An independent claim sets forth all of the

11   requirements that must be met in order to be covered by

12   that claim.  Thus, it is not necessary to look at any other

13   claim to determine what an independent claim covers.

14         In this case, Claim 1 of the '192 Patent, Claim 45

15   of the '678 Patent, and Claim 1 of the '864 Patent are each

16   independent claims, and the remaining claims are dependent

17   claims.

18         A dependent claim does not itself recite all of

19   the requirements of the claim but refers to another claim

20   for some of its requirements.  In this way the claim

21   "depends" on another claim.  A dependent claim incorporates

22   all of the requirements of the claim to which it refers.

23   The dependent claim then adds its own additional

24   requirements.

25         To determine what a dependent claim covers, it is

1   necessary to look back both at the dependent claim and the

2   independent claim to which it refers.

3          For example, Claim 2 of the '192 Patent is a

4   dependent claim that depends on the independent Claim 1 of

5   the '192 Patent.

6          The dependent asserted claims -- I'm sorry -- the

7   dependent asserted claims in this case are Claim 2 of the

8   '192 Patent, Claim 49 of the '678 Patent, and Claim 2 of

9   the '864 Patent.

10         A product that meets all of the requirements of

11  both the independent claim and the claim to which it refers

12  is covered by that dependent claim.

13         If you find that an independent claim is not

14  infringed, then you must also find that its dependent

15  claims are not infringed.

16         If you find that an independent claim is

17  infringed, you must further decide whether its dependent

18  claims that are also asserted in this case are also

19  infringed.

20         Now, it is my job as the judge to determine the

21  meaning of any claim language from these patents that needs

22  interpretation.  You must accept the meaning that I give

23  you and use them when you decide whether any claim is

24  infringed.

25         In your notebook, you have been provided with a

1   copy of the meanings that I have adopted for certain terms.

2           You will first need to understand what each claim

3   covers in order to decide whether or not there is

4   infringement there is infringement of that claim.

5           Sometimes the words in a patent claim are

6   difficult to understand; and, therefore, it is difficult to

7   understand what requirements these words impose.

8           The law says that it is my role to define the

9   terms of the claims and it is your role to apply my

10  definitions to the issues that you are asked to decide in

11  this case.

12          Therefore, as I explained to you at the start of

13  the case, I have determined the meaning of the claims, and

14  I will provide you my definitions of certain claim terms.

15  You must accept my definitions of these words in the claims

16  as being correct.

17          By understanding the meaning of the words in a

18  claim and by understanding that the words in a claim set

19  forth the requirements that a product or process must meet

20  in order to be covered by that claim you will be able to

21  understand the scope of the coverage for each claim.

22          Once you understand what each claim covers, then

23  you are prepared to decide the issues that you will be

24  asked to decide, such as infringement.

25          For any words in the claims for which I have not

1    provided you with a definition, you should apply its

2    ordinary and accustomed meaning as understood by one of

3    ordinary skill in the art.

4            You should not take my definition of the language

5    of the claims as any indication that I have a view

6    regarding how you should decide the issues that you are

7    being asked to decide, such as infringement.  These issues

8    are for you to decide.

9            My interpretation of the various claim terms and

10   phrases appears in your juror notebook, and I'm going to

11   read them to you right now.

12           For the '192 Patent, a "system for developing an

13   application for a mobile device" should be given its plain

14   meaning and it is limiting.

15           "Application" should be given its plain meaning.

16           "Simulate" means "emulate."

17           "Emulate" should be given its plain meaning.

18           "Simultaneously visually emulate, via one or more

19   profile display windows," means "emulate simultaneously and

20   display one or more windows showing resources of the mobile

21   device that are available to the application."

22           And "configured to" means "actually programmed

23   to."

24           For the '678 Patent, a "system for testing an

25   application for a mobile device" should be given its plain

1   meaning and is limiting.

2          "Application" should be given its plain meaning.

3          "Simulate," again, means to "emulate."

4          "Simultaneously visually simulate, via one or more

5   profile display windows," again, means "emulate

6   simultaneously, and display one or more windows showing the

7   resources of the mobile device that are available to the

8   application."

9          And "configured to" means, again, "actually

10  programmed to."

11         For the '864 Patent, "system for testing an

12  application for a mobile device" should be given its plain

13  meaning, and is limiting.

14         "Application" should be given its plain meaning.

15         "Simulate" means to "emulate."

16         "Emulate" should be given its plain meaning.

17         "Simulate, via one or more profile display

18  windows" means "emulate and display one or more windows

19  showing resources of the mobile device that are available

20  to the application."

21         And "configured to," again, means "actually

22  programmed to."

23         Now, I will now instruct you on how to decide

24  whether or not Micro Focus has infringed the asserted

25  patents.

1          Infringement is assessed by a claim-by-claim

2   basis.  Therefore, there may be infringement of a

3   particular patent as to one claim but no infringement as to

4   the other claim in that patent.

5          In this case Wapp has alleged that Micro Focus

6   directly infringes the asserted patents by selling the

7   accused products.

8          Wapp must prove direct infringement by a

9   preponderance of the evidence.

10          I will now explain direct infringement by literal

11   infringement in more detail.

12          In order to prove direct infringement by literal

13   infringement Wapp must prove by a preponderance of the

14   evidence that Micro Focus sold an accused product that

15   meets all of the requirements of the claim and did so

16   without the permission of Wapp.  You must compare each

17   accused Micro Focus product with each and every one of the

18   requirements for each asserted claim to determine whether

19   all of the requirements of that claim are met.

20          Wapp alleges that Micro Focus directly infringes

21   Claims 1 and 2 of the '192 Patent, Claims 45 and 49 of the

22   '678 Patent, and Claims 1 and 2 of the '864 Patent.

23          As I explained before, Wapp alleges that the

24   LoadRunner Professional (formerly LoadRunner) Versions 12.0

25   through 2020 SP2-SP3 with Network Virtualization alone

1   and/or in combination with the UFT Mobile/Mobile Center

2   through Version 3.4 (the "LoadRunner Professional Accused

3   Systems"); LoadRunner Enterprise (formerly Performance

4   Center) Versions 12.0 through 2020 SP2-SP3 with Network

5   Virtualization alone and/or in combination with

6   UFT Mobile/Mobile Center through Version 3.4 (the

7   "LoadRunner Enterprise Accused Systems"); and LoadRunner

8   Cloud (formerly StormRunner Load) Versions 1.2 through

9   2020.10 with Network Virtualization alone and/or in

10  combination with UFT Mobile/Mobile Center through

11  Version 3.4 (the "LoadRunner Cloud Accused Systems")

12  infringe the asserted claims.

13          You must determine, separately for each asserted

14  claim and each accused product, whether or not there is

15  infringement.

16          There is one exception to this rule.  If you find

17  that a claim to which a dependent claim refers is not

18  infringed, there cannot be infringement of that dependent

19  claim.

20          On the other hand, if you find that an independent

21  claim has been infringed, you must still decide,

22  separately, whether the product meets the additional

23  requirements of any asserted claim that depend from the

24  independent claim; thus, whether those claims have also

25  been infringed.

1        A dependent claim includes all the requirements of

2    any of the claims to which it refers plus the additional

3    requirements of its own.

4        A claim limitation is met if it exists in the

5    accused product as it is described in the claim language

6    either as I have explained this language to you or, if I

7    did not explain it to you, as it would be understood by one

8    of ordinary skill in the art.

9        Direct infringement of a system claim occurs if a

10   single party sells the system as a whole.

11       Wapp contends that Micro Focus has sold the

12   accused systems.  To prevail on this assertion Wapp must

13   prove that Micro Focus sold all of the claim elements in a

14   system.

15       For a system claim the claim requirement may

16   describe a certain functionality or capability that an

17   accused product must possess.  In such cases, the product

18   satisfies the requirement if it is reasonably capable of

19   operating in the recited manner.

20       Now, in this case Wapp alleges that Micro Focus

21   willfully infringed Wapp's patents.  If you decide that

22   Micro Focus has infringed you must go on and address the

23   additional issue of whether or not the infringement was

24   willful.

25       Willfulness requires that you determine whether

1    Wapp proved that it is more likely than not that Micro

2    Focus knew of Wapp's patents and that the infringement by

3    Micro Focus was intentional.

4         You may not determine that the infringement was

5    willful just because Micro Focus was aware of the asserted

6    patents and infringed one or more of them.  Instead,

7    willful infringement is reserved for egregious behavior,

8    such as where the infringement is willful, wanton,

9    malicious, in bad faith, deliberate, consciously wrongful,

10   flagrant, or, indeed, as a characteristic of a pirate.

11        You may find that the defendants' actions were

12   egregious, willful, or wanton if they acted in a reckless

13   or callous disregard of or an indifference to the rights of

14   the plaintiffs.

15        A defendant is indifferent to the rights of

16   another when it proceeds in disregard of a high or

17   excessive danger of infringement that was known to it or

18   apparent to a reasonable person in its position.

19        To determine whether Micro Focus acted willfully

20   consider all the facts and assess Micro Focus' knowledge at

21   the time of the challenged conduct.  This may include, but

22   is not limited to:

23        One, whether or not Micro Focus acted consistently

24   with the standards of behavior for its industry.

25        Second, whether or not Micro Focus intentionally

1    copied a product of Wapp that is covered by the '192

2    Patent, the '678 Patent, or the '864 Patent.

3            Three, whether or not Micro Focus reasonably

4    believed that it did not infringe.

5            Four, whether or not Micro Focus made a good-faith

6    effort to avoid infringing the '192 Patent, the '678

7    Patent, or the '864 Patent.  For example, whether Micro

8    Focus attempted to design around the '192 Patent, the '678

9    Patent, or the '864 Patent.

10           And, five, whether or not Micro Focus tried to

11   cover up its infringement.

12           Damages.

13           If you find that Micro Focus infringed any valid

14   claim -- well, if you decide that Micro Focus infringed any

15   claim of the asserted patents you must then consider the

16   amount of damages to award to Wapp.

17           Wapp must prove each element of its damages,

18   including the amount of damages, by a preponderance of the

19   evidence.

20           If proven by Wapp, damages must be in an amount

21   adequate to compensate for the entire infringement.  The

22   purpose of the damage award is to put Wapp in about the

23   same financial position it would have been in if the

24   infringement had not happened at all, but the damage award

25   cannot be less than a reasonable royalty.  You may not add

1    anything to the amount of damages to punish an accused

2    infringer or to set an example.

3           The fact that I am instructing you on damages does

4    not mean that the Court believes that one party or the

5    other should win in this case.  My instructions about

6    damages are for your guidance only in the event you find in

7    favor of Wapp.

8           You will need to decide the issue of damages only

9    if you decide that one or more of the asserted claims are

10   infringed.

11          In determining the amount of damages you must

12   determine when the damages began.  The parties agree that

13   damages, if any, commenced on January, 1st 2015.  This

14   trial concerns damages from January 1st, 2015, through

15   July 31st, 2020.

16          Now, a royalty is a payment made to a patent

17   holder in exchange for the right to make, use, or sell the

18   claimed invention.  A reasonable royalty is the amount of

19   royalty payment that a patent holder and the alleged

20   infringer would have agreed to in a hypothetical

21   negotiation taking place at a time prior to when the

22   infringement first began.

23          In considering this hypothetical negotiation, you

24   should focus on what the expectations of the patent holder

25   and the alleged infringer would have been had they entered

1   into an agreement at that time and had they acted

2   reasonably in their negotiations.

3          In determining this you must assume that both

4   parties believed the patent was valid and infringed and

5   that both parties were willing to enter into an agreement.

6   The reasonable royalty you determine must be a royalty that

7   would have resulted from the hypothetical negotiation and

8   not simply a royalty either party would have preferred.

9          Evidence of things that happened after the

10  infringement first began can be considered in evaluating

11  the reasonable royalty only to the extent that the evidence

12  aids in assessing what royalty would have been resulted

13  from a hypothetical negotiation just prior to the first

14  infringement.

15         The amount you find as damages must be based on

16  the value attributable to the patented technology, as

17  distinct from the other unpatented features of the accused

18  products.  In other words, you must determine an

19  appropriate royalty that reflects the value attributable to

20  the patented invention alone.

21         In determining the reasonable royalty you should

22  consider all of the facts known and available to the

23  parties at the time the infringement began.  Some of the

24  kinds of factors that you may consider in making your

25  determination are:

1            One, the value that the claimed invention

2      contributes to the accused products;

3            Two, the value that factors other than the claimed

4      invention contribute to Micro Focus's accused products and

5      services;

6            And three, the availability of acceptable

7      non-infringing alternatives to the claimed invention.

8            No one factor is dispositive, and you can and

9      should consider the evidence that has been presented to you

10     in this case on each of these factors.  You may also

11     consider any other factors which in your mind would have

12     increased or decreased the royalty the alleged infringer

13     would have been willing to pay and the patent holder would

14     have been willing to accept acting as normally prudent

15     businesspeople.

16            Now, patent damages are designed to compensate the

17     patent holder based on the infringer's use of the patented

18     technology.  Reasonable royalty awards may take the duty of

19     a lump-sum payment.  A lump-sum payment is equal to the

20     amount that the alleged infringer would have paid at the

21     time of the hypothetical negotiation for a license covering

22     all sales of the licensed products for the period

23     January 1st, 2015, through July 31st, 2020.  When a lump

24     sum is paid the infringer pays a single price for the

25     license.

1           Now, it is your duty to deliberate and to consult

2    with one another in an effort to reach a verdict.  Each of

3    you must decide the case for yourself, but only after an

4    impartial consideration of the evidence with your fellow

5    jurors.

6           During your deliberations do not hesitate to

7    reexamine your own opinions and change your mind if you are

8    convinced that you were wrong; but do not give up your

9    honest beliefs because the other jurors think differently

10   or just to finish the case.

11          Remember at all times you are the judges of the

12   facts.

13          You have been allowed to take notes during the

14   trial.  Any notes that you took during the trial are only

15   aids to your memory.  If your memory should differ from

16   your notes, you should rely on your memory and not on the

17   notes.  The notes are not evidence.  If you did not take

18   notes, rely on your own independent recollection of the

19   evidence, and do not be unduly influenced by the notes of

20   other jurors.  Notes are not entitled to any greater weight

21   than the recollection or impression of each juror about the

22   testimony.

23          When you go to the jury room to deliberate you

24   must take -- you may take with you a copy of this charge,

25   the exhibits that have been admitted into evidence, and

1    your notes.  You must select a jury foreperson to guide you

2    in your deliberations and to speak for you here in the

3    courtroom.

4          Your verdict must be unanimous.  After you have

5    reached your unanimous verdict, the jury foreperson must

6    fill out the answers to the written questions on the

7    verdict form and sign and date it.

8          After you have concluded your service and I have

9    discharged jury, you are not required to talk with anyone

10   about the case.

11         If you need to communicate with me during your

12   deliberations, the jury foreperson should write the inquiry

13   on the piece of paper and give it to the court security

14   officer.

15         After consulting with the attorneys I will respond

16   either in writing or by meeting with you back here in the

17   courtroom.  Keep in mind, however, that you must never

18   disclose to anyone, not even me, your numerical division on

19   any question.

20         Now, normally, I would say you can go back to the

21   jury room, but let me say a couple other things.  Also

22   attached to the charge is a glossary of the patent and

23   technical terms.  I'm not going to read those, but they're

24   being provided to you as just to be a useful guide as you

25   begin your deliberations.

1           The other thing I will say is, of course, when you

2   go back to the jury room, the first thing you will do is

3   decide who your foreperson is.  And that will be Juror Note

4   Number 1, you'll send back to the Court, and it will say

5   Note Number 1, Juror Number 1 through 8 is the foreperson.

6   And that will be Note Number 1.  And then any other notes

7   will be Note 2, and so on.

8           One thing just to remind you is, when you're up in

9   the jury room, all eight of you have to be present while

10  the deliberations are happening.

11          And, of course, if you want to eat your lunch and

12  talk, you can start deliberations.  But if someone goes to

13  the restroom, deliberations must cease.  All deliberations

14  must happen when all eight of you are present.

15          So at this time I'm going to send you to the jury

16  room to eat your lunch and to begin deliberations.

17          I want to thank you for your attentiveness all

18  week, and I hope you enjoy this next part of the process.

19          Thank you.

20          (The jury exits the courtroom, 12:55 p.m.)

21          THE COURT:  You may be seated.

22          At this time -- of course, no waiver has occurred.

23          You haven't done your objections to the charge.

24          Any objections by the plaintiff to the charge or

25  verdict?

1          MR. DACUS:  We do not, your Honor.

2          THE COURT:  Okay.  I think defense had some

3   objections to the charge and verdict.  Go ahead, if you

4   would like to make those.

5          MR. SEARS:  Yes, your Honor.

6          I've asked Ms. Juergens to present our objections.

7          THE COURT:  Yes, go right ahead.  You can do it at

8   the podium or if you have a mic.

9          (Discussion off the record.)

10          THE COURT:  Go ahead.  Again, identify yourself

11   again.

12          MS. JUERGENS:  Yeah, Alexis Juergens for

13   defendants.

14          THE COURT:  Okay.  Thank you.

15          MS. JUERGENS:  We just have a few objections to

16   the jury instructions.

17          So, first, turning to page 7 on the accused

18   products.  It is defendants' position that these -- you

19   know, we've heard this throughout trial -- but these need

20   to be limited specifically to the two accused scripting

21   protocols, which is TruClient Mobile Web and TruClient

22   Native Mobile.

23          And as we've heard all throughout trial -- or, I'm

24   sorry -- as we saw in Docket 350-1, Mr. Kramer represented

25   that the infringement theories were limited to TruClient

Jury Trial, Volume 5                    1373

1    Native Mobile and TruClient Mobile Web.  But we see their

2    infringement positions changing, so we take the position

3    that the accused products should be limited to those

4    specific accused scripting protocols, which is TruClient

5    Mobile Web and TruClient Native Mobile.

6              And then we also actually have a special

7    instruction, which I recall we actually gave you last

8    night.  But would you like me to provide you a new copy?

9              THE COURT:  I don't need that, but you probably

10   need to read it into the record.  So it's not part -- I

11   mean, it was provided to me, but...

12             MS. JUERGENS:  Okay.  It's a little bit lengthy,

13   but...

14             THE COURT:  Well, unless you want to file it on

15   ECF, that's fine, too.  And you can just --

16             MS. JUERGENS:  Okay.  We'll just --

17             THE COURT:  I mean, I've already denied all of

18   these.  It's just a matter of making your record.

19             So if you want to go ahead and file that requested

20   instruction as part of ECF, that's fine.

21             MS. JUERGENS:  Okay.  Yeah.  We'll go forward with

22   that then.

23             And then next, if we turn --

24             THE COURT:  Just identify what that's about,

25   though.  Which instruction.

1          MS. JUERGENS:  Oh, yeah.  I'm sorry.  The special

2   instructions goes hand-in-hand with these accused products.

3   So this special instruction would specifically talk about

4   how the accused products are alleged to infringe only when

5   using either the TruClient Mobile Web protocol or the

6   TruClient Native Mobile protocol.

7          THE COURT:  That's fine.

8          MS. JUERGENS:  Thank you.

9          And then, as you heard earlier, my co-counsel

10  addressed the issue of willful infringement, and so I'll

11  just summarize this here.

12         But it's our position that this should be removed

13  altogether because there is no evidence in the record to

14  sustain a jury finding that there is willful infringement,

15  whether pre-suit or post-suit.

16         And then our last objection is on page 26.  This

17  is under the lump sum.  This is a simple -- a pretty simple

18  objection.  But, here, we would just like to take out the

19  through July 31, 2020, the second-to-last sentence.

20         So we would have that second-to-last sentence

21  read:  A lump-sum payment is equal to an amount that the

22  alleged infringer would have paid at the time of a

23  hypothetical negotiation for a license covering all sales

24  of the licensed product commencing January 1, 2015.

25         And that's all of our objections, your Honor.

1          THE COURT:  Those objections will be overruled,

2    including the one that you are going to submit in writing,

3    which it was provided to the Court last night.

4          Okay.  Anything else from plaintiff at this point?

5          MR. DACUS:  No, your Honor.

6          THE COURT:  From defense?

7          MR. SEARS:  No, your Honor.  Thank you.

8          THE COURT:  Okay.  Thank you.

9          And then we will await the jury's verdict.

10         (Recess, 1:00 p.m. to 3:24 p.m.)

11         (Open court, all parties present, jury not

12   present.)

13         THE COURT:  Okay.  So the first note is just the

14   foreperson, and Juror Number 1 is the foreperson.

15         And then Juror Note Number 2 is "We have reached a

16   unanimous verdict."

17         So when I bring the jury in, I will publish the

18   verdict and then poll the jury to make sure it's unanimous.

19         So let's go ahead and bring the jury in.

20         (The jury enters the courtroom, 3:25 p.m.)

21         THE COURT:  Okay.  Please be seated, except for

22   Juror Number 1.

23         My understanding, y'all have reached a verdict?

24         THE FOREPERSON:  Yes, we have.

25         THE COURT:  It's unanimous?

1          THE FOREPERSON:  Yes, sir.

2          THE COURT:  If you will hand the verdict to the

3   court security officer.  You can be seated now.

4          Okay.  So I'm going to go ahead and publish your

5   verdict; and when I'm finished, I'm going to ask each of

6   you if it is your verdict to make sure it is unanimous.

7          In the case 4:18cv469, Wapp Tech Limited

8   Partnership and Wapp Tech Corp. versus Seattle SpinCo,

9   Inc., *et al*, we, the jury, find as follows:

10          Question 1.  Has Wapp proven, by a preponderance

11   of the evidence, that Micro Focus infringed any of the

12   asserted claims?

13          Answer, yes.

14          Question 2.  Willful infringement.  Did Wapp

15   prove, by a preponderance of the evidence, that Micro Focus

16   willfully infringed any of the asserted claims that you

17   found were infringed?

18          As to the '192 Patent, yes.

19          As to the '687 *(sic)* Patent, yes.

20          As to the '864 Patent, yes.

21          Question 3.  What sum of money, if any, paid in

22   cash today, has Wapp proven, by a preponderance of the

23   evidence, would compensate Wapp for its damages resulting

24   from infringement through July 31st, 2020?

25          Answer, $172,554,269.

Jury Trial, Volume 5                    1377

```
 1            And then it is dated today and initialed by the

 2   foreperson.

 3            So, Juror Number 1, is this your verdict?

 4            JUROR NUMBER 1:  Yes, sir.

 5            THE COURT:  Juror Number 2, is this your verdict?

 6            JUROR NUMBER 2:  Yes, sir.

 7            THE COURT:  You can go ahead and be seated.  Thank

 8   you.

 9            Juror Number 3, is this your verdict?

10            JUROR NUMBER 3:  Yes, your Honor.

11            THE COURT:  Juror Number 4, is this your verdict?

12            JUROR NUMBER 4:  Yes, your Honor.

13            THE COURT:  Juror Number 5, is this your verdict?

14            JUROR NUMBER 5:  Yes, your Honor.

15            THE COURT:  Juror Number 6, is this your verdict?

16            JUROR NUMBER 6:  Yes, your Honor.

17            THE COURT:  Juror Number 7, is this your verdict?

18            JUROR NUMBER 7:  Yes, your Honor.

19            THE COURT:  And, Juror Number 8, is this your

20   verdict?

21            JUROR NUMBER 8:  Yes, your Honor.

22            THE COURT:  Thank you very much.

23            So, ladies and gentlemen, I'm going to file your

24   verdict and make it part of the record.

25            I want to thank you for your service on behalf of
```

Jury Trial, Volume 5                    1378

 1  the Eastern District of Texas, Sherman Division.

 2          I think, as I said during the *voir dire* process --

 3  and there were a lot of things said, so you may not

 4  remember that I said this.  At least I hope I said this.  I

 5  usually -- I try to say it every time.

 6          Our system of justice, as we know it and practice

 7  it, would not exist without men and women serving as jurors

 8  and settling disputes between the parties.  So I hope --

 9  with my heartfelt thank you, I do appreciate everything,

10  your service this week.

11          I'm going to send you back to the jury room

12  because I'm going to come up and see if you have any

13  questions -- so I can, you know, see if you have any

14  questions about anything, about the process, and I'll be up

15  there in a minute.  But, again, thank you for your service.

16          (The jury exits the courtroom, 3:28 p.m.)

17          THE COURT:  Okay.  Anything further from

18  plaintiff?

19          MR. DACUS:  No, your Honor.  Thank you.

20          THE COURT:  From defense?

21          MR. SEARS:  No, your Honor.

22          THE COURT:  And then if you all just want to wait

23  out in the hallway, I'm going to go talk to the jury.  And

24  then if you would like to talk to them, I'll come down and

25  get y'all.  I'm sure they will, but if not -- but either

1    way, I'll come down and talk to you.

2              And we'll be in recess.  Thank you.

3              (Proceedings concluded, 3:29 p.m.)

4    COURT REPORTER'S CERTIFICATION

5              I HEREBY CERTIFY THAT ON THIS DATE, MARCH 5,

6    2021, THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD

7    OF PROCEEDINGS.

8

9                        /s/_____
                       CHRISTINA L. BICKHAM, CRR, RDR
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          <u>INDEX</u>

2

3                                                          <u>PAGE</u>

4   CONTINUED RECROSS-EXAMINATION OF CLARKE NELSON    1200

5   DEFENSE RESTS                                     1207

6   DIRECT EXAMINATION OF SAM MALEK                   1208

7   CROSS-EXAMINATION OF SAM MALEK                    1244

8   DIRECT EXAMINATION OF ROY WEINSTEIN               1252

9   CROSS-EXAMINATION OF ROY WEINSTEIN                1258

10  PLAINTIFF CLOSES                                  1259

11  DEFENSE CLOSES                                    1259

12  RULE 50 MOTIONS                                   1261

13  CLOSING ARGUMENT BY MR. DACUS                     1288

14  CLOSING ARGUMENT BY MR. SHELTON                   1305

15  REBUTTAL ARGUMENT BY MR. DACUS                    1329

16  COURT'S CHARGE TO THE JURY                        1344

17  OBJECTIONS TO THE CHARGE AND VERDICT FORM         1372

18  JUROR NOTE NUMBER 1                               1375

19  JUROR NOTE NUMBER 2                               1375

20  VERDICT                                           1376

21  COURT REPORTER'S CERTIFICATION                    1379

22

23

24

25