**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | |
|---|---|
| WAPP TECH LIMITED PARTNERSHIP AND WAPP TECH CORP., <br><br> Plaintiffs, <br><br> v. <br><br> SEATTLE SPINCO, INC., ET AL., <br><br> Defendants. | Civil Action No. 4:18-cv-469 <br><br> **JURY TRIAL DEMANDED** |

**DEFENDANTS' COMBINED MOTION FOR JUDGMENT AS A MATTER OF LAW,
TO GRANT NEW TRIAL, TO SET ASIDE OR REDUCE DAMAGES AWARD, AND/OR
TO RECONSIDER, CORRECT, OR AMEND JUDGMENT**

# TABLE OF CONTENTS

Background ........................................................................................................................ 4

    A.    The Asserted Claims ........................................................................................ 4

    B.    The Accused Products ...................................................................................... 4

    C.    Dr. Malek's Accused Product Combinations .................................................. 6

        1.    The UFT Mobile Combination .............................................................. 6

        2.    The LoadRunner/NV Combination ........................................................ 9

        3.    Micro Focus' pre-verdict motion for judgment as a matter of law ........... 10

    D.    Plaintiffs' Damages Theory ........................................................................... 11

Applicable Legal Standard ............................................................................................. 12

Argument ....................................................................................................................... 13

I.    Micro Focus Is Entitled to Judgment as a Matter of Law, or Alternatively a New Trial, on the Issue of Non-Infringement. ........................................................... 14

    A.    JMOL #1: Micro Focus is entitled to judgment of non-infringement because Plaintiffs failed to prove that the accused software has the required "profile display windows." ..................................................... 14

        1.    Plaintiffs failed to prove that the accused products show resources "that are available to the application." ..................................... 15

        2.    Plaintiffs failed to prove that "throughput" and "page load event duration" are "resources of the mobile device." ....................................... 21

    B.    JMOL #2: Micro Focus is entitled to judgment of non-infringement because Plaintiffs failed to prove that the accused software contains an interface "configured to" perform all of the required functions. ........................ 24

        1.    Plaintiffs contend that VuGen is the "software authoring interface" required by the asserted claims of the '192 patent. ................................... 25

        2.    Plaintiffs failed to contend, much less prove, that VuGen is "configured to simultaneously visually emulate, via one or more profile display windows, a plurality of network characteristics indicative of performance of the mobile device when executing the application," as required by the asserted claims of the '192 patent. ......... 27

3.      Plaintiffs failed to contend, much less prove, that VuGen is "configured to simulate a network connection state encountered by the mobile device," as required by the asserted claims of the '192 patent. ................................................................................. 30

4.      Dr. Malek's testimony that "the products" are configured to perform the claimed functions is insufficient as a matter of law. ............. 31

5.      Micro Focus is entitled to judgment of non-infringement of the '678 and '864 patents for the same reasons. ............................................. 32

C.      JMOL #3: Micro Focus is entitled to judgment of non-infringement because Plaintiffs failed to prove that the accused software, as sold, constitutes the claimed system. .......................................................... 34

1.      Direct infringement of a system claim requires that the system be assembled. ................................................................................ 35

2.      Dr. Malek created the accused UFT Mobile Combination. ...................... 36

3.      Dr. Malek created the accused LoadRunner/NV Combination. .............. 40

D.      JMOL #4: Micro Focus is entitled to judgment of non-infringement because the accused software-only products cannot directly infringe the asserted system claims. ......................................................................... 42

1.      The software-only claim construction ...................................... 43

2.      The asserted system claims require hardware. ......................................... 44

3.      Because it is undisputed that Micro Focus does not sell hardware, Micro Focus cannot directly infringe. ...................................................... 48

4.      LoadRunner Cloud does not infringe as a matter of law. ........................ 49

II.     Micro Focus Is Entitled to a New Trial on Damages Because the Jury Award Is Legally Unsupportable and Clearly Excessive. .................................................... 50

A.      Mr. Weinstein's legally erroneous royalty base impermissibly included revenues for unpatented and non-infringing features. ........................................ 52

1.      Mr. Weinstein legally erred in relying on revenues for protocol bundles that did not include the accused TruClient protocols. ................ 52

2.      Mr. Weinstein legally erred in relying on revenues for LoadRunner, instead of on revenues for the accused combinations of LoadRunner and Network Virtualization. ............................................ 57

B.      Dr. Malek's apportionment analysis is legally erroneous. .................................... 59

C.      Mr. Weinstein's legally erroneous profit-split analysis uses an arbitrary metric. ................................................................................................ 63

III.    Micro Focus Is Entitled to a New Trial on Anticipation and Obviousness. ..................... 64

Conclusion ................................................................................................................................... 66

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*01 Communique Lab'y, Inc. v. Citrix Sys., Inc.*,
   889 F.3d 735 (Fed. Cir. 2018)...................................................................65

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
   882 F.3d 1121 (Fed. Cir. 2018)...............................................45, 46, 47–48

*Allvoice Devs. US, LLC v. Microsoft Corp.*,
   612 F. App'x 1009 (Fed. Cir. 2015) ....................................44, 46, 47, 48

*Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*,
   672 F.3d 1335 (Fed. Cir. 2012)..................................................................40

*Bilski v. Kappos*,
   561 U.S. 593 (2010)....................................................................................44

*Blue Spike, LLC v. Huawei Techs. Co.*,
   No. 6:13-CV-679, 2016 WL 9286102 (E.D. Tex. Oct. 14, 2016)....................61–62

*Cates v. Creamer*,
   431 F.3d 456 (5th Cir. 2005) .....................................................................13

*Chef America, Inc. v. Lamb-Weston, Inc.*,
   358 F.3d 1371 (Fed. Cir. 2004)..................................................................32

*Conoco, Inc. v. Energy & Env't Int'l, L.C.*,
   460 F.3d 1349 (Fed. Cir. 2006)............................................................42–43

*Cowart v. Erwin*,
   837 F.3d 444 (5th Cir. 2016) .....................................................................12

*Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*,
   424 F.3d 1293 (Fed. Cir. 2005)..................................................................36

*Deepsouth Packing Co. v. Laitram Corp.*,
   406 U.S. 518 (1972)............................................................34, 35, 39, 42

*Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*,
   758 F.3d 1344 (Fed. Cir. 2014)............................................................ *passim*

*Enplas Display Device Corp. v. Seoul Semiconductor Co., Ltd.*,
   909 F.3d 398 (Fed. Cir. 2018)....................................................................55

*Ericsson, Inc. v. D-Link Sys., Inc.*,
773 F.3d 1201 (Fed. Cir. 2014)..................................................................51

*Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prod. Grp., LLC*,
879 F.3d 1332 (Fed. Cir. 2018)..............................................................63, 65

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
879 F.3d 1299 (Fed. Cir. 2018)..................................................................54

*Finjan, Inc. v. Secure Computing Corp.*,
626 F.3d 1197 (Fed. Cir. 2010)..............................................................46–47

*Fromson v. Western Litho Plate & Supply Co.*,
853 F.2d 1568 (Fed. Cir. 1988)..................................................................51

*Garretson v. Clark*,
111 U.S. 120 (1884)..................................................................................59

*Guile v. United States*,
422 F.3d 221 (5th Cir. 2005) ......................................................................21

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
769 F.3d 1371 (Fed. Cir. 2014)..................................................................49

*Heck v. Triche*,
775 F.3d 265 (5th Cir. 2014) ......................................................................12

*Imonex Servs., Inc. v. W.H. Munzprufer Dietmar Trenner GmbH*,
408 F.3d 1374 (Fed. Cir. 2005)..................................................................55

*The Johns Hopkins Univ. v. Datascope Corp.*,
543 F.3d 1342 (Fed. Cir. 2008)..................................................................21

*Kramer v. Time Warner Inc.*,
937 F.2d 767 (2d Cir. 1991)........................................................................47

*LaserDynamics, Inc. v. Quanta Comput., Inc.*,
694 F.3d 51 (Fed. Cir. 2012)........................................................55, 57, 62

*Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*,
969 F.2d 1384 (2d Cir. 1992)......................................................................47

*Loesch v. United States*,
645 F.2d 905 (Ct. Cl. 1981) ........................................................................21

*Lucent Techs. v. Gateway*,
580 F.3d 1301 (Fed. Cir. 2009)........................................................51, 59, 65

*Mercoid Corp. v. Minneapolis-Honeywell Regulator Co.*,
  320 U.S. 680 (1944)...........................................................................................35

*Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*,
  370 F.3d 1354 (Fed. Cir. 2004)......................................................................65

*Microsoft Corp. v. AT &T Corp.*,
  550 U.S. 437 (2007)...................................................................................35, 36

*Microsoft Corp. v. GeoTag, Inc.*,
  817 F.3d 1305 (Fed. Cir. 2016).............................................................23, 24, 36

*Montano v. Orange Cty., Texas*,
  842 F.3d 865 (5th Cir. 2016) ..........................................................................13

*Nazomi Communications, Inc. v. Nokia Corp.*,
  739 F.3d 1339 (Fed. Cir. 2014)......................................................................40

*NTP, Inc. v. Research In Motion, Ltd.*,
  418 F.3d 1282 (Fed. Cir. 2005).......................................................................49

*Omega Pats., LLC v. CalAmp Corp.*,
  920 F.3d 1337 (Fed. Cir. 2019)......................................................................48

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005)......................................................................46

*Polanco v. City of Austin, Tex.*,
  78 F.3d 968 (5th Cir. 1996) ...........................................................................13

*Power Integrations v. Fairchild Semiconductor Int'l, Inc.*,
  904 F.3d 965 (Fed. Cir. 2018).........................................................................59

*Reeves v. Sanderson Plumbing Prods., Inc.*,
  530 U.S. 133 (2000)........................................................................................13

*ResQNet.com, Inc. v. Lansa, Inc.*,
  594 F.3d 860 (Fed. Cir. 2010).........................................................................59

*Rotec Indus., Inc. v. Mitsubishi Corp.*,
  215 F.3d 1246 (Fed. Cir. 2000).......................................................................36

*Smith v. Transworld Drilling Co.*,
  773 F.2d 610 (5th Cir. 1985) ..........................................................................13

*Southwall Techs., Inc. v. Cardinal IG Co.*
  54 F.3d 1570 (Fed. Cir. 1995).........................................................................23

*Stragent, LLC v. Intel Corp.*,
    No. 6:11-CV-421, 2014 WL 1389304 (E.D. Tex. Mar. 6, 2014) ...........................................61

*SynQor, Inc. v. Artesyn Techs., Inc.*,
    709 F.3d 1365 (Fed. Cir. 2013)...................................................................................49

*Uniloc USA, Inc. v. Microsoft Corp.*,
    632 F.3d 1292 (Fed. Cir. 2011)...............................................................................55, 63

*VirnetX, Inc. v. Cisco Sys., Inc.*,
    767 F.3d 1308 (Fed. Cir. 2014)........................................................................ *passim*

*Wechsler v. Macke Int'l Trade, Inc*,
    486 F.3d 1286 (Fed. Cir. 2007).................................................................................21

*Westinghouse Elec. & Mfg. Co. v. Wagner Elec. & Mfg. Co.*,
    225 U.S. 604 (1912)...................................................................................................59

*Whitserve, LLC v. Comput. Packages, Inc.*,
    694 F.3d 10 (Fed. Cir. 2012).....................................................................................64

*z4 Techs., Inc. v. Microsoft Corp.*,
    507 F.3d 1340 (Fed. Cir. 2007).................................................................................13

**Statutes**

35 U.S.C. § 101.................................................................................................44, 45, 47

35 U.S.C. § 271................................................................................................... *passim*

35 U.S.C. § 284.....................................................................................................51, 55

**Other Authorities**

*Black's Law Dictionary* 1337 (7th ed. 1999)......................................................................49

Fed. R. Civ. P. 50.....................................................................................................1, 10

Fed. R. Civ. P. 59.....................................................................................................1, 14

Fed. R. Civ. P. 60..........................................................................................................1

Defendants ("Micro Focus") move pursuant to Rules 50(b), 59, and 60 for judgment as a matter of law ("JMOL"), a new trial, to set aside or reduce damages, and to reconsider, correct, or amend the judgment.

*First*, Micro Focus is entitled to judgment as a matter of law, or in the alternative a new trial, because Plaintiffs failed to prove that Micro Focus has infringed any of the asserted patents. Plaintiffs' evidence of infringement is legally deficient in four respects.

(A) Each of the asserted claims requires "one or more profile display windows," which, under the Court's claim construction, must "show[] resources of the mobile device that are available to the application." Plaintiffs failed to prove that any of the accused products satisfies this claim limitation. Plaintiffs identified four displays that allegedly meet this requirement but none shows resources "that are available to the application." Plaintiffs' evidence showed, at most, that the accused products display "resource usage," but the Court distinguished resource "*utilization*" from resource *availability* in its claim construction order, and ruled that the asserted claims require display of available resources, not just resource "utilization." Plaintiffs' evidence is therefore inadequate as a matter of law.

(B) Each of the asserted claims requires a software "interface" or "software" to perform multiple functions. For example, claim 1 of the '192 patent requires a "software authoring interface" that is "configured to simultaneously visually emulate . . . a plurality of network characteristics" and is "further configured to simulate a network connection." For each asserted claim, Plaintiffs relied on a single program, called "VuGen," as the claimed software "interface" or "software." But Plaintiffs made no attempt to show that *VuGen* is configured to—which the Court construed as "actually programmed to"—perform all of the claimed functions.

(C) Plaintiffs failed to prove that Micro Focus sold the allegedly infringing systems. Plaintiffs' infringement theories require combining and configuring multiple different products, none of which is alleged to infringe on its own, in order to form an allegedly infringing system. It is well established that, under these circumstances, there can be no direct infringement until the individual components are combined to form the patented invention. But under Plaintiffs' infringement theories, the allegedly infringing combinations would be made by an end user, not Micro Focus. That does not constitute direct infringement by Micro Focus, and Plaintiffs did not assert (let alone prove) that Micro Focus is liable for its end users' conduct under a theory of indirect infringement.

(D) The Court should reconsider its previous ruling that the claims of the asserted patents can be infringed by the sale of software alone. Each of the asserted claims recites a "system," and under binding Federal Circuit precedent, a system claim must include some tangible element in order to be valid. In particular, a system claim cannot cover pure, intangible software; it must include some hardware that enables the software to operate. Because it is undisputed that Micro Focus does not sell any hardware, the sale of Micro Focus' software alone cannot infringe any of Plaintiffs' asserted system claims.

*Second*, Micro Focus is entitled to a new trial on damages. The $172.5 million verdict is excessive and legally unsupportable. The jury accepted without modification the reasonable-royalty damages award proposed by Plaintiffs' damages expert, Mr. Weinstein, even though his royalty base included the value of unpatented features and more than $150 million in non-infringing sales, his technical apportionment departed from any analytically sound methodology, and his metric for assessing a hypothetical profit split was arbitrary and overstated Plaintiffs' bargaining power by up to $100 million. These legal errors resulted in a windfall that compensated

Plaintiffs for not only the alleged infringement but also Micro Focus' substantial innovations that go beyond the scope of Plaintiffs' patents. Indeed, the damages award exceeds Micro Focus' entire operating profit for the accused products, and, as noted by the Court, was "potentially the largest verdict in the history of this courthouse. By [Plaintiffs]' own calculation, the verdict amounts to 41% of **revenue** for the accused products, not just profits[.]" Dkt. 486 at 7 (emphasis added); *see also* Tr. 592:2–5 (Mr. Weinstein testifying that "in [his] view, none of those revenues would have been received, absent inclusion of the patents-in-suit").[1]

*Third*, Plaintiffs' violation of their own pre-trial representations, which deprived Micro Focus of important anticipation and obviousness defenses, also requires a new trial on invalidity. In an effort to avoid Micro Focus' motion to amend its invalidity contentions before trial, Plaintiffs represented that their infringement theory narrowly accused only those Micro Focus products that include at least one of *two* newer protocols. If Plaintiffs understood the asserted claims more broadly, to also cover Micro Focus products that did not include either protocol—but instead only other older, unpatented features—then the same products would invalidate Plaintiffs' after-arising patents. At trial, however, Plaintiffs ignored their pre-trial representation, broadened their damages theory to cover products that admittedly did not include either protocol, and were impermissibly compensated for *unpatented* features. Micro Focus was precluded from similarly expanding its invalidity case to meet Plaintiffs' broadened infringement theory. Plaintiffs cannot have it both ways: either the damages are legally excessive, or Micro Focus should have been permitted to demonstrate invalidity based on its prior art products.

---

[1]      Citations to "Tr." refer to the trial transcript.

## BACKGROUND[2]

### A.    The Asserted Claims

Plaintiffs assert U.S. Patent Nos. 8,924,192 ("the '192 patent"), 9,298,864 ("the '864 patent"), and 9,971,678 ("the '678 patent") (collectively, "the Asserted Patents") against Micro Focus. Tr. 1351:3–18. At trial, Plaintiffs asserted that Micro Focus has infringed claims 1 and 2 of the '192 patent, claims 1 and 2 of the '864 patent, and claims 45 and 49 of the '678 patent. Tr. 1353:15–17. Plaintiffs contended that Micro Focus directly infringes the Asserted Patents by selling the accused software. Tr. 1361:5–7. Plaintiffs do not allege any form of indirect infringement in this litigation. *See, e.g.*, Tr. 512:5–18; *see also* Dkt. 76 (Pls.' Second Am. Compl.) at 18, 22, 27.

### B.    The Accused Products

Plaintiffs accused two "combinations" of Micro Focus software products of infringing each asserted claim: (1) LoadRunner[3] plus Network Virtualization (the "LoadRunner/NV Combination"); and (2) LoadRunner plus Network Virtualization and UFT Mobile (the "UFT Mobile Combination"). Tr. 360:12–361:1, 553:23–554:5, 1353:20–1354:9; Ex. 1, PDX 3.26.

LoadRunner is software used to generate load on servers and to test applications in order to isolate and identify potential client, network, and server bottlenecks. PX 40-042. One component of LoadRunner is the Virtual User Generator ("VuGen"), which allows a user to create "test scripts" that can "record" actions taken by a user and re-enact them. Tr. 357:20–358:11; Ex. 1, PDX 3.41. The second major component of LoadRunner is known as the "Controller."

---

[2]    All of the facts set forth in this section either are based on Plaintiffs' evidence or were undisputed at trial.

[3]    "LoadRunner" here encompasses three separate products, all of which were accused in these combinations: LoadRunner Professional, LoadRunner Enterprise, and LoadRunner Cloud. Tr. 356:24–357:17, 1353:20–1354:9.

LoadRunner's Controller can execute the test scripts created in VuGen. Tr. 358:7–18 (discussing Ex. 1, PDX 3.41), 708:3–709:15. This includes executing test scripts at a large scale (for example, having 100 "virtual users" execute a test script concurrently). *Id.* A third component, LoadRunner's "Analysis" tool, collects data while the aforementioned tests are running and allows a user to view different graphs displaying this data. Tr. 358:25–359:5.

Each of these three components are distinct applications that are accessed separately from the user's desktop, as seen in the top left portion of the image below taken from Dr. Malek's LoadRunner testing video.



PX 031-001 (red annotations added).

Network Virtualization is a software product that can be used to virtualize or imitate real-world network conditions. Tr. 383:6–10; PX 82-002. Network Virtualization can be used in conjunction with LoadRunner, and later versions of LoadRunner are bundled with Network Virtualization. *See* Tr. 757:4–20, 788:22–789:10, 863:6–864:11. Even when bundled, however,

Network Virtualization is not required to use LoadRunner, which existed for many years before the two were bundled, and in fact Network Virtualization must be installed separately. *See* Tr. 735:25–736:25, 767:23–768:7, 870:10–871:4, 997:12–22, 1000:14–1001:2. Specifically, once the LoadRunner installation is complete, the user is given the option to "opt in" to install Network Virtualization, which entails an "extra step" after the LoadRunner installation. Tr. 767:21–768:7, 870:10–871:4.

UFT Mobile is a software product that allows access to mobile devices for testing. Tr. 359:22–360:11. UFT Mobile is sold separately from—and can be used independently of—LoadRunner and Network Virtualization. *See* Tr. 435:2–13, 609:2–6, 612:17–23.

### C.    Dr. Malek's Accused Product Combinations

Plaintiffs' infringement theories at trial were based on two combinations of the accused software products. For each of the accused combinations, Dr. Malek presented a specific test scenario, each of which involved a number of steps in order to set up and run the tests.

#### 1.    The UFT Mobile Combination

As Plaintiffs' infringement expert, Dr. Sam Malek, explained, "the *only way* that [LoadRunner, Network Virtualization, and UFT Mobile can be used together] is when they are *installed and configured*." Tr. 457:3–12 (emphases added); *see also* Tr. 1248:20–1249:1 ("If the system is not set up as a system, if they're disconnected from each other, yes, you wouldn't be able to run a test."). The set-up for this accused combination involved a number of steps. First, this combination requires obtaining and installing LoadRunner, Network Virtualization, and UFT Mobile, each of which, in Dr. Malek's configuration, was installed on a separate machine. *Compare* PX 035-134 (UFT Mobile installed on machine with IP address "10.14.66.234") *with* PX 035-177 (Network Virtualization installed on machine with IP address "10.14.65.210"); *see also* PX 081-027; PX 324-001. For example, UFT Mobile resided on its own server, separate from

the computer on which LoadRunner was installed, as seen in the demonstrative below. Tr. 962:17–965:15; PX 324-001. In addition, the UFT Mobile combination requires a separate installation of Network Virtualization (*i.e.*, separate from the version bundled with LoadRunner). *See* D0129 at MFDEFS00029311; D0211 at 3.

Next, this configuration required obtaining and using a real mobile device and connecting that device directly to UFT Mobile; specifically, Dr. Malek tested a Motorola Nexus 6 with the Android 7.1.1 operating system installed. Tr. 449:10–450:12. The AdvantageShopping application was also downloaded and installed to use in the test. *Id.* As seen below, the UFT Mobile server was connected to the mobile device via a USB cable. Tr. 962:17–965:15 (confirming that "customers will install UFT Mobile on their own servers" and will require a "USB hub" and "USB cables"); PX 324-001.



Ex. 1, PDX 3.25; *see also* Tr. 962:17–965:15; PX 324-001.

It is also necessary to configure the Network Virtualization server as a proxy to the Internet to track network performance; to do this, the user "must apply the proxy configuration to the

mobile devices, install the proxy local certificate on the devices, and add proxy IP addresses and ports in the network settings." PX 081-027; *see also* Tr. 481:15–21, 977:12–980:20; PX 082-003; PX 324-001.

Additionally, Dr. Malek had to turn on Network Virtualization, which, even when installed, is disabled by default. Tr. 448:24–449:9. Dr. Malek then opened VuGen and selected the Native Mobile protocol, as well as the CPU and memory options in the "Collect Data On" menu. Tr. 362:3–16 (citing PX 35-056). Dr. Malek next had to develop a Native Mobile script within VuGen. Tr. 362:17–363:2 (citing PX 35-81).

Once the Native Mobile script was created, Dr. Malek switched out of VuGen to an already-open Google Chrome window that he used to remotely access two separate machines, one of which was running Network Virtualization (specifically, Network Virtualization's "NV Test Manager" interface) and the other running UFT Mobile. *See* Tr. 363:3–364:1; PX 035-122–128. Within the remotely accessed NV Test Manager interface, Dr. Malek was "able to see [] the throughput client-in and throughput client-out" graphs "on the Network Virtualization UI," as seen in the left-hand side of the display in Dr. Malek's testing video below. Tr. 363:3–364:1; *see also* Tr. 370:25–374:24, 480:24–481:21; Ex. 1, PDX 3.53; PX 035-122–128; PX 035-303. The right-hand side of the display shows metrics from the mobile device in a separate window. Although Dr. Malek sized the windows so that they appeared side-by-side, these are in fact two separate programs running in separate windows. *See* PX 035-122–128. Dr. Malek relied both on the graphs in the left-hand window and the device metrics in the right-hand window as satisfying the claim limitation requiring "profile display windows." Tr. 363:3–364:1, 370:25–374:24.



00:05:02:00

WAPP0017794

PX 035-303 (green annotations added).

### 2.   The LoadRunner/NV Combination

For the LoadRunner/NV combination, Dr. Malek also had to take several steps to configure and run the tests. First, it was necessary to obtain and install both LoadRunner and Network Virtualization and enable Network Virtualization (which is off by default and must be enabled). Tr. 448:24–449:9.

Dr. Malek then opened the VuGen application on his desktop and, within VuGen, selected a mobile device under the "device name" menu; Dr. Malek then selected a Samsung Galaxy S9. Tr. 378:4–16; Ex. 1, PDX 3.61–3.63. Using a web browser (Firefox)—*i.e.*, a separate program—Dr. Malek visited the Bank of America website and developed a test script that will execute actions on this website. Tr. 379:7–13, 463:17-464:6; Ex. 1, PDX 3.64.

Once the script was created, Dr. Malek quit the VuGen application and opened the LoadRunner Controller application. *See* PX 031-185–220. Once the Controller application was

open, he navigated to "Network Virtualization Characteristics" and selected the "4G Good" option. Tr. 379:7–380:6; Ex. 1, PDX 3.65. In Controller, Dr. Malek executed the test script, which, while running, displays graphs including "page load event duration" and "average throughput" within the Controller application, as seen in Dr. Malek's trial demonstrative below. Tr. 380:21–381:20 (citing Ex. 1, PDX 3.66, PX 31-667), 1221:19–1222:10. In this accused combination, Dr. Malek relied solely on the page load event duration and throughput graphs as satisfying the "profile display window" limitation of the asserted claims. Tr. 380:21–382:24 (citing Ex. 1, PDX 3.66, PX 31-667).



Ex. 1, PDX 3.66 (green annotations added).

### 3.  Micro Focus' pre-verdict motion for judgment as a matter of law

At the close of evidence, Micro Focus moved for a directed verdict of non-infringement pursuant to Rule 50(a). Tr. 1269:4–1271:10. The Court denied the motion. *Id.*

### D. Plaintiffs' Damages Theory

Micro Focus' accused products have gone by different names but their core functionality has existed since the 1990s, predating the Asserted Patents. Plaintiffs thus did not accuse the pre-existing LoadRunner products of infringing, but instead presented a narrow infringement theory that required combining LoadRunner with two specific, newer protocols—TruClient-Native Mobile or TruClient-Mobile Web ("the accused TruClient protocols")—that are part of Micro Focus' Network Virtualization product. *See* Tr. 462:11–18, 493:17–21; Dkt. 350 at 3. Every accused combination requires Network Virtualization. *See, e.g.*, Ex. 1, PDX 3.26; Tr. 360:12–361:1.

Plaintiffs' ***damages*** theory, however, far exceeded the scope of its infringement theory. Micro Focus first learned this when deposing Plaintiffs' experts, Dr. Sam Malek and Mr. Roy Weinstein. *See, e.g.*, Dkt. 313-6 at 258:14–18. Rather than apportioning damages to the value of the two accused TruClient protocols, the experts' damages theory swept in the entire value of Micro Focus' LoadRunner products, which include numerous non-infringing products and unpatented, prior-art features. Tr. 434:14–435:1.

After those depositions, Micro Focus moved to strike the experts' opinions, Dkt. 303, 305, and supplement its invalidity contentions, Dkt. 313. Micro Focus moved to strike based on the experts having included non-infringing products in the damages calculations, and having failed to apportion damages using any reliable methodology. *See generally* Dkt. 303, 305. Micro Focus moved to supplement because Plaintiffs' sweeping new damages theory, if accepted, also expanded Plaintiffs' infringement theory and the universe of prior art—to include prior-art LoadRunner products—that Micro Focus had not asserted previously based on Plaintiffs' representations concerning the scope of alleged infringement. *See generally* Dkt. 313.

The Court agreed that the damages analyses of Plaintiffs' experts were flawed but nonetheless allowed the experts to supplement their opinions and present them at trial. Dkt. 399 at 5; Dkt. 386 at 9; *see also* Dkt. 437. The supplemental opinions, however, were equally unscientific efforts to paper over the experts' earlier errors. The Court nonetheless denied Micro Focus' renewed requests to exclude these opinions. Dkt. 417, 437. The Court also denied Micro Focus' motion to amend its invalidity contentions as moot, resting on Plaintiffs' assurances that "'Dr. Malek will not present new opinions at trial.'" Dkt. 387 at 3 (quoting Dkt. 350 at 2).

Mr. Weinstein's and Dr. Malek's opinions did not honor Plaintiffs' assurances to avoid expanding the scope of their infringement theory but instead baked in Plaintiffs' new and sweeping infringement theory through the guise of fundamentally unapportioned damages. The Court nonetheless denied Micro Focus' requests to instruct the jury that Plaintiffs' infringement theory was limited to only those products that have the accused TruClient protocols. *See* Tr. 1372:15– 1374:7; Dkt. 453-1 at 2; Dkt. 458. This allowed Plaintiffs to present the jury with a narrow case of infringement (only the accused TruClient protocols), but a broad, over-inclusive damages theory (*any* LoadRunner protocol). Upon finding infringement, the jury adopted Drs. Malek's and Weinstein's analyses wholesale. Ex. 7, PDX 4.6; Tr. 563:2–20 (calculating damages of $172.5 million dollars); Dkt. 460 at 6 (awarding damages of $172.5 million dollars). The result is Micro Focus being liable for damages exceeding the entirety of its operating profits for all of the accused products.

## APPLICABLE LEGAL STANDARD

"When a case is tried to a jury, a motion for judgment as a matter of law 'is a challenge to the legal sufficiency of the evidence supporting the jury's verdict.'" *Cowart v. Erwin*, 837 F.3d 444, 450 (5th Cir. 2016) (quoting *Heck v. Triche*, 775 F.3d 265, 272 (5th Cir. 2014)). "JMOL should be granted when 'a party has been fully heard on an issue and there is no legally sufficient

evidentiary basis for a reasonable jury to find for that party on that issue.'" *Montano v. Orange Cty., Texas*, 842 F.3d 865, 873 (5th Cir. 2016) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149 (2000)).

The Court may grant a new trial if the verdict is against the weight of the evidence, the damages are excessive, the trial was unfair, or prejudicial error occurred. *See Smith v. Transworld Drilling Co.*, 773 F.2d 610, 612–13 (5th Cir. 1985); *Cates v. Creamer*, 431 F.3d 456, 460 (5th Cir. 2005); *z4 Techs., Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1347 (Fed. Cir. 2007) (regional circuit law governs new-trial standard). Alternatively, "when the award is deemed merely 'excessive,' the district court may remit the award." *Polanco v. City of Austin, Tex.*, 78 F.3d 968, 981 (5th Cir. 1996).

## ARGUMENT

Micro Focus is entitled to judgment as a matter of law or, in the alternative, a new trial.

First, Plaintiffs failed to provide legally sufficient evidence that any of the accused products infringe any of the Asserted Patents. Therefore, Micro Focus is entitled to judgment as a matter of law, or at least a new trial, on non-infringement.

Second, Micro Focus is entitled to a new trial on damages because the damages award violates well-established damages principles. Plaintiffs' damages theory, which the jury accepted, was divorced from and covered significantly more than Plaintiffs' avowed infringement case.

Third, the order precluding Micro Focus from asserting that prior versions of the accused products invalidated the asserted claims materially prejudiced its invalidity case in light of Plaintiffs' expansive reading of the claims for damages purposes. The Court thus should grant a new trial on invalidity.

13

## I.    Micro Focus Is Entitled to Judgment as a Matter of Law, or Alternatively a New Trial, on the Issue of Non-Infringement.

Micro Focus is entitled to judgment as a matter of law on the issue of non-infringement for four independent reasons, each of which applies to both infringement theories (*i.e.*, the LoadRunner/NV Combination and the UFT Mobile Combination). In the alternative, Micro Focus should be granted a new trial pursuant to Rule 59(a)(1) because Plaintiffs' failure to present sufficient evidence of infringement, as discussed below, rendered the trial fundamentally unfair.

### A.    JMOL #1: Micro Focus is entitled to judgment of non-infringement because Plaintiffs failed to prove that the accused software has the required "profile display windows."

Each of the asserted claims requires "one or more profile display windows." Under the Court's claim construction, the profile display windows must "show[] resources of the mobile device that are available to the application." Dkt. 176 at 35. For example, the Court construed the term "simultaneously visually emulate, via one or more profile display windows" in claim 1 of the '192 patent to mean "emulate simultaneously, and display one or more windows showing resources of the mobile device that are available to the application." *Id.*[4]

At trial, Plaintiffs identified four different displays that allegedly meet this limitation, depending on the accused combination. For the LoadRunner/NV Combination, Plaintiffs relied on graphs of "throughput" and "page load event duration." Tr. 380:21–381:20. For the UFT Mobile Combination, Plaintiffs again cited the same "throughput" graphs, Tr. 372:23–373:8, but also relied on certain "device metrics," including "CPU" and "Memory," obtained from the mobile device and shown in a "Control Panel." Tr. 373:17–19; PX 035-291.

---

[4]    The other patents have slightly different language. Claim 45 of the '678 patent requires the software to "simultaneously visually simulate" rather than "simultaneously visually emulate." Claim 1 of the '864 patent omits the word "simultaneously." These differences are not material to the present motion.

| Infringement Theory | Alleged "resources of the mobile device that are available to the application" |
|---|---|
| LoadRunner/NV Combination | throughput<br>page load event duration |
| UFT Mobile Combination | throughput<br>CPU<br>memory |

Micro Focus is entitled to judgment of non-infringement because Plaintiffs failed to present any evidence that the accused software shows resources of the mobile device "that are available to the application," as required by the Court's claim construction. The alleged profile display windows on which Plaintiffs relied at most show the *usage*, as opposed to availability, of the alleged resources. *See, e.g.*, Tr. 381:19–20. Plaintiffs' trial theory is foreclosed by the Court's *Markman* ruling, which rejected Plaintiffs' argument that it is sufficient to show resource "utilization." Dkt. 176 at 30–32. Plaintiffs' theory is therefore deficient as a matter of law.

       1.    **Plaintiffs failed to prove that the accused products show resources "that are available to the application."**

There is no evidence that the accused software shows the resources of the mobile device "that are available to the application." Rather than provide evidence that the accused products satisfy this aspect of the Court's claim construction, Plaintiffs relied on an interpretation of the claims that the Court has explicitly rejected.

During claim construction, the parties disputed whether the profile display window must display resources "available to the application," as Micro Focus argued, or whether it was sufficient to display resources "utilized by an application," as Plaintiffs argued. As the Court explained:

> Plaintiff argued that the patents-in-suit disclose displaying resources
> *utilized by* an application and also disclose displaying resources

15

> *available to* the application. Plaintiff argued that the patents-in-suit
> encompass displaying either or both. Plaintiff urged that the claims
> at issue do not necessarily require displaying resources *available to*
> the application.

Dkt. 176 at 28–29. After the *Markman* hearing, Plaintiffs submitted a supplemental claim

construction brief proposing a construction that would cover "showing resources of the mobile

device that are available to *or utilized by* the application." Dkt. 171 at 2 (emphasis added).

The Court rejected Plaintiffs' argument and its proposed construction, recognizing that

there is an important difference between resource utilization and resource availability. The Court

ruled that the "claims are directed to the *available* resources of the mobile device when executing

the application." Dkt. 176 at 30. The Court further found that the patents disclose "that tracking

available resources is necessary to determine whether an application will consume too many

resources and 'crash' as a result." *Id.* at 33. Figure 3 of the patents shows an exemplary profile

display window that has a "capacity line 308" that "indicated the maximum processor resource

available to application 104." *Id.* at 31–32 (quoting PX 001 ('864 patent), 8:4–30). "Where bars

304 rise above capacity line 308 at locations 310, resource utilization . . . *exceed[s] the available*

*processor resources* of mobile device 113." *Id.* at 32 (quoting PX 001 ('864 patent), 8:4–30). The

Court further noted that the patents include claims that explicitly require "displaying the resource

utilization information," but none of those claims is asserted in this case. *Id.* at 30–31 (quoting

PX 001 ('864 patent), claims 20, 25).

The patents further explain that there is a difference between the total resources of the

mobile device and the resources that are "available to the application." A mobile device may be

running many different applications simultaneously, in addition to its operating system and other

internal programs, and the device may hold resources in reserve for such other uses. PX 003 ('192

patent), 6:28–31. As the patents explain, a mobile device such as a phone "has to maintain 'phone'

16

operations while running any applications, thus there may only be a portion of the maximum processing resources available to applications." *Id.* The amount of RAM and "non-volatile storage space" available to an application may be similarly limited. *Id.*, 6:31–34. Table 1 of the '192 patent provides an example where only 60% of the processor, 60% of the RAM, and 40% of the non-volatile storage are available to the application. *Id.*, 6:1–9.

None of the purported "profile display windows" shows resources that are "available to the application." Instead, Plaintiffs' infringement expert repeatedly testified that the throughput graph, for example, displays resource "usage":

- "[T]hroughput is a graph of *resource usage* over time." Tr. 381:19–20 (emphasis added).

- "It's capturing the *resource usage* of the mobile device, as you can see on the graph on the right-hand side." Tr. 459:23–25 (emphasis added).

- "[Y]ou can see that the average throughput graph in their own documentation—and this is a technical document, this is the LoadRunner User Guide—they define it as *resource usage* on the Y-axis on that graph. . . ." Tr. 1224:8–14 (emphasis added).

Dr. Malek never identified anything in any of the putative profile display windows that shows *availabl*e resources. And even a cursory examination of the displays confirms that no reasonable jury could find that they show *available* resources. For instance, Dr. Malek relied on the following image of an "Average Throughput" graph:



PX 040-1340 (red box added). The graph explicitly states that it is displaying a measure of "resource usage." Unlike the "profile display window" in the asserted patents, this graph does not include a "capacity line" or any other indication of the amount of available resources. There is nothing in the graph that shows when the "resource usage" has "exceed[ed] the available processor resources of mobile device," PX 001 ('864 patent), 8:19–22, or that indicates "whether an application will consume too many resources and 'crash' as a result," Dkt. 176 at 33.

Similarly, Dr. Malek relied on the following image of a "page load event duration" graph:



PX 031-667. Like the "throughput" graph, this graph does not include a "capacity line" or any other indication of the amount of available resources.

18

The "Control Panel" in the UFT Mobile Combination similarly shows resource usage. The Control Panel shows various "device metrics," including CPU, memory, and free memory.



PX 035-291 (red box added); *see also* Tr. 373:17–19. However, it is undisputed that the Control Panel is showing CPU and memory *usage*. "CPU" refers to "CPU *usage* during the test run." D0129 at MFDEFS00029007. "Memory" refers to "[t]he amount of memory *used* during the test run." *Id.* Thus, in the screenshot relied upon by Dr. Malek, the application was using "0%" of the CPU and "2%" of memory. PX 035-291. Plaintiffs do not contend that the Control Panel shows a "capacity line" as in Figure 3 of the patents, or even anything remotely similar. Plaintiffs have not identified anything in the Control Panel display—or anywhere else for that matter—that shows how much CPU or memory resources are "available to the application."

The fact that the Control Panel displays CPU and memory usages as a percentage does not establish that the software displays the amount of those resources that are "*available* to the

application." As noted above, the patents distinguish between the total resources of the mobile device and the resources "available to the application." PX 003 ('192 patent), 6:28–31. When, as in the figure above, the Control Panel reports that 2% of memory is being used, it is impossible to know how much memory is "available to the application," because the "available" memory will depend on the amount of memory held "in reserve" for the phone, the operating system, or other applications. *Id.* In the scenario illustrated in Table 1 of the '192 patent, where a maximum of 60% of memory can ever be used by an application, only 58% of memory would be available. But in another scenario, where the application is limited to no more than 10% of memory, only 8% would be available. Depending on the number of applications that are running on the device, there may be no memory available to the application, because all of it is either in use or held in reserve for "phone operations" or other purposes. There is no way to know, because the Control Panel does not display the CPU or memory resources that are "available to the application."

The Control Panel also displays a measure of "Free Memory." But "free" memory is just memory that is not being used. It is undisputed that the "Free Memory" display shows "[t]he amount of free memory *on the device*, during t[h]e run." D0129 at MFDEFS00029007 (emphasis added). In other words, it is the total amount of unused memory on the device—not the amount "available to the application." The asserted patents make clear that unused resources are not necessarily "available to the application" because "there may only be a portion of the maximum . . . resources available to applications." PX 003 ('192 patent), 6:28–31. Therefore, the display of free memory does not show resources "available to the application."

The sum total of Plaintiffs' evidence that these putative "profile display windows" show resources "available to the application" is Dr. Malek's *ipse dixit*. *See, e.g.*, Tr. 373:22–23 ("That's the throughput on the mobile device that is available to you."). But a conclusory expert opinion is

insufficient to support a jury verdict. "[O]pinion evidence is only as good as the facts upon which it is based," *Loesch v. United States*, 645 F.2d 905, 915 (Ct. Cl. 1981), and Dr. Malek has not offered any facts or evidence to support his opinion that the graphs show "available" resources. As the Federal Circuit has held, an "expert opinion contrary to the factual evidence need not be credited," and courts will "not accept [such an] opinion in deciding whether substantial evidence exists to support the jury's finding of infringement." *The Johns Hopkins Univ. v. Datascope Corp.*, 543 F.3d 1342, 1348 (Fed. Cir. 2008) (citing *Wechsler v. Macke Int'l Trade, Inc.*, 486 F.3d 1286, 1294 (Fed. Cir. 2007)); *see also Guile v. United States*, 422 F.3d 221, 227 (5th Cir. 2005) ("An expert's opinion must be supported to provide substantial evidence. . . .").

There is simply no evidence that the "throughput" graph or the Control Panel in the UFT Mobile Combination, shows "resources of the mobile device that are available to the application," as required by the Court's construction. Given the lack of evidence, no reasonable jury could find that Plaintiffs carried their burden to prove that the accused products contain the required "profile display windows."

### 2. Plaintiffs failed to prove that "throughput" and "page load event duration" are "resources of the mobile device."

Micro Focus is entitled to judgment that the LoadRunner/NV Combination does not infringe any of the asserted claims for a second, independent reason: neither "throughput" nor "page load event duration" is a "resource of the mobile device."

The accused software is capable of displaying various graphs showing metrics related to the performance of the network, including the "throughput" and "page load event duration" graphs on which Plaintiffs relied. There is no factual dispute as to what these graphs show. The throughput graph "shows the average data traffic passing to or from the virtualized location, measured in kilobytes per second." PX 040-1339; *see also* Tr. 381:15–20. The page load event duration graph

21

shows "the average time per document, in milliseconds, it takes for the load event to occur." PX 373; *see also* Tr. 381:5–12. In other words, the throughput graph displays the speed at which data is being uploaded or downloaded, and the page load event duration graph displays the average time to load a webpage.

While these metrics may provide valuable information to the user, they are not, in any sense, "resources of the mobile device," as the Court's claim construction requires. As described in the patents, resources are the assets of the device—such as the processor and memory—that the mobile device needs to function. PX 003 ('192 patent), 8:18–23. These assets are consumed by an application, which might crash if the resources are "stressed." *Id.* But an application cannot *use* throughput and page load time. These performance metrics are fundamentally different from the mobile device resources discussed in the patents.

Plaintiffs' infringement expert, Dr. Malek, effectively acknowledged that "throughput" and "page load event duration" are not, themselves, "resources of the mobile device." With respect to throughput, he testified that, rather than being a "resource of the mobile device," throughput is "defined in terms of" such resources:

> [T]hroughput is the rate at which data is processed or produced. It is—in computing, in computer science, it is *defined in terms of* available hardware, software, and network resources.

Tr. 374:3–6 (emphasis added). Thus, by Dr. Malek's own testimony, throughput is, at best, a measurement that may be *affected by* the resources of a mobile device—*i.e.*, the "available hardware, software, and network resources." *Id.*

To be sure, throughput—the speed at which data is being transferred—may *depend on* the available resources. For example, the speed of a car may depend on the resources of the car, such as fuel, oil, and tire tread. If a car is low on oil, or the tires are bald, it may affect the car's speed. The same is true of a mobile device. If a device is low on memory, it may run more slowly,

potentially causing network throughput to decrease. But that does not make throughput a resource of the mobile device.

Plaintiffs' reliance on a metric "defined in terms of" the device resources amounts to a thinly veiled doctrine of equivalents argument. But Plaintiffs accused Micro Focus only of *literal* infringement. Plaintiffs did not argue for infringement under the doctrine of equivalents or even ask that the jury be instructed on the doctrine. *See* Dkt. 362. Plaintiffs are therefore required to prove *literal* infringement, which requires that "every limitation set forth in a claim must be found in an accused product, **exactly**." *Microsoft Corp. v. GeoTag, Inc*., 817 F.3d 1305, 1313 (Fed. Cir. 2016) (quoting *Southwall Techs., Inc. v. Cardinal IG Co.* 54 F.3d 1570, 1575 (Fed. Cir. 1995)) (emphasis added). Under the Court's claim construction, the profile display windows must "show[] resources of the mobile device." Showing performance metrics affected by—or "defined in terms of"—the resources for the mobile device is not *literal* infringement. The claims require showing the actual resources, and throughput is not such a resource.

Similarly, Dr. Malek did not argue that "page load event duration" is a resource of the mobile device, opining instead that the graphs "tell you when the resources are available on the mobile device." Tr. 380:25–381:4. Even if Dr. Malek were correct, it would not support a finding of *literal* infringement. Providing an indication of *when* a resource is available is not the same as showing the resource. Instead, as with throughput, the page load event duration is, at best, a measurement that may be impacted by device resources. Thus, even taking Dr. Malek's testimony at face value and drawing all reasonable inferences in favor of the Plaintiffs, there is no basis to find that the "page load event duration" graphs *literally* satisfy the profile display window limitation by "showing a resource of the mobile device."

23

**B.**      **JMOL #2: Micro Focus is entitled to judgment of non-infringement because Plaintiffs failed to prove that the accused software contains an interface "configured to" perform all of the required functions.**

Each of the asserted claims requires software or a particular software interface that is "configured to" perform multiple different functions. Claim 1 of the '192 patent, for example, requires:

> a *software authoring interface configured to* simultaneously visually emulate, via one or more profile display windows, a plurality of network characteristics indicative of performance of the mobile device when executing the application; wherein the *software authoring interface* is further *configured to* simulate a network connection state encountered by the mobile device.

PX 003 ('192 patent), claim 1 (emphases added). It is black-letter law that, in order to prove infringement of this claim, Plaintiffs must show that the accused products contain a "software authoring interface" that is configured to perform *all* of the claimed functions. *GeoTag*, 817 F.3d at 1313 ("To establish literal infringement, every limitation set forth in a claim must be found in an accused product, exactly."). That is, Plaintiffs must prove that there is something in the accused products that is:

> (1) a software authoring interface;
>
> (2) configured to simultaneously visually emulate, via one or more profile display windows, a plurality of network characteristics indicative of performance of the mobile device when executing the application; and
>
> (3) configured to simulate a network connection state encountered by the mobile device.

Micro Focus is entitled to judgment of non-infringement because Plaintiffs never identified anything in the accused products that meets all three requirements. Plaintiffs argued that one piece of software constitutes the "software authoring interface" and that other, *different* pieces of software provide most of the functionality in the rest of the claim. The claim, however, requires

24

that the *software authoring interface* be configured to provide the claimed functionality. Thus, the opinion of Plaintiffs' expert, Dr. Malek, that "*the products* are actually programmed to do the [claimed] features that we talked about," Tr. 376:6–8 (emphasis added), was insufficient as a matter of law to establish infringement.

Plaintiffs' evidence at trial concerning the '678 patent, which requires a "software testing interface" configured to perform each of the claimed functions, and the '864 patent, which requires "software" configured to perform each of the claimed functions, was similarly deficient. Micro Focus is entitled to judgment of non-infringement of all of the asserted claims.

### 1.     Plaintiffs contend that VuGen is the "software authoring interface" required by the asserted claims of the '192 patent.

Plaintiffs have alleged that the asserted patents are infringed when multiple software products—LoadRunner, Network Virtualization, and, in one theory, UFT Mobile—are combined together to form the claimed systems. As Plaintiffs' infringement expert, Dr. Malek, acknowledged, LoadRunner itself includes at least three different components: VuGen, Controller, and Analysis. Tr. 357:18–359:5.[5]

According to Plaintiffs, the VuGen component is the "software authoring interface" required by the '192 patent. Dr. Malek repeatedly testified that he was relying on VuGen to meet this claim limitation:

> Q. So were you able to determine that all of the LoadRunner products include a software authoring interface?
>
> A. Yes, I did.

---

[5]     At trial, Plaintiffs' expert witnesses in some instances described Network Virtualization as a fourth component of LoadRunner, *see, e.g.*, Tr. 358:19–24, and in others referred to it as a separate product that had to be "combin[ed]" with LoadRunner, *see, e.g.*, Tr. 553:23–554:5. For the purposes of JMOL #2, it does not matter whether Network Virtualization is a fourth component or a second product. All that matters is that it is undisputed that Network Virtualization is not VuGen.

. . . .

But here is a document from LoadRunner user—here is a text from LoadRunner User Guide, PX-40, that—and I've highlighted the relevant portion here. It says "VuGen's editor enables you to edit recorded scripts."

And so that meets the limitation of the software authoring interface.

Tr. 368:25–369:19. Several days later, Plaintiffs recalled Dr. Malek to respond to the testimony of Micro Focus' non-infringement expert. Dr. Malek again testified that VuGen was the required software authoring interface:

So, as you may recall, in VuGen, that's where you actually create the script, the test script. And so it satisfies the notion of a software authoring interface because you are developing the test script for software development.

Tr. 1219:14–18. Dr. Malek's demonstratives further illustrate that Plaintiffs' contention was that VuGen was the software authoring interface:



Ex. 1, PDX 3.41 (highlighting in original).

At no point in the entire trial did Plaintiffs identify anything other than VuGen as a potential software authoring interface. Therefore, in order to prove infringement, Plaintiffs were required to

26

show that VuGen is "configured to" perform the various functions of the claimed software authoring interface.

> **2.    Plaintiffs failed to contend, much less prove, that VuGen is "configured to simultaneously visually emulate, via one or more profile display windows, a plurality of network characteristics indicative of performance of the mobile device when executing the application," as required by the asserted claims of the '192 patent.**

As discussed in JMOL #1, the asserted claims of the '192 patent require "simultaneously visually emulat[ing], via one or more profile display windows, a plurality of network characteristics indicative of performance of the mobile device when executing the application." For purposes of JMOL #2, the relevant claim requirement is that the "software authoring interface"—*i.e.*, VuGen—must be configured to perform these functions. Plaintiffs have not proven that VuGen is so configured. Instead, Plaintiffs rely on multiple different programs, including Network Virtualization, the Controller component of LoadRunner, and UFT Mobile.

For example, Plaintiffs have not offered any evidence that VuGen is configured to emulate "a plurality of network characteristics indicative of performance of the mobile device when executing the application." Dr. Malek does not claim that VuGen performs this function. To the contrary, he expressly testified that Network Virtualization, not VuGen, satisfies this part of the claim limitation:

> Q. Did you consider how Network Virtualization plays into meeting the rest of the claim, which is a plurality of network characteristics indicative of performance of the mobile device when executing the application?
>
> A. Yes, sir. As I mentioned, Network Virtualization is the Micro Focus product that simulates networks.

Tr. 374:25–376:22; *see also* Ex. 1, PDX 3.56; Tr. 382:25–384:6 (citing PX 82-002).

For the LoadRunner/NV combination, Plaintiffs' proof fails for a second reason. Plaintiffs contend that the "profile display windows" limitation is satisfied by the "throughput" graphs.

Tr. 380:7–382:24. Dr. Malek's testing videos indicate that these graphs are accessed from within LoadRunner *Controller*, as seen in the demonstrative below. Tr. 380:7–382:24 (citing PDX 3.66 (Ex. 1), PX 31-667), 1221:19–1222:10. Dr. Malek does not contend that VuGen shows the "throughput" graph. Indeed, in his testing video, Dr. Malek *quits* the VuGen application and opens the separate Controller application in order to view the graphs. *See* PX 031-185–220.



Ex. 1, PDX 3.66 (green annotations added).

For the UFT Mobile Combination, Plaintiffs again rely on "throughput" graphs. Tr. 370:25–374:24 (citing PDX 3.53 (Ex. 1)), 1221:19–1222:10. For this combination, however, the graphs are displayed by a web browser accessing a remote installation of the Network Virtualization software. As seen below, Dr. Malek's testing videos illustrate that the throughput graphs are seen within the "NV Test Manager," part of the Network Virtualization product.



WAPP0017794

PX 035-303 (green annotations added). As Dr. Malek testified, "[y]ou get this on the Network Virtualization UI [user interface]. What you're able to see is the throughput client-in and throughput client-out." Tr. 363:3–364:1; *see also* Tr. 370:25–374:24, 480:24–481:21; Ex. 1, PDX 3.53.

Dr. Malek also relied on UFT Mobile to satisfy aspects of this claim limitation for purposes of the UFT Mobile Combination. For example, he contended that UFT Mobile is at least partly responsible for emulating the resources of the mobile device, which he conceded is a requirement of all of the asserted claims. Tr. 450:23–451:1, 451:12–15; *see also* Tr. 372:23–373:8 ("And so here you can see PX-40 is LoadRunner User; and in it, it describes how a LoadRunner with UFT Mobile emulates and displays mobile device resources."); Ex. 1, PDX 3.52 ("LoadRunner with UFT Mobile emulates mobile device resources.").[6]

---

[6]    Not only are UFT Mobile and Network Virtualization not part of the VuGen interface, but in Dr. Malek's test, they were installed on different computers than VuGen. Dr. Malek's testing

In short, Plaintiffs have not presented any evidence that VuGen is configured to "simultaneously visually emulate, via one or more profile display windows, a plurality of network characteristics indicative of of performance of the mobile device when executing the application." Because the claims of the '192 patent expressly require that the software authoring interface perform these functions, Plaintiffs have failed to prove that this claim limitation is satisfied. Micro Focus is therefore entitled to judgment of non-infringement of the asserted claims of the '192 patent.

### 3. Plaintiffs failed to contend, much less prove, that VuGen is "configured to simulate a network connection state encountered by the mobile device," as required by the asserted claims of the '192 patent.

The final limitation of claim 1 of the '192 patent requires that "the software authoring interface is further configured to simulate a network connection state encountered by the mobile device." As with the "simultaneously visually emulat[ing]" limitation discussed in the previous section, Plaintiffs have failed to offer any evidence that VuGen is configured to perform this function. Once again, Plaintiffs contend that other programs—not VuGen—meet this claim limitation. In particular, Dr. Malek relies on Network Virtualization's network state functionality, such as the option to choose between "3G busy, 3G good, 3G typical," which (if Network Virtualization has been installed) is accessible through LoadRunner's *Controller* rather than VuGen. Tr. 379:14–380:6, 384:7–386:2 (citing PDX 3.65 (Ex. 1), PDX 3.75 (Ex. 1), PX 40-1369, PX 33-202). For this additional reason, Micro Focus is entitled to judgment of non-infringement.

---

video shows him switching from the VuGen application to a Google Chrome web browser to access the UFT Mobile and Network Virtualization software running on entirely different computers. *See* PX 035-134 (showing UFT Mobile running on a machine with IP address 10.14.66.234); PX 035-177 (showing NV Test Manager running on a machine with IP address 10.14.65.210); *see also* PX 081-027.

### 4.     Dr. Malek's testimony that "the products" are configured to perform the claimed functions is insufficient as a matter of law.

While Dr. Malek did attempt to directly address the "configured to" limitation in his testimony, he did so by testifying that "*the products* are actually programmed to do the [claimed] features that we talked about," Tr. 375:21–376:22 (emphasis added). This, however, is not what the claim requires; the claim, as construed, requires that the *software authoring interface* (*i.e.*, VuGen) is "actually programmed to" perform these functions. Dkt. 176 at 38. Further, while much of the evidence relied upon by Dr. Malek as satisfying the "configured to" language was source code from the accused products, Dr. Malek consistently failed to demonstrate that any of the cited source code pertained to *VuGen*. Indeed, often the source code relied upon by Dr. Malek was source code from software other than LoadRunner. Tr. 406:24–407:23 (relying on *Network Virtualization* source code as allegedly showing infringement of claims 1 and 2 of the '864 patent and claim 45 of the '678 patent).

Dr. Malek's opinion effectively rewrites claim 1 of the '192 patent.

| '192 patent, claim 1 (as written) | '192 patent, claim 1 (as interpreted by Plaintiffs) |
|---|---|
| 1. A system for developing an application for a mobile device comprising:<br><br>a software authoring interface configured to simultaneously visually emulate, via one or more profile display windows, a plurality of network characteristics indicative of performance of the mobile device when executing the application;<br><br>wherein the software authoring interface is further configured to simulate a network connection state encountered by the mobile device. | 1. A system for developing an application for a mobile device comprising:<br><br>a software authoring interface<u>;</u><br><br><u>wherein the system is </u>configured to simultaneously visually emulate, via one or more profile display windows, a plurality of network characteristics indicative of performance of the mobile device when executing the application; <u>and</u><br><br>wherein the ~~software authoring interface~~ <u>system</u> is further configured to simulate a network connection state encountered by the mobile device. |

But the Federal Circuit "repeatedly and consistently has recognized that courts may not redraft claims, whether to make them operable or to sustain their validity." *Chef America, Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004); *see also id.* ("[W]e construe the claim[s] as written, not as the patentees wish they had written it."). Here, the applicant *chose* to draft the claims so as to require that the "software authoring interface" performs all of the recited functions. Plaintiffs cannot now, in the middle of litigation, rewrite their claims in order to make it easier to prove infringement.

Dr. Malek thus failed to provide testimony on whether a "software authoring interface" (VuGen) is configured to perform the claimed functions, as required by claim 1 of the '192 patent. There is thus not even a scintilla of evidence, let alone a legally sufficient amount of evidence, to sustain the infringement verdict.

### 5.   Micro Focus is entitled to judgment of non-infringement of the '678 and '864 patents for the same reasons.

Although the previous sections focused on claim 1 of the '192 patent, Plaintiffs' proof as to the claims of the '678 patent and the '864 patent was deficient for similar reasons. Micro Focus is therefore entitled to judgment of non-infringement of all three asserted patents.

The claims of the '678 patent use slightly different language than those of the '192 patent. Instead of a "software authoring interface," the '678 patent requires a "software testing interface." But Dr. Malek testified that VuGen is both the "software testing interface" of the '678 patent and the "software authoring interface" of the '192 patent. *See* Tr. 395:9–396:17. Therefore, in order to prove infringement of claim 45, Plaintiffs had to prove that VuGen is:

> configured to simultaneously visually simulate, via one or more profile display windows, a plurality of operator network characteristics including at least bandwidth availability indicative of performance of the mobile device when executing the application.

PX 002 ('678 patent), claim 45. As with the '192 patent, Plaintiffs have not offered any evidence that VuGen is configured to perform these functions.

Instead, Dr. Malek confirmed that he "rel[ied] on the same evidence" for this limitation as he did for the corresponding portion of claim 1 of the '192 patent. Tr. 395:9–397:16. That is, according to Dr. Malek, Network Virtualization, not VuGen, simulates the operator network characteristics; Network Virtualization and/or Controller (depending on the infringement theory) display profile display windows; and UFT Mobile emulates resources of the mobile device. *See supra* §§ I.B.2, I.B.3.

Plaintiffs' evidence with respect to claim 1 of the '864 patent is equally flawed. The claim requires:

> software configured to simulate, via one or more profile display windows, a plurality of network characteristics indicative of performance of the mobile device when executing the application; wherein the network characteristics are based on data of interaction with networks in non-simulated environments.

PX 001 ('864 patent), claim 1. Dr. Malek testified that he was relying on the same evidence that he relied on for the '192 patent's "software authoring interface" to also satisfy the '864 patent's "software" limitation—*i.e.*, VuGen. Tr. 390:10–391:17. Although Dr. Malek commented that he believed "software" was likely broader than "software authoring interface," he did not identify any component besides VuGen that might satisfy that claim limitation. *Id.*; Ex. 1, PDX 3.90–3.93.

As with his testimony concerning the '192 and '678 patents, at no point did Dr. Malek provide testimony that VuGen performs the function of "simulat[ing], via one or more profile display windows, a plurality of network characteristics." Dr. Malek again relied on the "same evidence" as with the corresponding limitation in the '192 patent, Tr. 390:20–24—*i.e.*, Network Virtualization, Controller, and/or UFT Mobile allegedly perform this functionality. *See supra*

33

§§ I.B.2, I.B.3. Accordingly, Plaintiffs failed to show that the alleged "software" (*i.e.*, VuGen) meets all of the requirements of the asserted claims of the '864 patent.

>   **C.      JMOL #3: Micro Focus is entitled to judgment of non-infringement because Plaintiffs failed to prove that the accused software, as sold, constitutes the claimed system.**

As the Court instructed the jury, Plaintiffs have "alleged that Micro Focus directly infringes the asserted patents by selling the accused products." Tr. 1361:5–7; *see also* Tr. 409:12 ("[T]he sale of the product is the infringement act."). Plaintiffs did not argue at trial that Micro Focus "makes" or "uses" an infringing system under 35 U.S.C. § 271(a). Nor have Plaintiffs alleged that Micro Focus indirectly infringes by inducing or contributing to the infringement of a third party under Section 271(b) or (c). *See* Dkt. 76 (Plaintiffs' Second Amended Complaint) at 18, 22, 27. Plaintiffs therefore had to prove that the accused products constituted an infringing system *as sold*. Tr. 1363:11–14 ("[Plaintiffs] contend[] that Micro Focus has sold the accused systems. To prevail on this assertion, [Plaintiffs] must prove that Micro Focus sold all of the claim elements in a system.").

Plaintiffs have failed to prove that Micro Focus sold the system as claimed. Instead, Plaintiffs expressly relied on "combinations" of distinct Micro Focus products—none of which is alleged to infringe on its own—to create a combined system that allegedly meets all of the claim elements. *E.g.*, Tr. 360:12–361:1, 379:14–380:6, 381:13–20, 553:23–554:5 (Plaintiffs' damages expert explaining that "there are two combinations of products" accused by Plaintiffs); *see also* Dkt. 268 at 3–4 (Plaintiffs' summary judgment opposition describing each infringement theory as a "combination"). Under Supreme Court precedent, however, the sale of the components of a patented invention for assembly by the purchaser does not render the *seller* liable for direct infringement under Section 271(a). *See Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518, 528 (1972). Here, Plaintiffs' expert created the accused systems by combining and configuring

different Micro Focus products. Thus, even assuming, *arguendo*, that these systems would infringe the asserted patents, Micro Focus did not sell those systems and, as a result, is not liable for direct infringement.[7]

### 1. Direct infringement of a system claim requires that the system be assembled.

It is a fundamental tenet of patent law that "a patent on a combination is *a patent on the assembled or functioning whole, not on the separate parts*." *Deepsouth*, 406 U.S. at 528 (quoting *Mercoid Corp. v. Minneapolis-Honeywell Regulator Co.*, 320 U.S. 680, 684 (1944)) (emphasis added). In *Deepsouth*, the Supreme Court considered the question of whether selling all of the component parts of a machine for them to be assembled by customers constitutes direct infringement by the seller. The alleged infringer in that case, instead of selling fully assembled shrimp deveining machines, sold the components of the machine to foreign buyers, who assembled the parts abroad in order to avoid infringement.[8] *See id.* at 523–24. The Court concluded: "We cannot endorse the view that the 'substantial manufacture of the constituent parts of (a) machine' constitutes direct infringement [under § 271(a)] when we have so often held that a combination patent protects only against the operable assembly of the whole and not the manufacture of its parts." *Id.* at 528. The Supreme Court has recently reaffirmed this fundamental principle: Deepsouth could not be held liable as a direct infringer because it "did not make, sell, or use the

---

[7]     In JMOL #4, Micro Focus argues that the asserted claims require hardware. JMOL #3 assumes, *arguendo*, that the claims do not require hardware and therefore can be infringed by software alone. But given that Plaintiffs' infringement theories depend on the combined functionality of discrete pieces of software, the allegedly infringing systems do not exist until a user installs and configures each of the individual software components.

[8]     At the time, Section 271 did not extend liability for inducement or contributory infringement to scenarios where the act of direct infringement occurred abroad, so the plaintiff's only recourse was direct infringement by the sale of components. *See Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 444–45 (2007).

patented invention—the fully assembled deveining machine—within the United States." *Microsoft Corp. v. AT & T Corp.*, 550 U.S. 437, 443 (2007); *see also Rotec Indus., Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, 1252 (Fed. Cir. 2000) ("[A]s to claims brought under § 271(a), Deepsouth remains good law: one may not be held liable under § 271(a) for 'making' or 'selling' less than a complete invention.").

The Federal Circuit has likewise made explicit that literal infringement requires that "***every*** limitation set forth in a claim [be] found in an accused product, ***exactly***." *GeoTag*, 817 F.3d at 1313 (emphases added). As such, when a patent claims an apparatus or system, infringement only occurs once the patented invention is fully assembled. *See, e.g.*, *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1311 (Fed. Cir. 2005). For example, in *Cross Medical*, the Federal Circuit held that an apparatus claim was not infringed by the sale of a device because the claim required the device to be connected to a bone, which did not occur until the device was used in surgery. *Id.* As the court explained, "if anyone makes the claimed apparatus, it is the surgeons, who are, as far as we can tell, not agents of Medtronic. Because Medtronic does not itself make an apparatus with the 'interface' portion in contact with bone, Medtronic does not directly infringe." *Id.*

### 2.    Dr. Malek created the accused UFT Mobile Combination.

Under one of Plaintiffs' infringement theories, the combination of LoadRunner, Network Virtualization, and UFT Mobile can be used to create an infringing system (the "UFT Mobile Combination"). Plaintiffs did not allege that any one of these products infringes on its own. Instead, Dr. Malek cherry-picked different features from the three products in opining that all of the claim limitations are met. For example, as discussed in JMOL #2, Dr. Malek relied on VuGen (part of LoadRunner) to satisfy the "software authoring interface" limitation of claim 1 of the '192 patent. *Supra* § I.B.1. He relied on Network Virtualization to satisfy the "configured to simulate a network

36

connection state encountered by the mobile device" limitation of the same claim. Tr. 384:7–386:2 (citing PX 40-1369, PX 33-202). And he relied on UFT Mobile as allegedly responsible for emulating the resources of the mobile device. Tr. 451:12–15; *see also* Tr. 372:23–373:8; Ex. 1, PDX 3.52. The same is true of every one of the asserted claims; Plaintiffs rely on the "combination" of all three products as allegedly, and collectively, providing the claimed functionality. *E.g.*, Tr. 360:19–23.

The undisputed evidence at trial established that this combination does not exist at the time of sale. Instead, UFT Mobile is an entirely distinct software product that is sold separately from, and can be used independently of, LoadRunner and Network Virtualization. Tr. 435:2–13, 609:1–6, 612:17–23. As Plaintiffs' damages expert conceded, not all LoadRunner customers purchase UFT Mobile, and not all UFT Mobile customers purchase LoadRunner. Tr. 612:17–23. Similarly, LoadRunner and Network Virtualization, though sold together, are distinct components: LoadRunner can be used without Network Virtualization, Tr. 609:17–25, and Network Virtualization requires a separate installation as a "extra step" in which a user must "opt in" to install and use the software, Tr. 612:17–23, 767:23–768:7, 870:10–871:4, 997:12–22.

Dr. Malek's own admissions establish that the allegedly infringing system requires an end user to combine and configure the various components. For example, he agreed that "when [the products are] used together, the ***only way*** that that's possible is when they are ***installed and configured***." Tr. 457:1–12 (emphases added). Dr. Malek further admitted that "[i]f the system is not set up as a system, if they're disconnected from each other, yes, ***you wouldn't be able to run a test***." Tr. 1248:20–1249:1 (empahsis added); *see also* Tr. 1248:13–19 ("I mean, this is a system consisting of these products that are intended to work with each other. If they can't work with each other because they're disconnected, yes, then you can't do the testing."). This is consistent with

Micro Focus' documents. *See, e.g.*, D0129 at MFDEFS00029305 ("Before you can perform Network Virtualization testing on your mobile devic[e,] you need to **configure** the UFT Mobile server." (emphasis added)).

Assembling and configuring this new "system" requires many steps. First, the user must purchase and install LoadRunner, Network Virtualization, and UFT Mobile. In Dr. Malek's configuration, these products were installed on multiple, different computers. *Supra* p. 30 n. 7. This set-up requires a standalone installation of Network Virtualization (*i.e.*, separate from the version bundled with LoadRunner), *see id.*; D0129 at MFDEFS00029311; D0211 at 3, and because Network Virtualization is turned off by default, the user must manually seek out the option and enable it, Tr. 448:24–449:9. The user must then "*configure[]*" a Network Virtualization server as a proxy to the Internet to track network performance; to do this, the user "must apply the proxy configuration to the mobile devices, install the proxy local certificate on the devices, and add proxy IP addresses and ports in the network settings." Tr. 481:15–21; PX 081-027; PX 082-003. Dr. Malek's system also required obtaining and using a real mobile device, a Motorola Nexus 6, with the Android 7.1.1 operating system installed, and with the AdvantageShopping application downloaded and installed. Tr. 449:10–450:12.

The user must select the particular protocol, Native Mobile, out of the "three or four dozen" protocols available in LoadRunner, Tr. 702:12–14, and then develop a NativeMobile script. In addition to running the test in the Controller component of LoadRunner, the user must also select the specific data such as throughput to track during test execution from among the "hundreds, if not thousands" of different graphs available. Tr. 700:19–22.

Only once Dr. Malek took the foregoing steps did the allegedly infringing system come into existence. None of the various pieces of software infringes on its own, and the mere *capability*

of combining the software in the allegedly infringing manner is not enough to prove direct infringement, because the asserted patents are "on the assembled or functioning whole, not on the separate parts." *Deepsouth*, 406 U.S. at 528. For example, under Plaintiffs' theory, the purchase of Network Virtualization would allow a user to "emulate . . . a plurality of network characteristics." But unless and until the user purchased UFT Mobile—and configured it to work with Network Virtualization in the same manner as Dr. Malek—there would be no system that (allegedly) "emulate[s], via one or more profile display windows, a plurality of network characteristics indicative of performance of the mobile device when executing the application." The fact that UFT Mobile is sold separately from Network Virtualization and LoadRunner makes the absence of direct infringement even clearer than in *Deepsouth*, where the manufacturer sold all of the parts to build the machine together (yet shipped them in three separate boxes). *Deepsouth*, 406 U.S. at 524 ("Deepsouth sells these components as though they were the machines themselves; the act of assembly is regarded, indeed advertised, as of no importance.").

Nor would Micro Focus be liable for direct infringement even if, as Plaintiffs suggested, UFT Mobile is *designed* to work with LoadRunner and Network Virtualization. *See, e.g.*, Tr. 367:10–368:8. The manufacturer in *Deepsouth* sold the machine parts with "the intent of having the foreign user effect the combination without [the patentee's] permission," 406 U.S. at 524, yet this did not amount to direct infringement, *id.* at 526. As the Supreme Court acknowledged, such intent may be relevant to a claim for indirect infringement. *See id.* ("Certainly if Deepsouth's conduct were intended to lead to use of patented deveiners inside the United States, its production and sales activity would be subject to injunction as an induced or contributory infringement."). Here, however, Plaintiffs chose to proceed solely on a theory that Micro Focus *directly* infringed by selling the *components of* the claimed system.

The Federal Circuit's decision in *Nazomi Communications, Inc. v. Nokia Corp.*, 739 F.3d 1339 (Fed. Cir. 2014), is instructive. In *Nazomi*, the product as sold (CPUs) did not infringe the asserted patents, but a customer could create the claimed apparatus by purchasing and installing software for use with the CPUs. *Id.* at 1342. The Federal Circuit held that the "purchase and installation" of the software "clearly constitutes a 'modification' of the accused products." *Id.* at 1345. It affirmed the district court's grant of summary judgment of non-infringement because "the products sold by [the defendants] do not infringe without modification—the modification of installing the required software." *Id.* at 1346.

Similarly, under Plaintiffs' UFT Mobile Combination, LoadRunner and Network Virtualization "do not infringe without modification—the modification of installing [UFT Mobile]." *Id.* UFT Mobile "add[s] new functionality not currently present" in LoadRunner and Network Virtualization. *Id.* As Dr. Malek conceded, "if they're disconnected from each other, . . . you wouldn't be able to run a test." Tr. 1248:24–1249:1. Thus, there can be no direct infringement under this theory until a user combines and configures the products to form the allegedly infringing system.[9]

### 3.    Dr. Malek created the accused LoadRunner/NV Combination.

Plaintiffs' other infringement theory is based on the combination of LoadRunner and Network Virtualization ("LoadRunner/NV Combination"). As with the previous theory, Micro Focus only sells the components (LoadRunner and Network Virtualization), which must be

---

[9] It bears mention that *Nazomi* involved claims reciting an apparatus "capable of" performing certain functions, 739 F.3d at 1343, whereas the claims here require that the system be "configured to" perform the claimed functions. The Court construed "configured to" to mean "actually programmed to," Dkt. 176 at 38, which reflects the well-established principle that the phrase "'configured to' has a narrower meaning than merely 'capable of' or 'suitable for,'" *id.* at 37 (citing *Aspex Eyewear, Inc. v. Marchon Eyewear, Inc*., 672 F.3d 1335, 1349 (Fed. Cir. 2012)). Thus, the burden to prove direct infringement here is even higher than in *Nazomi*.

combined and configured by an end user in order to create the allegedly infringing system. Therefore, there is no evidence that Micro Focus directly infringed any of the asserted claims.

As explained above in Section I.C.2, LoadRunner and Network Virtualization are distinct pieces of software.[10] Although LoadRunner and Network Virtualization have been sold together since November 2018, Tr. 788:19–789:10, the unrebutted testimony establishes that Network Virtualization is installed separately from LoadRunner, Tr. 767:23–768:7, 870:10–871:4, 997:12–22, 1000:14–1001:2; *see also* Tr. 448:10–19 (testimony of Plaintiffs' expert failing to dispute this point). Specifically, the unrebutted testimony establishes that once the LoadRunner installation is complete, the user is given the option to "opt in" to install Network Virtualization, which entails an "extra step" after LoadRunner installation. Tr. 767:21–768:7, 870:10–871:4. It bears emphasis that this step is optional: It is undisputed that LoadRunner can be used without Network Virtualization and existed for a long time before becoming "integrated" with Network Virtualization.[11] Tr. 609:17–25, 735:25–736:25. Even after it is installed, Network Virtualization is disabled by default and has to be enabled by the customer. Tr. 448:24–449:9.

In view of these undisputed facts, Micro Focus' sale of LoadRunner and Network Virtualization does not amount to direct infringement as a matter of law. As explained above, with respect to claim 1 of the '192 patent, Plaintiffs rely on LoadRunner for certain limitations, including the "software authoring interface" (VuGen) and the "profile display windows"

---

[10]     Dr. Malek at times referred to Network Virtualization as a "Micro Focus product," Tr. 375:4–5, but in other instances, he inaccurately described Network Virtualization as a "component" of LoadRunner, *e.g.*, Tr. 358:19–24. This mischaracterization has no bearing on the undisputed evidence that Network Virtualization is distinct from the LoadRunner components discussed above (VuGen, Controller, Analysis), and must be installed separately from those components.

[11]     The evidence at trial showed that only a small fraction of LoadRunner customers purchased Network Virtualization before Micro Focus began bundling the two in November 2018. Tr. 791:13–792:5.

(Controller), and Network Virtualization for "emulat[ing] . . . a plurality of network characteristics" and "simulat[ing] a network connection state encountered by the mobile device." *Supra* §§ I.B.2, I.B.3. The claim provides that these are not discrete elements, but rather combine together to form a "software authoring interface *configured to*" perform the functionality. But under Plaintiffs' theory, this combined functionality does not exist unless and until a user chooses to install and enable Network Virtualization. If a user does not do so—*i.e.*, if the user installs LoadRunner alone—the claims would not be infringed.

The sale of these software products is analogous to the non-infringing sale of machine parts in *Deepsouth.* A Micro Focus user's act of taking the "extra step" to install and enable Network Virtualization is akin to the user's assembly of the patented machine in *Deepsouth*. 406 U.S. at 524 (noting that the assembly took "less than one hour" and "is regarded, indeed advertised, as of no importance"). It is irrelevant that the products are sold together. *See id.* (alleged infringer shipped machine parts in three separate boxes). Nor does it matter that they are "integrated," which means the "two products talk together easier so that the customer has an easier time running both side-by-side." Tr. 871:15–17. So, too, were the machine parts in *Deepsouth* intended to work together. 406 U.S. at 524. The critical fact is that, in both cases, it was the customer, rather than the seller, who assembled the parts into an allegedly infringing combination. Because Micro Focus does not sell the system as claimed, it has not directly infringed any of the asserted claims.

**D.    JMOL #4: Micro Focus is entitled to judgment of non-infringement because the accused software-only products cannot directly infringe the asserted system claims.**

Shortly before trial, the Court ruled that the asserted claims—all of which are system claims—do not require hardware and therefore can be infringed by software alone. Ex. 2, Feb. 22, 2021 Hr'g Tr. 73:17–22; Ex. 3, Feb. 26, 2021 Hr'g Tr. 24:16–25:7. Micro Focus respectfully requests that the Court reconsider this construction. *See Conoco, Inc. v. Energy & Env't Int'l, L.C.*,

460 F.3d 1349, 1359 (Fed. Cir. 2006) ("We have recognized that district courts may engage in rolling claim construction, in which the court revisits and alters its interpretation of the claim terms as its understanding of the technology evolves." (internal quotation omitted)). The Federal Circuit has squarely rejected software-only claims as running afoul of the requirement that a non-process claim include some tangible element. In the case of a system claim comprising software, the Federal Circuit has interpreted the claimed system as including hardware that enables the software to perform the claimed functionality.

This precedent requires that the asserted claims here be construed as requiring hardware. Under such a construction, Plaintiffs' infringement claims fail as a matter of law. Plaintiffs do not assert that Micro Focus provides the hardware for operating the software it sells; rather, Plaintiffs rely solely on Micro Focus' sales of software alone. Because software sales cannot infringe claims requiring hardware, Micro Focus is entitled to judgment as a matter of law.

### 1.     The software-only claim construction

The preamble of each asserted claim recites a "system for [developing/testing] an application for a mobile device." In its claim construction ruling, the Court held that the preambles are limiting and should be given their plain and ordinary meaning. Dkt. 176 at 9–13. The Court's opinion does not address whether the claimed systems require hardware.

In December 2020, Micro Focus filed a summary judgment motion that argued, *inter alia*, that Micro Focus' sale of software could not directly infringe the asserted claims because they require hardware elements. Dkt. 259 at 1, 18–21. Plaintiffs responded by arguing the claims do not require hardware and instead claim a software-only system. Dkt. 268 at 17–24. The Court denied the motion without specifically addressing this argument. Dkt. 311.

Plaintiffs subsequently filed a motion in limine concerning "Arguments Contrary to the Court's Claim Construction Order" ("MIL #9"), which sought to preclude Micro Focus from

arguing, *inter alia*, "that the Asserted Claims require hardware in order to infringe." Dkt. 317 at 7. Although Plaintiffs' motion argued that such an interpretation was foreclosed by "the Court's claim construction order," *id.*, at the hearing, Plaintiffs primarily argued that the plain language of the claims did not recite hardware and that Federal Circuit law permitted software-only system claims. Ex. 2, Feb. 22, 2021 Hr'g Tr. 64:16–66:20. The Court granted the motion, noting that it was "covered with what's already happened in the case." *Id.* at 73:17–22; *see also* Dkt. 423 (Order on Plaintiffs' Motion in Limine).

At the February 26, 2021 pre-trial hearing, the Court held that "software is enough for infringement. Hardware is not required in this case, based on this Court's claim construction." Ex. 3, Feb. 26, 2021 Hr'g Tr. 24:16–20. For this reason, Micro Focus was prevented from offering evidence that it does not sell hardware required by one of Plaintiffs' infringement theories. *Id.* at 24:21–25.

### 2.   The asserted system claims require hardware.

"Section 101 [of the Patent Act] specifies four independent categories of inventions or discoveries that are eligible for protection: processes, machines, manufactures, and compositions of matter." *Bilski v. Kappos*, 561 U.S. 593, 601 (2010). "For all categories except process claims, the eligible subject matter must exist in some physical or tangible form." *Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*, 758 F.3d 1344, 1348–49 (Fed. Cir. 2014). Because software is not tangible, a claim directed to software must "recite a process or tangible or physical object." *Allvoice Devs. US, LLC v. Microsoft Corp.*, 612 F. App'x 1009, 1017 (Fed. Cir. 2015); *see also id.* at 1018 ("Software may be patent eligible, but when a claim is not directed towards a process, the subject matter must exist in tangible form."). A claim that recites "software instructions without any hardware limitations" is invalid under Section 101. *Id.* at 1018 (claims to "speech-recognition

44

interface" invalid); *see also Digitech*, 758 F.3d at 1349–50 (claims to a "device profile" invalid because they were limited to "a collection of intangible color and spatial information").

The Federal Circuit has interpreted system claims as requiring tangible components—namely hardware—even where, as in the present case, the body of the claim recites software or other intangible items. *See Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125–26 (Fed. Cir. 2018). In *Aatrix*, the claim recited a "data processing system" comprising two software programs ("a form file creation program" and "a form viewer program") and two "file[s]." *Id.* at 1123–24. Although the claim did not specify any particular hardware for operating or storing the software and files, the court nevertheless held that such hardware was required: "Like many claims that focus on software innovations, it is a system claim. It claims a data processing system which clearly ***requires a computer*** operating software, a means for viewing and changing data, and a means for viewing forms and reports. ***It is very much a tangible system***." *Aatrix*, 882 F.3d at 1125 (emphases added). Accordingly, the court reversed the district court's ruling that the claim was invalid for lacking any tangible subject matter. *Id.* at 1125–26.

*Aatrix* requires interpreting the asserted claims here as requiring hardware. Like the claim in *Aatrix*, the preambles of the asserted claims here recite a "system for" performing certain functions.[12] And the bodies of the claims similarly recite intangible components: a "software . . . interface" in the case of the '192 and '678 patents and "software" in the case of the '864 patent. *See* PX 003 ('192 patent), claim 1; PX 002 ('678 patent), claim 45; PX 001 ('864 patent), claim 1.

As in *Aatrix*, these software components require hardware to carry out the claimed functionality, including, for example, "emulat[ing], via one or more profile display windows, a

---

[12]     While the claims at issue in *Aatrix* recited a "data processing system," rather than simply a "system," the additional "data processing" language is of no import as the asserted claims in the present case plainly require data processing.

plurality of network characteristics" and "simulat[ing] a network connection state." The claims "clearly require[] a computer operating software" in order to carry out those functions. *Aatrix*, 882 F.3d at 1125–26. Moreover, the Court has construed each of the asserted independent claims to require that the software "display one or more windows showing resources of the mobile device that are available to the application." Dkt. 176 at 35. As in *Aatrix*, this display functionality requires "a means for viewing . . . data." *Aatrix*, 882 F.3d at 1125–26.

The specification confirms that the claimed systems include hardware. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (*en banc*) ("[C]laims must be read in view of the specification, of which they are a part." (internal quotations and citation omitted)). The Abstract explains that "[t]he mobile device is emulated in real time using a model running on a processor," PX 003 ('192 patent), Abstract, and the specification shows and describes a computer for running the emulator, *see id.*, Fig. 1B & 5:40–44 ("FIG. 1B shows one exemplary embodiment of system 100 within a computer 130. Computer 130 includes memory 132, storage 134 and a processor 136."). Indeed, the very purpose of the alleged inventions—according to the claims themselves—is "developing" or "testing" software. This necessarily involves the use of computers. Although the claims do not specify any particular hardware for undertaking this development and testing, they must include *some* hardware. Otherwise, the claims would be invalid for claiming patent-ineligible subject matter under Section 101. *See Allvoice*, 612 F. App'x at 1017–18; *Digitech*, 758 F.3d at 1348–50.

Plaintiffs have failed to acknowledge any of the foregoing Federal Circuit cases, which flatly reject Plaintiffs' argument that "software only" system claims are permissible. At summary judgment, Plaintiffs mischaracterized an earlier case, *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197 (Fed. Cir. 2010), as purportedly holding that "a software system claim is infringed when

the software is sold and a computer or other hardware is not also needed in order to infringe." Dkt. 268 at 15. Plaintiffs again cited *Finjan* at the February 22, 2021 pre-trial hearing. Ex. 2, Feb. 22, 2021 Hr'g Tr. 71:21–72:7 ("the *Finjan* case is controlling law"). At that hearing, Plaintiffs admitted that its "opposition [to] the motion on summary judgment was **based solely on the legal ground** that under *Finjan* and the language of the claims, nothing more is required to show infringement than the sale of software." Ex. 2, Feb. 22, 2021 Hr'g Tr. 71:21–72:7 (emphasis added).

Plaintiffs' reliance on *Finjan* is demonstrably wrong. The *Finjan* court did *not* consider the issue of whether the asserted system claims required hardware in order to be infringed. Rather, the issue was whether the plaintiffs' failure to allege indirect infringement was fatal given that the accused software could not be used by the defendant's customers unless they first purchased a key. *Finjan*, 626 F.3d at 1203–05. In other words, the issue was whether *activating* the software was necessary for direct infringement. The court had no opportunity to consider whether the claims required hardware, as this issue was not raised by either party on appeal. *See* Exs. 4, 5 (*Finjan* appeal briefs).[13] And the Federal Circuit's subsequent decisions in *Digitech* and *AllVoice* make clear that *Finjan* did not sanction claims to "software instructions without any hardware limitations." *AllVoice*, 612 F. App'x at 1018.

Although *Finjan* did not address this issue, the *Aatrix* court did: A system claim reciting software is "a computer system" that includes hardware. *Aatrix*, 882 F.3d at 1125 n.1. The asserted

---

[13]     The Court may take judicial notice of the appeal briefs in *Finjan* as they appear on the Federal Circuit's docket. *See Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388 (2d Cir. 1992) ("A court may take judicial notice of a document filed in another court 'not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.'" (quoting *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)).

claims in the present case therefore must be interpreted as requiring hardware to operate the claimed system. Otherwise, the claims would be directed to ineligible subject matter and therefore invalid. *See Allvoice*, 612 F. App'x at 1017–19; *Digitech*, 758 F.3d at 1348–49; *cf. Aatrix*, 882 F.3d at 1125–26 (system claims not ineligible because they required hardware).

### 3. Because it is undisputed that Micro Focus does not sell hardware, Micro Focus cannot directly infringe.

At trial, Plaintiffs argued that Micro Focus directly infringed the asserted patents by selling the accused software. Tr. 512:5–18, 1361:5–7. Plaintiffs did not argue that Micro Focus committed any other act of direct infringement or that it is liable for indirect infringement. *Id.*; *see also* Dkt. 76 (Pls.' Second Am. Compl.) at 18, 22, 27.

A system claim is directly infringed by a sale only when "'all of the elements of the claim . . . [are] present in the accused system[s]' allegedly sold by [the defendant]." *Omega Pats., LLC v. CalAmp Corp.*, 920 F.3d 1337, 1345 (Fed. Cir. 2019). Here, it is undisputed that Micro Focus does not sell any of the hardware used to operate the allegedly infringing system, such as the computers on which the software runs. Micro Focus' summary judgment motion established that the accused software is either installed on, or accessed from, its customers' own computers. Dkt. 259 at 6. Plaintiffs did not (and could not) dispute these facts, *see* Dkt. 268 at 3, and instead confirmed that its infringement claims are based solely on the sale of software, *see id.* at 24–25 ("Plaintiffs are not accusing hardware of infringing any element of the asserted claims . . . [Plaintiffs] assert[] that Defendants' sale of the infringing software alone is the act of infringement."). *See also* Tr. 667:20–668:12 (Plaintiffs' damages expert confirming that the accused products "are all software products").

Therefore, under the proper construction of the asserted claims, no reasonable jury could have found direct infringement. As a matter of law, Micro Focus' sale of the accused software

cannot directly infringe the asserted claims because such sales do not include all of the claim elements, including the necessary hardware. The Court should grant judgment of non-infringement of the asserted claims on that basis. Should the Court find that judgment of non-infringement is not warranted, the Court should grant a new trial in order for Micro Focus to be afforded the opportunity to present evidence establishing non-infringement under the proper construction of the claims. *See SynQor, Inc. v. Artesyn Techs.*, Inc., 709 F.3d 1365, 1383 (Fed. Cir. 2013) (court may grant new trial if it finds the trial was "unfair or prejudicial error was committed").

### 4.    LoadRunner Cloud does not infringe as a matter of law.

Even under the current construction of the claims in which hardware is *not* required for infringement, Plaintiffs' claim as to Micro Focus' LoadRunner Cloud product fails as a matter of law. As such, regardless of whether the Court reconsiders its construction, it should grant judgment of non-infringement for at least the LoadRunner Cloud products.

As stated above, the sole infringing act alleged by Plaintiffs is Micro Focus' sale of the accused software. *See* Tr. 512:5–18, 1361:5–7. In construing the term "sale" under Section 271(a), the Federal Circuit has relied on a definition from *Black's Law Dictionary*: "1. The transfer of property or title for a price. 2. The agreement by which such a transfer takes place. . . ." *NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1319 (Fed. Cir. 2005) (quoting *Black's Law Dictionary* 1337 (7th ed. 1999)). This definition requires, *inter alia*, "a thing capable of being transferred." *Id.* (quoting *Black's Law Dictionary* 1337 (7th ed. 1999)). *Accord Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 769 F.3d 1371, 1379 (Fed. Cir. 2014), *vacated and remanded on other grounds*, 136 S. Ct. 1923 (2016).

Plaintiffs offered no evidence at trial that LoadRunner Cloud involves any "transfer of property or title," or "an agreement by which such a transfer takes place." As established by the undisputed evidence at trial, LoadRunner Cloud uses a software as a service (SaaS) model, in

which the software is hosted by the cloud service provider and customers may subscribe to gain

access to the service via the Internet. PX 89-001 ("While using LoadRunner Cloud, you don't need

to manage and/or maintain infrastructure such as controller or load generator, the service is hosted

in the cloud. . . ."); *see also* Tr. 366:5–10 (testimony that Dr. Malek relied on PX 89). A copy of

the LoadRunner Cloud software is not downloaded by or otherwise provided to the customer for

installation on the customer's computers. Tr. 764:24–765:10 ("Nobody can run an install on a

cloud-hosted application but us."). A Micro Focus witness offered unrebutted testimony on this

key distinction between LoadRunner Cloud and the other accused versions of LoadRunner:

> To get LoadRunner Professional and LoadRunner Enterprise to work, you have to actually install software. We talked about desktop software. You have to put something on a machine that you own.
>
> LoadRunner Cloud requires none of that. The primary use case for LoadRunner Cloud is to log in, with no software needed. . . .

Tr. 834:20–835:11.

Because Plaintiffs have failed to demonstrate that there has been any "transfer of title or

property" with respect to LoadRunner Cloud, Plaintiffs have failed to provide evidence of any

"sale" under Section 271(a). Plaintiffs' claims of infringement based on this product fail as a matter

of law.

## II.   Micro Focus Is Entitled to a New Trial on Damages Because the Jury Award Is Legally Unsupportable and Clearly Excessive.

The $172.5 million jury verdict is excessive and legally unsupportable. Patentees are

entitled only to "damages adequate to compensate *for the infringement*." 35 U.S.C. § 284

(emphasis added). But Plaintiffs' experts failed to tie their damages calculations to the alleged

infringement. Instead, Mr. Weinstein used a royalty base that included revenues for unpatented

features and non-infringing sales, relied on a flawed technical apportionment analysis by Dr.

Malek, and applied an arbitrary profit-splitting metric to arrive at a damages award encompassing

50

much more than the alleged infringement. Each of these errors would be enough standing alone to warrant a new trial. Taken together, there is no doubt the jury's verdict is fundamentally flawed and cannot stand.

Even an overview of Mr. Weinstein's process reveals its legal errors. In determining a royalty base, Mr. Weinstein aggregated all revenues attributable to both allegedly infringing and admittedly *non-infringing* products—LoadRunner with Network Virtualization, with or without UFT Mobile—not just revenues attributable to the claimed inventions. Tr. 555:8–18. Mr. Weinstein included sales that lacked Network Virtualization (which is required for the alleged infringement) and sales in which Network Virtualization was included, but likely never installed, activated, or used. *See* Tr. 626:12–24. Mr. Weinstein then calculated a profit margin that did not account for costs unrelated to the patented invention—such as overhead, research and development, sales, and marketing—but instead accounted only for sales expenses. Tr. 561:13–62:4. Thus, Mr. Weinstein applied a profit margin of 85.5% (totaling $362.3 million in ***gross*** profits), rather than 37.9% (totaling $160.5 million in ***operating*** profits). Tr. 1146:9–15.[14]

Mr. Weinstein also relied on Dr. Malek's legally erroneous and arbitrary apportionment factor of 61.6% based on headings in marketing documents and conclusory assertions of mobile-device usage. By applying that factor to Micro Focus' gross profits, Mr. Weinstein calculated the

---

[14]    In opposing Micro Focus' pre-trial *Daubert* motion, Plaintiffs cited *Fromson v. Western Litho Plate & Supply Co.*, 853 F.2d 1568, 1578–79 (Fed. Cir. 1988) as purportedly supporting the propriety of using gross profits. Dkt. 335 at 6. Micro Focus does not contend that using gross profits is *always* improper, but instead that if Plaintiffs use gross profits as a royalty base, they must account for unpatented contributions to determine the "incremental value that the patented invention adds to the end product." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014). Indeed, *Fromson* affirms that "[t]he royalty may, for example, be measured ***as a percentage*** of [defendants'] gross or net profit dollars." *Fromson*, 853 F.2d at 1578. Micro Focus offered evidence explaining why gross profits were an improper metric in *this* case. Tr. 1144:3–46:19; *see Lucent Techs. v. Gateway*, 580 F.3d 1301, 1332 (Fed. Cir. 2009) ("the manufacturing process" must be separated from "the portion of the realizable profit that should be credited to the invention").

profits attributable to the patented inventions to be $223.2 million. Tr. 551:3–53:1. Mr. Weinstein then selected another arbitrary metric at an arbitrary point in time to determine the parties' profit split at the hypothetical negotiation—Micro Focus' return on invested capital ("ROIC") *five months after* the hypothetical negotiation. Using that metric at that time resulted in 77.3% of profit going to Plaintiffs, and 22.7% going to Micro Focus, to arrive at a reasonable royalty of $172.5 million. Tr. 563:2–64:12. Mr. Weinstein's approach was erroneous at every step and resulted in an excessive award at odds with both the evidence and controlling precedent.

### A.    Mr. Weinstein's legally erroneous royalty base impermissibly included revenues for unpatented and non-infringing features.

Mr. Weinstein committed at least two legal errors in calculating the royalty base. First, Mr. Weinstein did not limit the base to revenues for protocol bundles that include an accused protocol but instead relied on revenues for *all* protocol bundles—even though the vast majority of those bundles admittedly do not infringe, and even though Plaintiffs did not prove that demand for any accused bundle was attributable to the patented technology, violating the entire market value rule. Second, even though only protocol bundles including the combination of LoadRunner and Network Virtualization were accused of infringement, Mr. Weinstein's royalty base included sales of LoadRunner that lacked Network Virtualization licenses or to users who likely never installed or used Network Virtualization. The combined effect of these errors inflated the royalty base by hundreds of millions of dollars.

### 1.    Mr. Weinstein legally erred in relying on revenues for protocol bundles that did not include the accused TruClient protocols.

Mr. Weinstein's first error fundamentally misunderstands how LoadRunner is both sold and used. There are three LoadRunner products: LoadRunner Professional, Enterprise, and Cloud. Tr. 356:24–357:9. Central to the LoadRunner products are 37 different protocols for the scripts that the LoadRunner software runs and analyzes. Tr. 787:10–13. Micro Focus packages and sells

52

the 37 protocols as 16 different protocol bundles, for LoadRunner Professional and LoadRunner Enterprise, and 6 different bundles for LoadRunner Cloud. Tr. 711:18–23, 715:20–21; PX 466. LoadRunner's usage, like its sales, is protocol-based: users must first select an individual scripting protocol before performing other operations. Tr. 834:20–35:11; 1211:18–12:3.

In an effort to avoid prior-art implementations of LoadRunner, Plaintiffs initially narrowed their infringement theory to two of the newer protocols, TruClient-Native Mobile and TruClient-Mobile Web. Dkt. 350 at 3 ("Dr. Malek's report explained that LoadRunner *when running scripts that use the TruClient - Native Mobile and TruClient - Mobile web protocols infringes the asserted claims. Dr. Malek did not opine on any of the other protocols* . . . ."); Tr. 461:20–23; 462:11–18 (stating at trial, "Q. And you've relied upon, for your infringement analysis, on two separate protocols used with LoadRunner. The first one that was used with UFT Mobile is called TruClient Native Mobile, right? A. That's right. Q. And the other one [is] called TruClient Mobile Web, right? A. That's right."). Only 3 of the 16 LoadRunner Professional and LoadRunner Enterprise bundles, and only 2 of the 6 LoadRunner Cloud bundles, include an accused TruClient protocol. *See* Tr. 371:21–372:12, 377:12–378:3, 411:18–23, 493:17–21; PX 466; D0249-1–4; Dkt. 417 at 5–6. Plaintiffs' entire infringement case thus centered on a small part (bundles having one of the accused TruClient protocols) of a larger, multi-component product (LoadRunner, including 35 *unpatented* protocols sold in several unaccused bundles). Tr. 420:12–21:11; 550:15–53:1.

By contrast, Plaintiffs used as their royalty base revenues from all LoadRunner products as a whole—all 16 protocol bundles for LoadRunner Professional and LoadRunner Enterprise, and all 6 bundles for LoadRunner Cloud—without subtracting the value of the unaccused protocols or showing that the demand for each of the unaccused bundles was attributable to the two accused

TruClient protocols in the accused bundles.[15] Tr. 617:23–618:1, 618:14–20, 619:14–620:5, 621:3–12 ("Q. Okay. So of these 13 protocol bundles that do not include either of the protocols that Dr. Malek reies on for infringement, did you exclude revenues for any of those bundles when you were adding up revenues? A. Not when I'm adding up revenues, no."); *see also, e.g.*, Dkt. 313-6 at 258:14–18 ("I'm not pointing to a particular protocol, right? So ***all the protocols in my opinion are infringing***. And so the purpose of using a particular protocol for—in my testing was to just create a test case.").[16] Indeed, Plaintiffs disavowed an entire-market-value analysis, never attempted to show the accused protocol bundles drove demand for the indisputably unpatented bundles, and never invoked any other doctrine (*e.g.*, convoyed sales) to justify using total revenues. *See, e.g.*, Dkt. 335 at 1–4 ("Mr. Weinstein does not seek damages based on the entire market value of the accused products.").

The entire market value rule does not apply here regardless. Under the "entire market value rule," in order to use the revenues from all protocol bundles as the royalty base, Plaintiffs would have had to prove "that the demand for the entire product is attributable to the patented feature,"

---

[15]     Plaintiffs may argue that the *combination* of LoadRunner, Network Virtualization, and/or UFT Mobile infringes, and they can use the revenues for such *combinations* for damages. But that is not the law. Even if such combinations were the smallest salable patent-practicing unit, "the fact that [a patentee] has established a royalty base based on the 'smallest, identifiable technical component' does not insulate them from the essential requirement that ***the ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product***." *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1311 (Fed. Cir. 2018) (internal marks omitted; emphasis added). Here, any purported value added by the asserted patents is at most in the network-virtualization features of the two accused TruClient protocols.

[16]     To avoid Micro Focus' motion to supplement its invalidity contentions, Plaintiffs later purported to disavow this testimony and promised no new ***infringement*** theories would be presented at trial. Dkt. 350 at 2, 8–9. But the trial testimony cited above makes plain that Plaintiffs nonetheless advanced their broad infringement theory throughout their damages case. *See also, e.g.*, Tr. 1339:14–1340:11 (stating in closing, "[i]f you hear that word 'protocol,' there need[s] to be some alarm bells going off in your head, because it's like a big garbage or dump truck about to back over you. . . . With all this talk about protocols and graphs and apportioning based on that, I want you to read every claim when you get back there, and I want you to see if the word 'protocol' is anywhere in these inventions.").

*LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 67–68 (Fed. Cir. 2012)—which they did not even claim to do. Nor could they. The accused TruClient protocols could not have driven demand for the *non-infringing* protocol bundles that do not even include them. "The entire market value rule allows a patentee to assess damages based on the entire market value *of the accused product* only where the patented feature creates the 'basis for customer demand' or 'substantially create[s] the value of the component parts.'" *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011) (emphasis added); *see Enplas Display Device Corp. v. Seoul Semiconductor Co., Ltd.*, 909 F.3d 398, 412 (Fed. Cir. 2018) ("SSC's expert opined that Enplas and SSC would have agreed to a \$2 to 4 million royalty based on a royalty base comprising sales of non-accused lenses. This testimony cannot support the jury's damages award, for § 284 and *our precedent proscribes awarding damages for non-infringing activity.*"); *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1329 (Fed. Cir. 2014); *Imonex Servs., Inc. v. W.H. Munzprufer Dietmar Trenner GmbH*, 408 F.3d 1374, 1380 (Fed. Cir. 2005).

At bottom, Mr. Weinstein's analysis "improperly compensated [Plaintiffs] for non-infringing components" by including revenues attributable to unaccused protocol bundles, *LaserDynamics*, 694 F.3d at 67, and by failing to show that the accused TruClient protocols drove demand for *all* LoadRunner protocol bundles. In so doing, Mr. Weinstein not only overstated damages but also inevitably "skew[ed] the damages horizon for the jury, regardless of the contribution of the patented component," *Uniloc*, 632 F.3d at 1320—particularly here, where Plaintiffs heavily emphasized the top-level dollar amounts before the jury. *See, e.g.*, Tr. 1340:18–1341:21 (closing argument); *see also VirnetX*, 767 F.3d at 1316, 1328–29, 1331–34 (failure to exclude inadmissible evidence is grounds for a new trial).

This Court initially found the same, *i.e.*, that using the total revenues for all LoadRunner products without any "attempt to remove non-infringing elements" should have been inadmissible. Dkt. 399 at 7. Yet Mr. Weinstein's and Dr. Malek's purportedly revised analyses were also legally erroneous, inadmissible, and blatant attempts to sidestep the Court's decision and improperly use an entire-market-value-rule analysis under the guise of relying on revenues for only the smallest salable unit. At trial, Mr. Weinstein and Dr. Malek declared that the LoadRunner products as a whole were the smallest salable units in an effort to justify Mr. Weinstein's reliance on total product revenues. Tr. 435:14–436:4, 555:19–556:7. And Mr. Weinstein reasserted Dr. Malek's same apportionment factor as a purported way to separate profits between the patented and the unpatented features, Dkt. 427, Ex. A, even though the Court had already recognized that the apportionment-factor and royalty-base issues are distinct, Dkt. 399 at 7 ("The current issue is whether Mr. Weinstein properly separated profits in his royalty base calculations, before applying the apportionment factor. The apportionment factor is a separate consideration.").

The Federal Circuit has denounced just such tactics. "Where the smallest salable unit is, in fact, a multi-component product containing several non-infringing features with no relation to the patented feature . . . , the patentee must do more to estimate what portion of the value of that product is attributable to the patented technology. To hold otherwise would permit the entire market value exception to swallow the rule of apportionment." *VirnetX*, 767 F.3d at 1327–28. In *VirnetX*, the Federal Circuit reviewed the same type of calculations used here—by the same ***Mr. Weinstein***, *see* Dkt. 399 at 7—and held that Mr. Weinstein erred by using the entire price of the accused product as the royalty base because he "did not even try to link demand for the accused device to the patented feature" and "failed to apportion value between the patented features and

the vast number of non-patented features contained in the accused products" under a smallest-salable-unit analysis. *Id.* at 1329 & 1328 n.2.

*VirnetX* demands the same result here. Although Micro Focus certainly placed *some* value on the accused TruClient protocols, *see* Tr. 412:22–413:2, 417:13–418:18, Plaintiffs never alleged that the two protocols drove demand for the entire LoadRunner products, and thus the entire market value rule cannot apply. *See LaserDynamics*, 694 F.3d at 68 ("LaserDynamics' use of the entire market value rule was impermissible, however, because LaserDynamics failed to present evidence showing that the patented [] method drove demand for the [product]. It is not enough to merely show that the [patented] method is viewed as valuable, important, or even essential to the use of the [entire product]."). Plaintiffs should have been precluded from using total revenues for all LoadRunner products as a royalty base, and the jury award based on that erroneous analysis cannot stand. *See id.*; *see also VirnetX*, 767 F.3d at 1329.

### 2.    Mr. Weinstein legally erred in relying on revenues for LoadRunner, instead of on revenues for the accused combinations of LoadRunner and Network Virtualization.

Mr. Weinstein's second royalty-base error independently requires a new trial because his analysis improperly assumed LoadRunner had no value after it was integrated with Network Virtualization, contradicting his own concessions. Mr. Weinstein agreed that before LoadRunner was integrated with Network Virtualization (which Plaintiffs admitted was necessary for alleged infringement), the royalty base could not include the revenues for sales of LoadRunner alone (which does not infringe), but instead only sales to customers that purchased both LoadRunner and Network Virtualization. Tr. 554:6–16, 611:1–8, 625:6–631:15; Dkt. 399 at 4. Mr. Weinstein also acknowledged that LoadRunner itself had value—when he subtracted sales of LoadRunner without Network Virtualization, he reduced the purported revenues of the accused products by nearly 50%. *Compare* Dkt. 303-1 at 133 (finding total accused revenue of $27.7 million) *with* Dkt. 335-1 at

484 (removing LoadRunner revenue and finding total accused revenue of $16.2 million); *see also* Tr. 611:1–8, 625:6–631:15. At trial, however, Plaintiffs' experts repeatedly opined that Network Virtualization was Micro Focus' "secret sauce," and that LoadRunner had no value independent of Network Virtualization when the two products were integrated. Tr. 412:22–415:13, 484:9–16, 591:22–592:5. This testimony diametrically opposed Dr. Weinstein's own calculations, is clearly erroneous, and impermissibly prejudiced the jury against the weight of the evidence.

Indeed, by ignoring the value of LoadRunner after it was integrated with Network Virtualization, Mr. Weinstein inflated the royalty base by upwards of $150 million. Tr. 630:20–631:9. Until November 2018, only about 3–5% of customers (roughly 140 of 3,000–4,000) who purchased a LoadRunner license also purchased an "NV Add-on license." Tr. 629:3–13, 791:13–792:12, 870:10–871:4. Rather than deduct the LoadRunner revenues by that percentage from his royalty base, Mr. Weinstein lumped all LoadRunner sales after August 2015 into the royalty base. Tr. 630:20–631:9.[17] Furthermore, even after Network Virtualization was integrated with LoadRunner, Mr. Weinstein made no attempt to account for sales to users who likely never installed, activated, or used Network Virtualization during the damages period. *See* Tr. 610:7–21. By failing to eliminate such sales from his royalty base, Tr. 553:2–555:18, Mr. Weinstein thus overstated any allegedly infringing revenues by hundreds of millions of dollars in total. Tr. 1143:22–1144:2.

---

[17]     Mr. Weinstein incorrectly assumed that Network Virtualization was sold with LoadRunner beginning in August 2015 based on an interrogatory response, *see* Tr. 554:6–16; PX 29-5, even though unrebutted testimony refuted that assumption. Although Network Virtualization was "integrated" into LoadRunner in 2015, "integration" means different things in different contexts, and Plaintiffs offered evidence contradicting the fact that Network Virtualization was sold as a separate "NV Add-on license" before November 2018. D088 at 1; Tr. 626:12–24, 627:12–20, 630:20–631:9.

### B.   Dr. Malek's apportionment analysis is legally erroneous.

Mr. Weinstein's reliance on Dr. Malek's legally improper apportionment analysis, none of which should have reached the jury, is also error warranting a new trial. *VirnetX*, 767 F.3d at 1316, 1328–29, 1331–34. For well over a century, it has been the law that patentees "must … give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features." *Westinghouse Elec. & Mfg. Co. v. Wagner Elec. & Mfg. Co.*, 225 U.S. 604, 615 (1912) (quoting *Garretson v. Clark*, 111 U.S. 120, 121 (1884)).[18] But as the Court correctly recognized before trial, "Dr. Malek assigned the same apportionment factor to each of the three accused versions of LoadRunner, even though LoadRunner Enterprise and LoadRunner Cloud each incorporate unpatented functionality beyond what LoadRunner Professional provides." Dkt. 386 at 11–12 (internal citations omitted). As the Court aptly put it: "How can the premium version of software attribute the same 61.6% of its value to the patented technology, when the premium software contains more unpatented features than the basic software? Without further explanation, it cannot." *Id.* In response, Dr. Malek concocted a *post hoc*, non-technical assessment of marketing datasheets to arrive at the same 61.6% apportionment for all LoadRunner products. Dr. Malek's analysis lacked any scientific foundation and was not admissible. The jury's reliance on his erroneous opinion warrants a new trial.

---

[18]     *See also Power Integrations v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 977 (Fed. Cir. 2018) (patent damages must "be apportioned between the infringing and non-infringing features of the product"); *VirnetX*, 767 F.3d at 1329 (noting a "patentee's obligation to apportion damages only to the patented features does not end with the identification of the smallest salable unit if that unit still contains significant unpatented features"); *Lucent*, 580 F.3d at 1332–33 (a patent damages analysis must distinguish "the portion of the realizable profit that should be credited to the invention … from non-patented elements"); *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010) ("Any evidence unrelated to the claimed invention does not support compensation for infringement but punishes beyond the reach of the statute.").

First, Dr. Malek purported to arrive at his 61.6% figure by looking at lists of "key features" of LoadRunner in marketing documents. Tr. 426:2–13; *see* PX 55; PX 464; PX 467. If any listed feature somehow implicated Network Virtualization, Dr. Malek concluded that the patented inventions contributed 100% of the value of that feature.[19] These non-specific descriptions of the "key features," however, are an inadequate basis for a proper apportionment. *See, e.g.*, Tr. 1054:5–1055:1; Dkt. 417 at 10–11. For example, Dr. Malek considered the allegedly patented elements of Network Virtualization to be 100% of the value of: (1) "Test Against a Broad Range of Applications and Protocols" (which specifically named several protocols but *not* the accused TruClient protocols),[20] (2) "Simplify Analysis and Reporting," and (3) "Scale Up Tests Leveraging the Public Cloud." PX 55-0002–03; Tr. 428:5–8. Based on those and similarly generic descriptions of "key features," Dr. Malek found the patented inventions contributed 100% of the value to 89% of the features in LoadRunner Professional, 84% of the features in LoadRunner Cloud, and 80% of the features in LoadRunner Enterprise. Tr. 428:9–430:21. Thus, according to Dr. Malek, the value of all other features combined in each of those LoadRunner products is 11%, 5%, and 9% of their total value, respectively. Purporting to adopt a "conservative" approach, Dr. Malek settled on an 80% apportionment for all LoadRunner products.[21] Tr. 428:13–22.

---

[19]     Dr. Malek purported to attribute 100% of the value of "key features" only to those features in which "Network Virtualization is ***core*** to the feature," Tr. 497:16–23, but he never explained what "core" means, or whether any feature could be used (and thus have value) without Network Virtualization.

[20]     Under the heading "Test Against a Broad Range of Applications and Protocols," the document names these "environments and protocols": "Web/Mobile, Web services, MQ, HTML5, WebSockets, AJAX, Flex, RDP, Database, Remote Terminal Emulators, Citrix, Java, .NET, Oracle, and SAP." PX 55-002.

[21]     Dr. Malek performed a separate apportionment analysis to determine the percentage of mobile-device virtualization (as opposed to desktop virtualization), which he concluded was 77% based on his "personal experiences" and a single industry report from 2019 related to "the time spent online in the U.S." on mobile devices. Tr. 430:22–431:22, 433:5–13, 509:7–22. Plaintiffs

That conclusion defies common sense and relies on several unexplained assumptions and analytical leaps. *See generally* Dkt. 417. Dr. Malek never examined each of the 37 protocols or 16 protocol bundles to determine their relative value. Nor did he examine each "key feature" for other unpatented sub-features that contributed independent value to LoadRunner. Instead, Dr. Malek shortcut the process by summarily concluding that the patents contributed 100% of the value to Network Virtualization, and that Network Virtualization contributed 100% of the value to any feature that somehow implicated it.[22] Indeed, Dr. Malek inexplicably assigned the same value to each feature without any explanation why. That is legal error. *See Stragent, LLC v. Intel Corp.*, No. 6:11-CV-421, 2014 WL 1389304, at *4 (E.D. Tex. Mar. 6, 2014), order clarified, No. 6:11-CV-421, 2014 WL 12611339 (E.D. Tex. Mar. 12, 2014) (excluding expert testimony that "attribute[ed] equal value to all 19 RAS features [because it was] not based on any theory that meets the *Daubert* criteria of verifiability, peer review or publication, an acceptable error rate, or general acceptance in the scientific community").

Indeed, an apportionment opinion is fundamentally unreliable and inadmissible when it has such "analytical gap[s]." *Blue Spike, LLC v. Huawei Techs. Co.*, No. 6:13-CV-679, 2016 WL 9286102, at *4 (E.D. Tex. Oct. 14, 2016); *see also VirnetX*, 767 F.3d at 1333 ("where an expert

conceded, however, that mobile-device usage grew rapidly during the damages period, *see, e.g.*, Tr. 208:22–209:4, 547:23–549:1 ("[S]ince 2014, there has been what can only be called an explosion in the market for mobile apps."); Ex. 6, PDX 1.10, yet neither Dr. Malek nor Mr. Weinstein justified a 77% mobile-device-usage apportionment factor across the entire damages period. Instead, they selected a single time point after the mobile "explosion" had occurred. Dr. Malek arrived at his overall apportionment of 61.6% only by multiplying this fatally flawed estimation of mobile-device usage (77%) by his indefensible estimation of the contribution of the claimed features (80%). Tr. 434:14–435:1.

[22]     That LoadRunner has had other, non-accused features for testing mobile applications in a virtualized network environment underscores the error of attributing to Network Virtualization 100% of the value of any feature implicating it. LoadRunner has always had a runtime setting, separate from Network Virtualization, to simulate different network speeds, as well as non-accused, mobile-specific (or mobile-friendly) protocols. *See* Tr. 725:25–733:3.

considers relevant material but fails to provide an opinion explaining how that material leads to his conclusion, a court may conclude that there is simply too great an analytical gap between the data and the opinion proffered") (internal quotation marks omitted); *LaserDynamics*, 694 F.3d at 69 (rejecting apportionment factor that "appears to have been plucked out of thin air based on vague qualitative notions of the relative importance of the [patented] technology"). In *Blue Spike*, for instance, the expert's original apportionment was excluded from trial, despite relying on consumer surveys, because the expert did "not explain how the 10% [apportionment] factor accounts specifically for the value of the patented feature" and "undoubtedly incorporates consumers' value for other non-patented [] features." *Blue Spike*, 2016 WL 9286102, at *4. So too here.

Second, Dr. Malek's opinion should not have been admitted because, rather than determine the value of the patented invention's incremental advance over the prior art, Dr. Malek assumed prior-art features had no value whatsoever—a legally erroneous position Micro Focus could not challenge at trial because it was precluded from informing the jury that versions of LoadRunner with Network Virtualization predated the asserted patents. *See, e.g.*, Dkt. 313 at 5. In *Exmark Manufacturing*, the Federal Circuit vacated a damages award where the trial court excluded prior art that "would have demonstrated that many of the benefits [the patentee] attributed to the [claimed invention] were already present in the prior art." *Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prod. Grp., LLC*, 879 F.3d 1332, 1351 (Fed. Cir. 2018). Because similar evidence was precluded here, the jury could not assess the incremental value of the claimed inventions, as the law requires. Dr. Malek's failure to apportion the patented features from unpatented and prior-art features requires a new trial.

**C.  Mr. Weinstein's legally erroneous profit-split analysis uses an arbitrary metric.**

Finally, Mr. Weinstein's reliance on an arbitrary ROIC to assess the profit-split in a hypothetical negotiation contravened the Court's express order and independently warrants a new trial. Tr. 563:2–564:12. Before trial, the Court ruled Mr. Weinstein could testify about ROIC "[b]ecause Mr. Weinstein opine[d] that the hypothetical negotiation took place in December 2014, [and] *he use[d] Micro Focus' ROIC from that month*" at the time. Dkt. 399 at 10 (emphasis added). At trial, however, Mr. Weinstein did no such thing. Rather than use Micro Focus' ROIC as of December 2014 as promised—which would have resulted in approximately 70% of profits going to Micro Focus and 30% to Plaintiffs, Tr. 1149:18–51:22—Mr. Weinstein instead cherry picked an ROIC *five months after* the date of the hypothetical negotiation, after the profit-split numbers had flipped (allowing Plaintiffs to argue entitlement to more than 70% of Micro Focus' profits). Tr. 537:20–538:25, 642:24–643:3. That not only contradicted the Court's order but also makes no sense. The only reason ROIC flipped in the intervening five months was because Micro Focus made a large capital expenditure—acquiring another company—which added debt to the balance sheet and significantly reduced ROIC at that particular time. Tr. 1149:18–51:22; *see also* Tr. 836:9–37:5; Dkt. 317-1, Ex. B at 96. That change in Micro Focus' ROIC had nothing to do with the patented invention, yet by selecting an ROIC value just after the expensive acquisition, Mr. Weinstein artificially boosted Plaintiffs' royalty by over $100 million.

Mr. Weinstein thus undermined the sole theory on which the Court found that ROIC may be sufficiently tied to the facts of the case. *See* Dkt. 399 at 10; *Uniloc*, 623 F.3d at 1317–18 ("To be admissible," evidence of profit splitting "must be tied to the relevant facts and circumstances of the particular case at issue and the hypothetical negotiations that would have taken place in light of those facts and circumstances at the relevant time."). The Court permitted a profit split based

on ROIC because it "is a financial calculation that fluctuates and is therefore a different figure for each defendant at any given timepoint," Dkt. 399 at 10, but it was imperative that if Mr. Weinstein were permitted to rely on ROIC at all, he use the ROIC at the time of the hypothetical negotiation. But Mr. Weinstein did not do that, or provide the jury with an explanation as to why *these parties* on *these facts* would have used a single ROIC value *five months after* the hypothetical negotiation to determine the profit split. This confirms that his use of ROIC was arbitrary all along, and a metric[23] of the sort repeatedly rejected by the Federal Circuit and that should have been excluded here.

### III.   Micro Focus Is Entitled to a New Trial on Anticipation and Obviousness.

Micro Focus is also entitled to a new trial on invalidity because Plaintiffs made the LoadRunner products as a whole center stage—especially during the damages portion of trial—despite assuring Micro Focus and the Court that the infringement case was narrowed to only those products containing an accused TruClient protocol. At his deposition shortly before trial, Dr. Malek for the first time asserted that all 37 of LoadRunner's protocols infringed Plaintiffs' patents. *See* Dkt. 313-6 at 258:14–18 ("I'm not pointing to a particular protocol, right? *So all the protocols in my opinion are infringing*. And so the purpose of using a particular protocol for—in my testing

---

[23]     Micro Focus reasserts its pretrial position that ROIC is not a suitable profit-splitting metric under any circumstances. *See* Dkt. 303 at 8–10. The Federal Circuit has repeatedly rejected similarly arbitrary and unreliable metrics—including an across-the-board "25% rule," the general applicability of Nash Bargaining, and royalty rates based on offered but unaccepted licenses—as "based on pure conjecture" and "irrelevant." *See Whitserve, LLC v. Comput. Packages, Inc.*, 694 F.3d 10, 30 (Fed. Cir. 2012); *VirnetX*, 767 F.3d at 1331–34 ("Weinstein's thin attempts to explain his 10% deviation from the 50/50 baseline in this case demonstrates how this methodology is subject to abuse."). At bottom, ROIC does not measure the value of any particular patent, but rather requires a conclusory assumption that all accused infringers "would be satisfied receiving the same return on the profits that were earned [] as it made in other aspects of its business." Tr. 563:21–564:12. Under this logic, however, every accused infringer would accept such a profit split to license *any* patent (no matter the importance or value of the invention's contribution), for *any* product.

was to just create a test case."). Many of those protocols had been part of the LoadRunner product

for years before the asserted patents issued in 2014. *See, e.g.*, Dkt. 313 at 5; Dkt. 350 at 8–9. Micro

Focus immediately moved to supplement its invalidity contentions to add those earlier versions of

LoadRunner as prior art. Dkt. 313. In response, Plaintiffs promised that their experts would "not

present new [infringement] opinions at trial." Dkt. 350 at 2. The Court denied Micro Focus' motion

as moot based on that representation. Dkt. 387 at 3.

      But Plaintiffs violated that promise at trial. Although Plaintiffs' technical expert admitted

that infringement required the presence of one of the two accused TruClient protocols, Tr. 462:11–

18, throughout their damages case, Plaintiffs' expert repeatedly admitted that the damages

impermissibly captured ***all*** protocols as part of the analysis. Tr. 617:23–618:5, 618:14–20, 619:14–

620:5, 621:3–12 ("Q. Okay. So of these 13 protocol bundles that do not include either of the

protocols that Dr. Malek reies on for infringement, did you exclude revenues for any of those

bundles when you were adding up revenues? A. Not when I'm adding up revenues, no."). Given

that Plaintiffs improperly expanded their infringement contentions through the guise of damages,

Micro Focus should have been permitted to respond in kind with evidence of the patents' invalidity

over prior-art LoadRunner products. *See Exmark Mfg.*, 879 F.3d at 1351; *01 Communique Lab'y,*

*Inc. v. Citrix Sys., Inc.*, 889 F.3d 735, 742 (Fed. Cir. 2018) ("[I]f a claim term must be broadly

interpreted to read on an accused device, then this same broad construction will read on the prior

art."); *Lucent*, 580 F.3d at 1334 (vacating lump-sum damages award and noting "[patentee] tries

to stretch the claim scope so that claim 19 covers all pop-up tools. If this were the proper claim

construction, we might have to reverse the validity ruling"); *Metabolite Labs., Inc. v. Lab. Corp.*

*of Am. Holdings*, 370 F.3d 1354, 1364, (Fed. Cir. 2004) ("This court declines the invitation to

apply a different claim construction for computation of damages than for infringement liability.").

Because Micro Focus did not have that opportunity, it is now liable for an excessive damages award that is not commensurate with Plaintiffs' infringement theories, and is entitled to a new trial on invalidity to make just such a showing.

## CONCLUSION

For the foregoing reasons, Micro Focus' motion should be granted.  Judgment of non-infringement should be entered in favor of Micro Focus on all claims and the damages award should be set aside. In the alternative, a new trial should be granted on non-infringement, invalidity, and damages. Further in the alternative, the Court should set aside and remit the damages award.

Dated: May 20, 2021

Richard L. Rainey (Admitted *Pro Hac Vice*)
Washington, D.C. Bar No. 452996
Brian G. Bieluch  (Admitted *Pro Hac Vice*)
Washington, D.C. Bar No. 490398
COVINGTON & BURLING LLP
One CityCenter, 850 Tenth Street, N.W.
Washington, D.C. 20001
Telephone: (202) 662-6000
Facsimile: (202) 662-6291
rrainey@cov.com
bbieluch@cov.com

John C. O'Quinn (Admitted *Pro Hac Vice*)
Washington, D.C. Bar No. 485936
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.,
Washington, D.C. 20004
Telephone: (202) 389-5191
Facsimile: (202) 654-9592
john.oquinn@kirkland.com

Respectfully submitted,

By: */s/ L. Rex Sears*

L. Rex Sears (Admitted *Pro Hac Vice*)
Lead Attorney
Utah State Bar No. 8548
Jared J. Braithwaite (Admitted *Pro Hac Vice*)
Utah State Bar No. 12455
Alexis K. Juergens (Admitted *Pro Hac Vice*)
Utah State Bar No. 16861
MASCHOFF BRENNAN
111 South Main Street, Suite 600
Salt Lake City, Utah 84111
Telephone: (801) 297-1850
Facsimile: (435) 252-1361
rsears@mabr.com
jbraithwaite@mabr.com
ajuergens@mabr.com

Barry K. Shelton
Texas State Bar No. 24055029
Bradley D. Coburn
Texas State Bar No. 24036377
SHELTON COBURN LLP
311 RR 620 S, Suite 205
Austin, Texas 78734-4775
Telephone: (512) 263-2165
Facsimile: (512) 263-2166
bshelton@sheltoncoburn.com

coburn@sheltoncoburn.com

Melissa Smith
GILLAM & SMITH
303 S. Washington Ave.
Marshall, Texas 75670
Telephone:  (903) 934-8450
melissa@gillamsmithlaw.com

*Attorneys for Defendants Seattle SpinCo, Inc., Micro Focus LLC f/k/a EntIT Software LLC, Micro Focus Interactive Israel Ltd. f/k/a Entco Interactive (Israel) Ltd, Micro Focus Government Solutions LLC f/k/a Entco Government Software LLC, and Micro Focus (US) Inc.*

## CERTIFICATE OF SERVICE

I certify that the foregoing document is being served via the Court's CM/ECF system on

May 20, 2021, on all counsel of record who consent to electronic service per Local Rule CV-

5(a)(3) or otherwise, as required by local and federal rules.

/s/ *L. Rex Sears*